IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

In re

RECIPROCAL OF AMERICA (ROA)
SALES PRACTICES LITIGATION

Master File No. MDL 1551

This Document Relates to:
Civil Action No. 04-2313

---

ORDER GRANTING MOTION OF DEFENDANT CREWS & HANCOCK, P.L.C.
TO DISMISS

---

## INTRODUCTION

Before the Court in this multi-district litigation is the motion of the Defendant, Crews &

Hancock, P.L.C. ("C&H") to dismiss the complaint filed against it by the Plaintiff, Alfred W. Gross

("Gross," "Plaintiff," or the "Receiver"), Commissioner of Insurance of the Commonwealth of

Virginia and deputy receiver of Reciprocal of America ("ROA"), a Virginia unincorporated

association and reciprocal insurer, and  and The Reciprocal Group ("TRG"), a Virginia non-stock

corporation, pursuant to Rules 9(b)  and 12(b)(6) of the Federal Rules of Civil Procedure.[1]

## FACTUAL ALLEGATIONS

The Plaintiff has summarized the facts alleged in this litigation as follows:

This case arises from the insolvency of a Virginia reciprocal insurer, ROA, and three
Tennessee reciprocal risk retention groups that were largely reinsured by ROA,
[Doctors Insurance Reciprocal, Risk Retention Group ("DIR"), The Reciprocal
Alliance, Risk Retention Group ("TRA") and American National Lawyers Insurance
Reciprocal, Risk Retention Group ("ANLIR")].  ROA was first organized in
response to a perceived shortage in the Virginia market of medical liability
(especially hospital liability) insurance options.  For many years, the company
seemed to grow and do well, returning to its hospital-owners substantial dividends.

---

[1] Collectively, ROA and TRG are referred to herein as "ROA/TRG."

1

The benevolent period during which this growth occurred emboldened management, especially the enterprising attorney (Crews), who had first organized ROA and served as its general counsel.  Together with his law firm, Crews & Hancock, and his associates in senior management and the board of directors (eventually including defendants Bland, Patterson, Kelley, Hudgins, McLean, and Davis, in his capacity as chairman of the board of DIR), Crews took ROA (initially known as [Virginia Professional Underwriters, Inc. ("VPUI") and The Virginia Insurance Reciprocal ("TVIR")]) from a small, single-state hospital insurer to a multi-state major player in the liability insurance market.  During this time the company grew in size and complexity, diversifying its coverage by adding physician and lawyer malpractice, as well as workers' compensation and other types of insurance.  In due course, the three Tennessee risk retention groups were created to avoid some of the burdens of Virginia insurance regulation and to specialize in some of the newer lines of business (physician malpractice for DIR, attorney malpractice for ANLIR, and health care liability for TRA), enabling segregation of risk as well.  Crews participated actively in the management of the four insurance companies which, in many respects, were under common management.  However, each was owned by a different group of policyholders/owners.  Three of the four reciprocal insurance companies (i.e., DIR, TRA, and ANLIR) also qualified as lightly regulated Tennessee risk retention groups, a key reason for their formation.  Those three companies were largely reinsured by ROA, the Virginia reciprocal, so that ultimately the latter became liable for most of their insurance risks.

During the 1970s and 1980s a number of well-publicized insurance insolvencies sensitized the insurance-buying public, especially commercial insureds, to the importance of financial soundness.  Ratings accorded insurers by independent organizations, like A.M. Best, took on added value in the marketplace.  Crews and his associates understood well the need to address that concern as a precursor to successful competition for lucrative new customers.  For a young, and relatively small, insurer like ROA, the appearance of financial stability could be created without actually amassing the necessary capital and surplus, a daunting and very lengthy process.  Instead, they could arrange for a well-respected and well-heeled reinsurer to at least appear to stand behind its obligations through reinsurance.  Of great value, this enabled the reinsured, ROA, to utilize Best's rating of the reinsurer.  For this role, Crews and his associates selected one of the world's largest reinsurers, [General Reinsurance Corporation ("Gen Re")].  From the beginning, Crews had close business and personal ties with Gen Re and its management (including at various times, Reindel, Kellogg, and Seeger).  Together these individuals, along with others, formed an informal "*de facto*" partnership to improve the appearance of ROA's balance sheet and stated surplus by ceding business from ROA to Gen Re.  ROA was accorded superior ratings from <u>Best's Insurance Reports</u> in part because of ROA's reinsurance relationship with Gen Re, which A.M. Best rated A++ Superior.  <u>Best's Insurance Reports</u> noted that "ROA's principal reinsurer is Gen Re." From a regulatory perspective, this permitted ROA to reduce the liability it had to

recognize on its books by the amount for which the reinsurer would be liable (referred to in the industry as "reserve credit"). By providing ROA with this reinsurance, Gen Re earned lucrative ceding commissions from ROA. But the arrangement was structured so that, in reality, the risk assumed by Gen Re was minimal. Indeed, Gen Re entered into, and participated in, this arrangement with the full expectation that every year it would earn valuable reinsurance premiums with little danger of experiencing a net loss. At times, the illusion of reinsurance was additionally maintained through deceptive financial reinsurance, in which loans from Gen Re to ROA and [First Virginia Reinsurance, Ltd. ("FVR")] were guised as substantial insurance risk of net loss.

Crews and other members of management also sought to minimize regulatory oversight and taxation of ROA, ANLIR, DIR, and TRA and their owners. Toward this end, Crews formed the offshore Bermuda captive FVR to serve as reinsurer for ROA's physicians and attorney liability insurance business (and later, ROA's net retained share of risk on the DIR and ANLIR business), thereby enabling profits on that business to accumulate on a tax deferred basis. Atlantic Security and Witkowski served as FVR's agents in Bermuda. An offshore reinsurer's profits are not subject to United States taxation so long as the reinsurer does no business in the United States. Crews devised the use of FVR as a means to hold profits from ROA's retained business (for use as surplus to policyholders) while sheltering ROA's physician and lawyer subscribers from taxation on those profits until distribution. But, under Virginia law, reserve credit for reinsurance provided by offshore companies can only be taken to the extent of an acceptable security trust funded and maintained in the U.S. Moreover, this reliance by ROA upon FVR as reinsurer brought the latter within the scrutiny of Virginia insurance officials.

Starting in or about 1990, when regulators began asking too many questions about FVR, Crews' law firm and other defendants arranged for Gen Re to remove FVR from the regulators' scrutiny by providing "accommodation" reinsurance to ROA for all of the business that ROA formerly ceded directly to FVR. Pursuant to this "accommodation reinsurance" arrangement, Gen Re would "accommodate" ROA by acting as a "pass-through" between ROA and FVR, with ROA ceding risk as reinsurance to Gen Re and Gen Re "retroceding" 100% of that risk to FVR. FVR remained the ultimate "retrocessionaire," but the "accommodation" enabled ROA to report only Gen Re (with its strong balance sheet), and not FVR, as a reinsurer of ROA, thereby removing FVR from the scrutiny of regulators. As Gen Re later explained, "Reinsurance assumed by FVR was always intended to be 'accommodation reinsurance.' If this was real reinsurance, rates would have been different.'"

As the insurance enterprise became less lucrative and economic challenges increased, FVR became chronically underfunded to meet its obligations to Gen Re on the risks ceded from ROA to Gen Re to FVR. If FVR had not been removed from

scrutiny of ROA's regulators pursuant to the "accommodation" arrangement with Gen Re, ROA's reserve credit for the business ceded would have been at risk, because such a credit could only have been claimed to the extent of FVR's ability to secure its reinsurance obligations.

Unwilling to take on the increased reinsurance risk from ROA's mounting losses, Gen Re eventually demanded in October, 2000, that the "understanding" behind the "accommodation reinsurance" scheme be memorialized in writing--albeit in the 2000 Unreported Side Agreement kept hidden from the public. Subsequently, ROA's losses grew even worse. Gen Re feared the possibility that it would be found accountable for what the outside public thought was "real reinsurance," and thus in late 2000 devised a complicated plan which would "virtually eliminate" Gen Re's reinsurance risk of net loss as if "Gen Re were never there." Effective on or about December 31, 2001, Gen Re ceased providing "accommodation" reinsurance that required it to be at risk for FVR's financial condition. ROA resumed ceding certain risks directly to FVR, and the Wachovia-FVR Trust was established to secure FVR's reinsurance obligations to ROA. Wachovia served as trustee of the Wachovia-FVR Trust[,] which also became chronically underfunded.

Crews' law firm, Crews & Hancock, reaped substantial fees for legal work performed for ROA, which fees ultimately benefitted the partners at Crews & Hancock, including Crews and Bland. Besides Crews, other members of management came and went, but for the relevant years included McLean, Patterson, Hudgins, and Kelley, all of whom benefitted from the business in the way of substantial salaries and perquisites. A lesser, but significant participant was Davis, who served as Chairman of the Board for DIR, for which he, too, was paid a salary.

Independent auditors and certified actuaries for ROA, ANLIR, DIR, TRA, and FVR also came and went. However, for the relevant years, the independent auditor was [Pricewaterhouse Coopers, LLP ("PwC")] (whose engagement partner was Stephani) and the certified actuary was Milliman (whose work was performed by Sanders). Milliman (beginning in 1997) and PwC (beginning in 1999) reaped substantial fees for having, and maintaining as clients, ROA, ANLIR, DIR, TRA, and FVR.

Eventually, ROA and DIR experienced extreme financial difficulty, due in large part to the nature of the "accommodation reinsurance" scheme, which enabled the companies to grow at an accelerated rate, and generate disproportionate profits, without ever providing the necessary capital and surplus that is essential to weather the inevitable cycles and developments. In order to maintain the false appearance of ROA's continued financial viability and therefore enable themselves to continue and maximize the benefits they were receiving from their association with ROA/TRG (or, in some instances to receive preferential payments), the Management Defendants (Crews, Patterson, Hudgins, and Kelley), McLean, the Gen Re Defendants (Gen Re, Seeger, Kellogg, and Reindel), Crews & Hancock, Bland,

Davis, Witkowski, Atlantic Security, Milliman, Sanders, Stephani, PwC, and Wachovia conspired to participate, and did participate, in various fraudulent schemes . . .

The fraudulent schemes included various types of "creative accounting," arbitrary reductions in DIR's and ROA's claim reserves, reinsurance agreements that did not transfer substantial insurance risk of net loss, nondisclosure of modifications to reinsurance agreements that rendered much of ROA's reinsurance receivables from Gen Re illusory, and disguised misappropriations of funds from ROA and the Wachovia-FVR Trust.  The defendants appeared to have believed that if they could just conceal ROA's financial troubles long enough, ROA eventually could emerge from a hazardous financial condition without regulators ever being the wiser. Unfortunately, but predictably, things went from bad to worse, and the defendants' success in postponing regulatory intervention resulted in the deepening of ROA's insolvency.

ROA's concealed insolvency finally came to light only after, in late December of 2002, Virginia regulators discovered the 2002 Unreported Side Agreement and its $135 million aggregate cap, and other financial irregularities. . . .

(Deputy Receiver's Resp. and Mem. In Opp'n to Mot. to Dismiss of Def. Ronald K. Davis, M.D. at pp. 1-7) (internal citations omitted). In the amended complaint, as to C&H Gross alleges violation of  the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., common law conspiracy, common law fraud and constructive fraud, breach of contract for legal services, misappropriation of trust funds, tortious interference with trust agreement, breach of fiduciary duty, avoidance of voidable transfer and fraudulent conveyances, and accounting.

## CHOICE OF LAW

The Judicial Panel on Multidistrict Litigation transferred the instant action to this Court from the United States District Court for the Eastern District of Virginia pursuant to 28 U.S.C. §§ 1407. In such circumstances, the law of the transferee forum generally controls with regard to claims under federal law.  See e.g., In re Korean Air Lines Disaster of September 1, 1983, 829 F.2d 1171 (D.C. Cir.1987) ("[T]he law of a transferor forum on a federal question ... merits close consideration, but

5

does not have stare decisis effect in a transferee forum situated in another circuit."); In re Litigation Involving Alleged Loss of Cargo from Tug Atlantic Seahorse, Sea Barge 101 Between Puerto Rico and Florida in Dec. 1988, 772 F. Supp. 707, 711 (D. Puerto Rico 1991) (noting that, with respect to federal claims, "[a] transferee district court is bound, ultimately, to follow only the law of its own circuit court and the Supreme Court, and that law must be presumed to be as "correct" a statement of federal law as that of the transferor circuit."); In re National Century Financial Enterprises, Inc., Inv. Litigation, 323 F. Supp.2d 861, 876 (S.D. Ohio 2004) ("the rule in multidistrict litigation is that the transferee court, in interpreting federal law, should apply the law of its own circuit rather than the law of the transferor court's circuit.")

By contrast, to the extent that a matter transferred pursuant to 18 U.S.C. § 1407 concerns issues of state law, a transferee court "must apply the state law that would have applied to the individual cases had they not been transferred for consolidation." In re Temporomandibular Joint (TMJ) Implants Products Liability Litigation, 97 F.3d 1050, 1055 (8th Cir. 1996); see also In re Parmalat Securities Litigation, 412 F. Supp.2d 392, 399 (S.D.N.Y. 2006); In re Air Crash at Detroit Metropolitan Airport, Detroit, Mich. on Aug. 16, 1987, 791 F. Supp. 1204, 1232 (E.D. Mich.1992) ("application of the choice of law rules of the transferor state . . . to all substantive state-law claims and issues" in an action transferred pursuant to § 1407 is a "well-established proposition of law"). Accordingly, as this case was filed in the United States District Court for the Eastern District of Virginia, Virginia's substantive state law, including choice-of-law rules, govern the resolution of all state law claims.

<u>STANDARD OF REVIEW</u>

The Defendants have filed this motion pursuant to Rules 12(b)(6) and 9(b) of the Federal

Rules of Civil Procedure. Rule 12(b)(6) permits dismissal of a lawsuit for failure to state a claim upon which relief could be granted. See FED. R. CIV. P. 12(b)(6). The Rule requires the Court to "construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle relief." Grindstaff v. Green, 133 F.3d 416, 421 (6th Cir. 1998). "The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim," Conley v. Gibson, 355 U.S. 41, 47 (1957). However, "[t]o avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all the material elements of the claim." Wittstock v. Mark a Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003).

Rule 9(b) provides that "[i]n all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." FED. R. CIV. P. 9(b). The Rule serves to put defendants on notice of the conduct complained of by the plaintiff to ensure that they are provided sufficient information to formulate a defense. Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 679 (6th Cir. 1988). The Sixth Circuit interprets the particularity requirement "liberally, . . . requiring a plaintiff, at a minimum, to allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." Coffey v. Foamex L.P., 2 F.3d 157, 162 (6th Cir. 1993) (internal quotations and citations omitted); Blount Financial Services, Inc. v. Walter E. Heller and Co., 819 F.2d 151, 152 (6th Cir. 1987) ("Fraud alleged in a RICO civil complaint for mail fraud must state with particularity the false statement of fact made by the defendant which the plaintiff relied on and the facts showing the plaintiff's reliance on defendant's false statement of fact."); see also Evans v.

Pearson Enterprises, Inc., 434 F.3d 839, 852 -853 (6th Cir. 2006) (affirming dismissal of fraud action

where plaintiff failed to plead reliance with particularity as required by Rule 9(b)).

    In ruling on a motion pursuant to Rule 9(b), a court must read the particularity requirement

in harmony with the "policy of simplicity in pleading" advanced by Federal Rule of Civil Procedure

8, which requires that a complaint provide only a "short and plain statement of the claim." Michaels

Bldg. Co., 848 F.2d at 679 (quoting FED. R. CIV. P. 8).   Accordingly, courts should not be "too

exacting" or "demand clairvoyance from pleaders" in determining whether the requirements of Rule

9(b) have been met. Id. at 681.  Rather, "if the defendant has fair notice of the charges against him,

[Rule 9(b)] is satisfied." Shapiro v. Merrill Lynch & Co., 634 F. Supp. 587, 593 -594 (S.D. Ohio

1986); see also Michaels Bldg. Co., 848 F.2d at 680.  However, "a district court need not accept

claims that consist of no more than mere assertions and unsupported or unsupportable conclusions."

Sanderson v. HCA - The Health Care Co., No 04-6342, 2006 WL 1302479, *2 (6th Cir. 2006).

## ANALYSIS

### I. Count One

    In Count 1 of the amended complaint, Plaintiff alleges that C&H, among others, violated §

1962(c) of RICO, which provides that

> [i]t shall be unlawful for any person employed by or associated with any enterprise
> engaged in, or the activities of which affect, interstate or foreign commerce, to
> conduct or participate, directly or indirectly, in the conduct of such enterprise's
> affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  In order to establish a RICO violation, the Plaintiff must show that C&H

engaged in "(1) conduct, (2) of an enterprise (3) through a pattern (4) of racketeering activity."

Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985).

"In addition, the plaintiff only has standing if, and can only recover to the extent that, he has been

injured in his business or property by the [predicate acts] constituting the violation." Id. at 496, 105 S.Ct. at 3285; see also 18 U.S.C. § 1964(c). In the instant motion, C&H allege that the Plaintiff has failed to state a claim for a violation of RICO and, on that basis, contend that the complaint must be dismissed.[2] (Def.'s Mem. Supp. Mot. Dismiss ("Def.'s Mot.") at 16-32.)

A "pattern of racketeering activity" is demonstrated by "at least two acts of racketeering activity, one of which occurred after the effective date of [RICO] and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity."  18 U.S.C. § 1962(c), § 1961(5).  In addition, proof of a pattern of racketeering activity requires a showing that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."  H.J., Inc., v. Northwestern Bell Telephone Co., 492 U.S. 229, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989).  In the instant action, Plaintiff's RICO claim is premised on predicate acts of mail and wire fraud.  (Am. Compl. ¶ 430.) § 1961(1) enumerates specific acts which constitute racketeering activity, including acts of mail fraud indictable under the federal mail fraud statute, 18 U.S.C. § 1341,[3] and acts of wire fraud indictable under the federal wire fraud statute, 18

---

[2] In addition to the arguments set forth in the instant motion, C&H incorporates by reference Section II of the memorandum of Defendants William Crews, Judith A. Kelley, and Gordon D. McLean in support of their motion to dismiss the Gross complaint as it relates to C&H.  (Case 04-2313, Docket 24.) In addition, C&H incorporates by reference Section I of Defendant Richard W.E. Bland's memorandum in support of his motion to dismiss the Gross and Flowers complaints.  (Case 04-2313, Docket 23.)

[3] 18 U.S.C. § 1341, provides in relevant part that
[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate

U.S.C. § 1343.[4]  18 U.S.C. § 1961(1)(B).  In order to be "indictable" and thus, to sustain a claim

under the RICO Act, each element of the predicate act must be proved.  <u>Central Distributors v.

Conn</u>, 5 F.3d 181, 183-84 (6th Cir.1993).  Moreover, as noted above, to survive a motion to dismiss

pursuant to Federal Rule of Civil Procedure 9(b), the complaint must plead the circumstances of the

mail and wire fraud with particularity.  FED. R. CIV. P. 9(b).

   "The elements of mail and wire fraud are: (1) a scheme to defraud, and (2) use of the mails,

or of an interstate electronic communication, respectively, in furtherance of the scheme." <u>Advocacy

Org. for Patients and Providers v. Auto Club Ins. Assoc.</u>, 176 F.3d 315, 322 (6th Cir.1999); <u>see</u> <u>also</u>

<u>Carpenter v. U.S.</u>, 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 320 (1987) (noting that the same analysis

applies to offenses under both the mail and wire fraud statutes).  The Sixth Circuit has defined a

> scheme to defraud as intentional fraud, consisting in deception intentionally
> practiced to induce another to part with property or to surrender some legal right, and
> which accomplishes the designed end.   In other words, in order to present a
> cognizable claim for fraud, the plaintiff[] must show that [the defendants] made a
> material misrepresentation of fact that was calculated or intended to deceive persons
> of reasonable prudence and comprehension, and must also show that [the] plaintiff[]
> in fact relied upon that material misrepresentation.

<u>VanDenBroeck v. CommonPoint Mortg. Co.</u>, 210 F.3d 696, 701 (6th Cir. 2000) (internal quotations

_____

> carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be
> delivered by mail or such carrier according to the direction thereon, or at the place at which
> it is directed to be delivered by the person to whom it is addressed, any such matter or thing,
> shall be fined under this title or imprisoned not more than 20 years, or both.

 18 U.S.C. § 1341.

> [4] 18 U.S.C. 1343 provides that
> [w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for
> obtaining money or property by means of false or fraudulent pretenses, representations,
> or promises, transmits or causes to be transmitted by means of wire, radio, or television
> communication in interstate or foreign commerce, any writings, signs, signals, pictures,
> or sounds for the purpose of executing such scheme or artifice, shall be fined under this
> title or imprisoned not more than 20 years, or both . . .

 18.U.S.C. § 1343.

and citations omitted); see also Advocacy Org., 176 F.3d at 322 (quoting Kenty v. Bank One, Columbus, N.A., 92 F.3d 384, 389-90 (6th Cir.1996)); Central Distributors, 5 F.3d at 184; Blount Financial Services, Inc., 819 F.2d at 152-53.

In Neder v. United States, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), the United States Supreme Court held that the "common-law requirements of 'justifiable reliance' and 'damages' . . . plainly have no place in the federal [mail and wire] fraud statutes." Neder, 527 U.S. at 24-25, 119 S.Ct. at 1841. In reaching this conclusion, the Supreme Court relied on the express language of the fraud statutes, noting that, by imposing such requirements, the statutes' prohibition on the "scheme to defraud," rather than the completed fraud, would be thwarted. Id. However, as noted in the quoted passage from VanDenBroeck, Sixth Circuit case law consistently espouses a reliance requirement to establish RICO claims. VanDenBroeck, 210 F.3d at 701. In Chaz Construction, L.L.C. v. Codell, LLC, 137 Fed. Appx. 735 (6th Cir. 2005), the Sixth Circuit addressed this seeming conflict and determined that, while, to be consistent with Neder, a "plaintiff need not plead detrimental reliance as an *element* of each predicate act of mail or wire fraud underlying his RICO claims," reliance must be demonstrated to establish standing in a civil RICO case. Brown v. Cassens Transport Co., 409 F. Supp.2d 793, 807 (E.D. Mich. 2005)(citing Chaz Construction, L.L.C., 137 Fed. Appx. at *2.) (emphasis added). In reaching this conclusion, the Sixth Circuit distinguished Neder on the basis that, unlike a criminal prosecution under the federal mail fraud statute, a plaintiff must have standing to pursue civil RICO claims.[5] Chaz Construction,

---

[5]   As indicated in the quoted passage from VanDenBroeck, see supra p.10, courts in this circuit considering RICO claims predicated on acts of mail and wire fraud often conflate the standing issue with discussion of the existence of the predicate acts. VanDenBroeck, 210 F.3d at 701 (holding, in a civil RICO case based upon predicate acts of mail and wire fraud, that the plaintiff must plead that he "relied upon [a] material misrepresentation" to establish the fraud statutes' requisite "scheme to defraud"). In light of Neder and Chaz Construction, the Court will address the matters separately.

L.L.C., 137 Fed. Appx. at *2-3.

RICO's statutory standing provision, 18 U.S.C. § 1964(c), provides a private cause of action under RICO for "[a]ny person injured in his business or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c).  In interpreting this provision, the United States Supreme Court has held that "[a] plaintiff's right to sue under § 1964(c). . . requires a showing that the defendant's violation was the proximate cause of the plaintiff's injury."  Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 112 S.Ct. 1311, 1312 (1992) (concerning standing in a RICO action predicated on acts of securities fraud).  According to the Holmes court, in this context, "proximate cause" requires "some direct relation between the injury asserted and the injurious conduct alleged."  Id. at 268, 112 S.Ct. 1311; see also Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (finding, in RICO action based on predicate acts of mail and wire fraud, that a plaintiff's damages must "flow from the commission of the predicate acts."); Trollinger v. Tyson Foods, Inc., 370 F.3d 602, 612 (6th Cir. 2004) (citing Holmes for the proposition that RICO statutory standing requires a showing of proximate cause).

The Sixth Circuit has interpreted § 1964(c)'s causation requirement to require a plaintiff to plead reliance in order to state a civil RICO claim predicated on acts of fraud.[6]  See Chaz

---

[6] Several other circuits similarly impose reliance as a standing requirement for RICO actions involving fraud.  See Summit Props. Inc. v. Hoechst Celanese Corp., 214 F.3d 556, 562 (5th Cir.2000) ("when civil RICO damages are sought for injuries resulting from fraud, a general requirement of reliance by the plaintiff is a commonsense liability limitation"); Chisolm v. TranSouth Financial Corp., 95 F.3d 331, 337 (4th Cir. 1996) (explaining that the Fourth Circuit's requirement that civil RICO plaintiffs demonstrate detrimental reliance "ensures the existence of a 'direct relation between the injury asserted and the injurious conduct alleged' required under Holmes); Appletree Square I, Ltd. P'ship v. W.R. Grace & Co., 29 F.3d 1283, 1286 (8th Cir.1994) ("In order to establish injury to business or property 'by reason of' a predicate act of mail or wire fraud, a plaintiff must establish detrimental reliance on the alleged fraudulent acts."); Metromedia Co. v. Fugazy, 983 F.2d 350, 368 (2d Cir.1992), abrogated on other grounds as recognized in Yung v. Lee, 432 F.3d 142, 147-48 (2d Cir.2005) ( "[i]n the context of an alleged RICO predicate act of mail fraud, we have stated that to establish the required causal connection,

Construction, L.L.C., 137 Fed. Appx. at *2; Central Distributors, 5 F.3d at 184; Blount Financial

Services, Inc., 819 F.2d at 152 ; Brown, 409 F. Supp.2d at 807;  Moon v. Harrison Piping Supply,

375 F. Supp.2d 577, 597 (E.D. Mich. 2005) (citing Grantham and Mann, Inc. v. American Safety

Products., Inc., 831 F.2d 596, 605 (6th Cir.1987)); Armbruster v. K-H Corporation, 206 F. Supp.2d

870, 898 (E.D. Mich.2002) (holding that a civil RICO complaint based upon predicate acts of mail

fraud must plead the plaintiff's reliance upon the defendant's misrepresentation);  Paycom Billing

Services, Inc. v. Payment Resources Int'l, 212 F. Supp.2d 732, 736 (W.D. Mich.2002) (holding that

a civil RICO complaint based upon predicate acts of mail fraud must plead the plaintiff's reliance

upon the defendant's material misrepresentation).   The reliance requirement has been further

interpreted to mean that "[a plaintiff] cannot maintain a civil RICO claim [predicated on mail or wire

fraud] against . . . defendants absent evidence that the defendants made misrepresentations or

omissions of material fact to [the plaintiff] and evidence that [the plaintiff] relied on those

misrepresentations or omissions to its detriment."  Central Distributors, 5 F.3d at 184.

Among many arguments as to why the Plaintiff's RICO claim should be dismissed, C&H

assert that Plaintiff has failed to make this required showing.  (Def.'s Mot. at 22-23.)  Specifically,

the Defendant argues that the complaint relies entirely on allegations of misrepresentations or

omissions to regulators rather than to ROA/TRG.  (Mem. Supp. Def.'s Mot. Dismiss Am. Compl.

("Def.'s Mot.") at 33.)  Because the complaint fails to assert, other than in conclusory fashion, that

C&H made misrepresentations or omissions to ROA/TRG *and* that ROA/TRG relied on them to its

detriment, C&H contends that the Plaintiff lacks standing under RICO. (Def.'s Mot. at 33-35.) In

---

the plaintiff was required to demonstrate that the defendant's misrepresentations were relied on.")

response to C&H's assertions, the Plaintiff alleges that ROA/TRG suffered injury as a direct result of its reliance on "the RICO Defendants'" racketeering activity, comprised of multiple acts of mail and wire fraud based on some thirteen alleged schemes to defraud.  (Pl.'s Resp. at 34-36.) In support of this contention, the Receiver directs the Court to the following specific paragraphs of the complaint in which reliance is alleged:

¶ 2        Plaintiff Alfred W. Gross, Commissioner of Insurance, Bureau of Insurance (the "Bureau"), State Corporation Commission of the Commonwealth of Virginia ("the Commission"), is the Deputy Receiver (the "Deputy Receiver") of ROA and TRG [collectively referred to herein as the "Companies"], in receivership for liquidation.  TRG is, and at all times relevant was, a Virginia non-stock corporation.  ROA is, and was at all times relevant, a Virginia unincorporated association and reciprocal insurer.  The Deputy Receiver asserts claims belonging to the Companies for the benefit of policy holders, insureds, and other creditors.  As authorized by the order appointing him pursuant to VA. CODE ANN., Title 38.2, Chapter 15 ("Chapter 15"), the Deputy Receiver also asserts claims on behalf of subscribers, members, insureds, policyholders, or creditors of the Companies that are common to them and result from the insolvency of the Companies, or are derivative claims, in that they involve injury to policyholders and creditors only insofar as the underlying conduct violated some legal duty to the Companies, thereby decreasing the assets of the estate to which policy holders and creditors must look for satisfaction of their debts.  The Deputy Receiver does not purport to assert any of the personal claims for injuries to individual policyholders and creditors that may have resulted directly from Defendants' violation of legal duties owed directly to them.

¶ 122      Specifically, the pattern of racketeering activity consisted of the use of fraudulent schemes involving certain undisclosed insurance rebates and aggregate "caps" on reinsurance (at least some of which required the prior written approval of regulators), deceptive reinsurance agreements involving no substantial transfer of insurance risk of net loss to the assuming reinsurer, arbitrary reserve write-downs, fraudulent financial transactions and reports, and fraudulent abuse of a regulated trust fund, all implemented and furthered by multiple instances of mail and wire fraud.  At all relevant times, the Companies relied on the material misrepresentations and omissions that were part of the pattern of racketeering activity, as alleged in greater detail in the paragraphs that follow.

¶ 126      The RICO Defendants' criminal acts had the actual result of misrepresenting

14

and concealing ROA/TRG's true financial condition from the companies, their policyholders and creditors, regulators, A.M. Best, and the public, thereby postponing the placing of ROA/TRG in receivership and enabling the RICO Defendants to prolong their receipt of salaries, perquisites, or contractual remuneration from ROA/TRG, or currying of favor with their respective employers (or masters or co-principals.)   During this time, ROA/TRG amassed increased liabilities, so that by the time ROA and TRG were placed in receivership, they were deeply and hopelessly insolvent.

¶ 395    The fraudulent conspiracy among the RICO Defendants (including Crews, Bland, Patterson, Hudgins, Crews & Hancock, Atlantic Security, Witkowski, and Wachovia) to cause the Companies to repay the second $2.5 million principal installment to Wachovia on July 31, 2002 (in part made possible by the negligence of PwC and Stephani), reduced by $2.5 million the assets in the Wachovia-FVR Trust that were held in trust as security for FVR's obligations to ROA pursuant to Retrocession Agreement No. 2002-1 and the Unreported Indemnification Agreement, thereby proximately causing a $2.5 million injury to ROA.

¶ 402    These withdrawals[7] reduced the assets in the Wachovia-FVR Trust that were held in trust as security for FVR's obligations to ROA pursuant to Retrocession Agreement No. 2002-1 and then Unreported Indemnification Agreement, thereby proximately causing additional injury to ROA in an amount exceeding $1.3 million.

¶ 404    On information and belief, the Management Defendants caused $1.85 million of the net cessions due to FVR for the second quarter of 2002, which should have been placed in the Wachovia-FVR Trust, to be used instead to fund a loan to ANLIR.  This misappropriation of funds caused injury to ROA in that amount, because the $1.85 million should have served as security for FVR's obligations to ROA under Retrocession Agreement No. 2002-1.

¶ 415    The deposit[8] was improper (because it was FVR, not ROA, which had a contractual duty to fund the Wachovia-FVR Trust), and injured ROA in the amount of $24.4 million, representing funds in the Wachovia-FVR Trust

---

[7]  The "withdrawals" referred to in ¶ 402 are the withdrawal of $1,148,890.41 on September 25, 2002 from the Wachovia-FVR Trust by "one or more of the Management Defendants" for payment to HSG Reinsurance, Ltd. and the October 11, 2002 withdrawal of $200,000 by Hudgins to be paid to FVR from the Wachovia-FVR Trust.  (Am. Compl. ¶ 400.)

[8]  The "deposit" referred to in ¶ 415 was a deposit of $24.4 million of ROA funds made on December 3, 2002 in the Wachovia-FVR Trust by "one or more of the Management Defendants."  (Am. Compl. ¶ 414.)

which, in equity and good conscience, belong to ROA outright.

¶ 417    ROA had a statutory duty to comply with insurance laws establishing minimum surplus to policyholders, in order to ensure ROA's financial viability, and its ability to pay insurance claims.  The Bureau had the statutory responsibility to monitor ROA and ensure ROA's ability to pay insurance claims.  ROA and the Bureau's staff reviewed PwC's audit reports, Milliman's actuarial opinions, reinsurance contracts entered into between ROA and Gen Re, ROA's quarterly and annual statutory financial statements prepared by the Management Defendants, and ROA's annual RBC reports.

¶ 418    ROA and the Bureau's staff relied on PwC's unqualified audit opinions, Milliman's actuarial opinions, the completeness of the contracts of reinsurance between ROA and Gen Re, ROA's statutory financial statements prepared by the Management Defendants, and ROA's RBC reports, to accept that ROA's statutory financial statements fairly presented its financial position, and that ROA maintained not less than the minimum required surplus to policyholders.

¶ 419    Because ROA's statutory financial statements showed ROA to be solvent, and because ROA's RBC reports indicated that ROA maintained not less than the minimum required surplus to policyholders, ROA continued, and the Bureau allowed ROA to continue, issuing new policies and taking on new debts.

¶ 420    In actual fact, ROA's statutory financial statements and RBC reports materially misrepresented its true financial condition, and surplus to policyholders. ROA's surplus to policyholders was inflated by the above-detailed schemes alone, by <u>at least</u> $5,372,5000 as of September 30,2000, by <u>at least</u> $27,275,993 as of December 31, 2000, <u>at least</u> $33.3 million as of September 30, 2001, by <u>at least</u> $20.4 million as os December 31, 2001, not to mention the as-yet undetermined effect of the 2000 Unreported Side Agreement, by <u>at least</u> $30 million as of March 31, 2002 (as a result of the 2002 Unreported Side Agreement), by an as-yet undetermined amount due to credit wrongfully taken for the MHP commutation as of June 30, 2002 and as a result of the 2002 Unreported Side Agreement, and by <u>at least</u> $42.5 million as of September 30, 2002 (as a result of the 2002 Unreported Side Agreement and Treaty 9016).

¶ 421    In its September 25, 3003, report to the Board of Directors of ROA, PwC opined that ROA's 2001 statutory financial statements were materially misstated and that, adjusted for the misstatements, ROA's surplus to policyholders was only $37,578,807, which was below the RBC calculated Authorized Control Level.  This triggered additional regulatory corrective

action pursuant to Chapter 55 of the Virginia Insurance Code.  But even this low surplus to policyholders  did not factor in the effect of the 2002 Unreported Side Agreement, with its $135 million aggregate cap.  Note 3 to ROA's amended 2001 statutory financial statements made the following representation:

> At December 31, 2001, ROA had unsecured reinsurance recoverables of $337,166,000 from Gen Re.  Gen Re is rated AA++ Superior by A.M. Best Company, an insurance rating service.

In note 13 ("Subsequent Events") to ROA's amended 2001 statutory financial statements, only certain of the related transactions comprising the LPT were reported.  Remarkably, note 13 made no mention of the 2002 Unreported Side Agreement or its $135 million aggregate cap.  This omission was materially misleading and made either negligently or fraudulently.

¶ 422   In late December 2002, after having learned of the 2002 Unreported Side Agreement and its million aggregate cap, and other financial irregularities, the Bureau made a preliminary estimate of ROA's surplus to policyholders and RBC.  ROA's Statement of Operations for the Month Ended October 31, 2002, reported ROA's surplus to policyholders to be $46,742,461.  However, after adjusting for deceptive Treaty 9016, a $5 million aggregate cap, and other irregularities, the Bureau estimated ROA's surplus to policyholders to be only 10% of ACL.  This was a Mandatory Regulatory Control Event.

¶ 423   When the Bureau discovered that ROA was in a hazardous financial condition in late December 2002, ROA was allowed a brief opportunity to demonstrate that it could immediately raise additional capital pursuant to Va. Code Ann. § 38.2-5506(B)(3).  When that effort failed, the Bureau made preparations to place ROA and TRG in delinquency proceedings on January 29, 2003.

¶ 424   Had PwC's audit reports, Milliman's actuarial opinions, the Management Defendants' ROA statutory financial statements, or the Management Defendants' ROA RBC reports been complete and accurate, ROA would have been prohibited sooner from incurring additional liabilities that it would prove unable to pay in full.

¶ 425   As a proximate result of a pattern of racketeering activity, consisting of the use of fraudulent schemes, furthered by multiple instances of mail fraud and wire fraud (such as undisclosed insurance rebates and aggregate "caps" on reinsurance, deceptive reinsurance agreements involving no substantial transfer of insurance risk, arbitrary reserve write-downs, and fraudulent financial transactions and reports), the RICO Defendants were able to avoid or minimize regulatory scrutiny and to conceal, from the Companies, their policyholders and creditors, A.M. Best, and regulators, the true financial

17

condition of ROA/TRG, the financial difficulties of ROA/TRG that eventually developed, and of which they became aware, and the inadequacy of ROA's surplus to policyholders.  This pattern of racketeering activity enabled the RICO Defendants to maximize benefits to themselves from the interstate commerce engaged in, by, and among ROA, Gen Re, and FVR.  Meanwhile, however, this pattern of racketeering activity proximately caused ROA and TRG to incur additional liabilities which it would prove unable to pay in full, resulting in injury to the Companies and, derivatively, to their policyholders and creditors.

¶ 431   The companies relied, to their detriment (and derivatively, to the detriment of their policyholders and creditors), on Defendants' material misrepresentations and fraudulent omissions.

¶ 432   The Companies (and derivatively, their policyholders and creditors) did not benefit from the unlawful acts of the Defendants.  On the contrary, the Companies were injured in their business as a proximate result of such violation of 18 U.S.C. 1962(c), sustaining damages in an amount that is yet to be ascertained (but which is believed to exceed $200 million).

¶ 436   Defendants' conspiratorial acts did not benefit the Companies (or, derivatively, their policyholders and creditors).  On the contrary, the Companies were injured in their business as a proximate result of Defendants' violation of 18 U.S.C. § 1962(c), sustaining damages in an amount that is yet to be ascertained (but which is believed to exceed $200 million).

(Am. Compl. ¶¶ 2, 122, 126, 395, 402, 404, 415, 417-25, 431-32, 436.)

Even assuming that omissions and misrepresentations were alleged in the complaint to have been made by C&H to ROA/TRG[9], the Court, after a review of the more than 500 paragraphs of the

---

[9] Even assuming the complaint adequately alleges misrepresentations or omissions made by C&H, it is unclear whether they can be construed as directed at ROA rather than toward the recipients of the assertions of the company's financial health, namely the regulators and the public.  Contrary to the Plaintiff's argument, based on United States v. Christopher, 142 F.3d 46, 54 (1st Cir. 1998) and United States v. Consentino, 869 F.2d 301, 303-04, 307 (7th Cir. 1989), that the language of the federal fraud statutes does not require that the person deprived of money or property (here, the Plaintiff) be the same person who was actually deceived (here, the regulator), Sixth Circuit precedent appears to require that, at least in civil RICO actions, the omission or misrepresentation be made by the defendant directly to the plaintiff.  See Central Distributors, 5 F.3d at 184 ("the defendant must make a false statement or omission of fact *to the plaintiff* to support a claim of wire fraud or mail fraud as a predicate act for a RICO claim.") (emphasis in original); Brown, 409 F.Supp.2d at 807- 08 ("a plaintiff cannot detrimentally rely upon any alleged fraudulent communications that were not directed to him.").  However, because the Court

amended complaint, agrees with C&H that detrimental reliance has not adequately been plead. Pursuant to Federal Rule of Civil Procedure 9(b), reliance must be plead with particularity.  Blount Financial Services, Inc., 819 F.2d at 152 ("Fraud alleged in a RICO civil complaint for mail fraud must state with particularity the false statement of fact made by the defendant which the plaintiff relied on and the facts showing the plaintiff's reliance on defendant's false statement of fact."); see also Dowling v. Select Portfolio Servicing, Inc., No. 2:05-CV-049, 2006 WL 571895, *7 (S.D. Ohio March 7, 2006) ("the plaintiff must plead the element of reliance with particularity.");  Evans, 434 F.3d at 852 -853 (affirming dismissal of fraud action where plaintiff failed to plead reliance with particularity as required by Rule 9(b)); McGee v. City of Warrensville Heights, 16 F.Supp.2d 837, 850 (N.D. Ohio 1998) (dismissing RICO action where complaint failed to allege misrepresentations or reliance with particularity); Gould, Inc. v. Mitsui Mining & Smelting Co., Ltd., 750 F.Supp. 838, 842-43 (N.D. Ohio 1990) (finding that both the false statement or omission and the reliance thereon by the plaintiff must be pled with particularity in civil RICO action based on mail or wire fraud).

Paragraphs 2, 122, 126, 431, 432, and 436 lack factual details concerning reliance and, at most, offer only general and conclusory statements of detrimental reliance.  Such allegations cannot survive a motion to dismiss pursuant to Rule 9(b).  See Blount Financial Services, Inc., 819 F.2d at 152; see also Piccone v. Board of Directors of Doctors Hosp. of Staten Island, Inc., No. 97 Civ. 8182(MBM), 2000 WL 1219391, *5 (S.D.N.Y. Aug. 8, 2000) (finding complaint paragraph containing no factual allegations and stating in a conclusory fashion that plaintiff relied on misrepresentations and omissions insufficient to establish reliance).

---

concludes that the complaint fails to state a claim for relief under RICO on the basis of reliance, the Court need not address this issue in depth.

Paragraphs 395, 402, 404, and 415 allege that various fraudulent schemes committed by some or all of the RICO Defendants "caused" (¶ 404), "proximately caus[ed]" (¶¶ 395, 402) injury, or simply "injured" (¶ 415) ROA/TRG. (Am. Compl. ¶¶ 395 (Crews, Bland, C&H); 402 (Crews); 404 (Crews); 415 (Crews).)   While these paragraphs do provide some specific factual support regarding circumstances surrounding the fraud alleged, including the persons involved, time, and subject matter, they are deficient for failure to demonstrate reliance by the Plaintiff.   Specifically, the allegations lack an explanation as to whether and how ROA/TRG relied on acts of mail or wire fraud committed by C&H and fail to demonstrate that the injury cited resulted from ROA's reliance thereon.   Taking as true the allegations contained in these paragraphs, at most, they assert that fraudulent actions were undertaken by defendants in this action which resulted in injury to ROA/TRG.   However, such a tenuous relationship between the RICO predicate acts and injury is not sufficient to establish standing pursuant to 18 U.S.C. § 1964(c) in this Circuit.   See Line v. Astro Mfg. Co., Inc., 993 F. Supp. 1033, 1038 (E.D. Ky. 1998) (dismissing RICO claim where complaint failed to allege with particularity the facts showing the plaintiff's reliance on the defendants' statements or omissions.)   Rather, to survive a motion to dismiss pursuant to Rule 9(b), the Plaintiff must plead with particularity that ROA/TRG relied on the cited acts of mail and wire fraud by C&H, and as a result of that reliance, suffered injury.   Blount Financial Services, Inc., 819 F.2d at 152.

Paragraphs 417-425 of the amended complaint describe "[e]conomic [d]amages [p]roximately [r]esulting from the [s]chemes" alleged in the complaint.   (Am. Compl. ¶ 114.)   In essence, these paragraphs summarize the complaint's overarching allegation that ROA/TRG

20

accepted information originating from the defendants in this action[10] as fairly presenting its financial position and, in reliance on that information, ROA/TRG "continued and the Bureau allowed [it] to continue, issuing new policies and taking on new debts." (Am. Compl. ¶ 419.) The allegations detail how the information was misleading and asserts that had the information presented been complete and accurate, "ROA would have been prohibited sooner from incurring additional liabilities that it would prove unable to pay." (Am. Compl. ¶ 420.) As a "proximate result" of this racketeering activity, the Plaintiff alleges that ROA/TRG incurred "additional liabilities which it would prove unable to pay in full, resulting in injury to ROA/TRG and, derivatively, to their policyholders and creditors." (Am. Compl. ¶ 425.)

Absent from these allegations, and fatal to the Plaintiff's claim, are facts demonstrating that ROA/TRG relied on the misrepresentations and omissions of C&H to its detriment. At most, the complaint alleges that, had the *regulators* not been deceived by the RICO Defendants as to the true financial status of ROA/TRG, the regulators would have taken steps to prohibit ROA/TRG from incurring additional liabilities sooner than they ultimately did. What it does not allege, and what is required by this Circuit, is that, had *ROA/TRG* not been deceived by the Defendant as to its true financial condition, it would not have suffered the injuries claimed. For example, the complaint alleges that ROA/TRG suffered injury because it continued to issue new policies despite its hazardous financial condition. (Am. Compl. ¶ 419.) However, there is no indication from the allegations in the complaint that the determination of whether to issue new policies was contingent on the assertion of ROA/TRG's financial health as fraudulently espoused by C&H. Rather, the

---

[10] The cited paragraphs do not attribute particular allegations to C&H, but rather, reference the schemes or particular false financial statements detailed more specifically in other portions of the complaint. The Plaintiff does not allege that C&H was involved in all allegations of fraudulent conduct referenced in paragraphs 415-425.

complaint alleges solely that ROA/TRG continued to operate as usual, but because the *regulators* were deceived, and thus did not act to prohibit ROA/TRG from operating, it suffered injury from doing so.  Because the complaint fails to plead facts demonstrating that the injuries asserted by ROA/TRG were suffered in reliance on fraudulent conduct by the Defendant, the Court cannot conclude that the conduct was the cause of its injuries.

As noted above, the Sixth Circuit is not alone in imposing a reliance requirement to establish proximate cause in civil RICO actions predicated on fraud.  See supra p.12 n.6; see also  Summit Properties Inc. v. Hoechst Celanese Corp., 214 F.3d 556, 560 (5th Cir. 2000) (noting that "most other circuits . . . require a showing of detrimental reliance" in civil RICO fraud actions and listing cases). The Fifth Circuit has explained that the requirement is consistent with Holmes' "admonition that federal courts employ traditional notions of proximate cause when assessing the nexus between a plaintiff's injuries and the underlying RICO violation." Id. at 560.  "For a misrepresentation to cause an injury, there must be reliance. Knowledge of the truth defeats a claim of fraud because it eliminates the deceit as the "but for" cause of the damages."  Sandwich Chief of Texas, Inc. v. Reliance National Indemnity Ins. Co., 319 F.3d 205, 218-19 (5th Cir. 2003).

However, other courts have found no basis for interpreting a reliance requirement in RICO's standing provision to demonstrate causation.  For example, in Systems Management, Inc. v. Loiselle, 303 F.3d 100 (1st Cir. 2002), the First Circuit Court of Appeals rejected finding such a requirement by reasoning that

> [i]t is true that at common law a civil action for fraud ordinarily requires proof that the defrauded plaintiff relied upon the deception, and some courts have imported this requirement into RICO actions where the predicate acts comprise mail or wire fraud. But RICO bases its own brand of civil liability simply on the commission of specified criminal acts-here, criminal fraud-so long as they comprise a "pattern of racketeering activity"; and criminal fraud under the federal statute does not require

22

"reliance" by anyone: it is enough that the defendant sought to deceive, whether or not he succeeded. . . .

Perhaps there is some surface incongruity in allowing a civil RICO plaintiff to recover for fraudulent acts even though the same plaintiff could not (for lack of reliance) recover for fraud at common law. But Congress structured its civil remedy to allow recovery for harm caused by defined criminal acts, including violation of section 1341; and, as noted, the federal mail fraud statute does not require reliance. Thus, under a literal reading of RICO-the presumptive choice in interpretation-nothing more than the criminal violation and resulting harm is required.

This is not a conclusive argument; common law (and other) concepts can often be imported to flesh out a federal statute. Indeed, we assume here that Congress intended to require not only "but for" but also "proximate cause" to link the criminal act with the harm to the plaintiff, even though the statute says nothing specific on this point. But proximate cause-largely a proxy for foreseeability-is not only a general condition of civil liability at common law but is almost essential to shape and delimit a rational remedy: otherwise the chain of causation could be endless.

By contrast, reliance is a specialized condition that happens to have grown up with common law fraud. Reliance is doubtless the most obvious way in which fraud can cause harm, but it is not the only way . . . There is no good reason here to depart from RICO's literal language by importing a reliance requirement into RICO.

Systems Management, Inc., 303 F.3d at 103-4.

In Holmes, the Supreme Court reasoned that requiring that proximate cause, interpreted as a "direct relation between the injury asserted and the injurious conduct alleged" would sufficiently ensure deterrence of injurious conduct because "directly injured victims can generally be counted on to vindicate the law. . without any of the problems attendant upon suits by plaintiffs injured more remotely." Holmes,  503 U.S. at 269-70, 112 S.Ct. at 1318-19.  In the instant case, ROA/TRG is arguably the party most directly injured as a result of the alleged fraudulent conduct of C&H. However, because ROA/TRG has not demonstrated that *it* relied to *its* detriment on misrepresentations or omissions alleged herein that were directed to *it*, under Sixth Circuit precedent, it does not have standing to pursue RICO claims.

The Court notes that, in what appears to be a means to reconcile this seeming inconsistency, some Circuits which require reliance to establish standing pursuant to 18 U.S.C. § 1964(c) have adopted a "target theory" exception, employed most commonly in cases of competitor fraud.  See e.g. Proctor & Gamble Co. v. Amway Corp., 242 F.3d 539, 564-65 (5th Cir. 2001) ("noting that the Fifth Circuit permits "a target of a fraud that did not itself rely on the fraud [to] pursue a RICO claim if the other elements of proximate causation are present.");  Mid Atlantic Telecom, Inc. v. Long Distance Services, Inc., 18 F.3d 260, 263-64 (4th Cir. 1994) (remanding to allow plaintiff additional discovery to determine whether it was the "target" of the defendant's fraud).  Pursuant to this theory, reliance is excused "when the plaintiff can demonstrate injury as a direct and contemporaneous result of fraud committed against a third party, because in this limited context there is a sufficient 'direct relation between the injury asserted and the injurious conduct alleged' to comport with the RICO requirement of proximate cause."  Sandwich Chief of Texas, Inc., 319 F.3d at 223.  In Proctor & Gamble, the exception was employed where a competitor lured the plaintiff's customers away by fraud directed, not at the plaintiff, but rather at the plaintiff's customers.  Specifically, the defendant spread a rumor among Proctor & Gamble's customers that caused them to cease purchasing the company's products.  Proctor & Gamble Co., 242 F.3d at 564-65.  Because no misrepresentation was directed at the plaintiff, the plaintiff was unable to demonstrate reliance.  However, the Fifth Circuit excused the requirement, finding that proximate cause was satisfied because the plaintiff was the target of the scheme to defraud and suffered direct injury as its result.  Sandwich Chief of Texas, Inc., 319 F.3d at 221-23; but see Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc., 162 F.3d 1290, 1318 (11th Cir.1998) (noting that a plaintiff's injury is not proximately caused by a defendant's misrepresentations when the injury results only from the detrimental reliance of a third

party).

In <u>Sandwich</u>, the Fifth Circuit considered application of the target exception to a case in which regulators rather than the plaintiffs were deceived.  In that action, an insured employer brought a class action suit under RICO against casualty insurance companies that charged excessive premiums on worker's compensation insurance policies claiming that the plaintiff policyholders were injured as a result of the defendants' misrepresentations to regulators regarding the premiums charged.  <u>Id.</u> at 211-13.  Similar to the instant action, the <u>Sandwich</u> defendants claimed that, since the alleged misrepresentations were directed to and relied upon by *regulators*, not the plaintiffs, proximate cause was not satisfied.  While the court left open the possibility that defrauding a regulator could, in some instances proximately cause injury and thus, fall within the Circuit's target exception, it declined to apply the exception because, in order for the policyholder to be injured,

> it would always be necessary for the regulator to be deceived *and* for the policyholder to pay an unlawfully-inflated premium.  Although disclosure of the true premium to a regulator could *prevent* injury to policyholders by prompting the regulator to interdict the carrier's attempt to bill at an inflated rate, concealment of inflated premiums would not result in direct and contemporaneous injury to the policyholder without the additional act of billing. [Thus,] [t]he regulator's reliance on the fraudulent act would not alone be enough to result in a direct and contemporaneous injury to a policyholder that satisfies RICO's proximate cause requirement.

<u>Id.</u> at 224 (emphasis in original).  Here, it appears that the injuries claimed by ROA/TRG were the direct result of the fraudulent schemes by C&H, and others, undertaken to deceive regulators and on which the regulators relied.  However, as noted above, the Sixth Circuit has not adopted the target theory and continues to require that a civil RICO plaintiff demonstrate its personal reliance on a misrepresentation or omission made to it by the defendants.  Because this Court is bound by the law of this Circuit, and because the complaint does not plead reliance with particularity, the Plaintiff's

§ 1962(c) claim must be DISMISSED.

Finally, the Court notes that Plaintiff is not without recourse for the wrongs alleged in this action.  As noted in In re Teledyne Defense Contracting Derivative Litigation,

> . . . RICO was not intended to federalize internal corporate relationships.  If the Corporation and its shareholders were in fact injured by the alleged actions or inactions of the [defendant officers and directors], they are free to pursue traditional breach of fiduciary duty corporate remedies under state law.

In re Teledyne Defense, 849 F. Supp. at 1377.  In addition to ROA/TRG's RICO claims, the complaint also asserts claims under state law for common law conspiracy, common law fraud and constructive fraud, breach of contract for legal services, misappropriation of trust funds, tortious interference with trust agreement, breach of fiduciary duty, avoidance of voidable transfer and fraudulent conveyances, and accounting under Virginia state law.  Rather than attempting to mold RICO to fit the particulars of these claims, they may be more properly addressed under existing state law frameworks.

## II. Count II

Count 2 of the Plaintiff's amended complaint alleges that C&H violated 18 U.S.C. § 1962(d), which prohibits conspiracy to violate the section's other substantive provisions.[11]  18 U.S.C. § 1962(d). The standing requirement of 18 U.S.C. § 1964(c) applies to all claims brought pursuant to RICO, including conspiracy claims under § 1964(d).  Beck v. Prupis, 529 U.S. 494, 500-01, 120 S.Ct. 1608, 1613-14, 146 L.Ed.2d 561 (2000). Accordingly, to have standing to pursue a civil RICO conspiracy claim, the Plaintiff must allege that ROA/TRG was "'injured by reason of' a 'conspiracy.'" Id. (quoting 18 U.S.C. §§ 1964(c), 1962(d)).  In Beck, the United States Supreme

---

[11]  Specifically, the statute provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. § 1962(d).

Court held "that a person may not bring suit under § 1964(c) predicated on a violation of § 1962(d) for injuries caused by an overt act [in furtherance of the racketeering conspiracy] that is not an act of racketeering or otherwise unlawful under the statute." Beck, 529 U.S. at 507, 120 S.Ct. at 1617. Thus, to state a claim for civil RICO conspiracy under § 1964(c), the Plaintiff must allege that ROA/TRG suffered injury as a proximate result of an overt act in furtherance of the conspiracy that is *itself* an act of racketeering activity or otherwise unlawful under RICO.[12]

Here, the Plaintiff alleges that the "conspiratorial acts" of C&H and others caused ROA to suffer damages by "aggravating the Companies' hazardous financial condition, fraudulently prolonging the Companies' life and leading to their insolvency, and the deepening of such insolvency." (Am. Compl. ¶ 442.)  The Court, for purposes of this motion, assumes that the conspiratorial acts referred to are the racketeering acts of mail and wire fraud alleged elsewhere in the complaint.  However, as discussed above, the complaint fails to allege that ROA/TRG was injured as a proximate result of those racketeering acts because it does not plead with particularity facts demonstrating reliance by ROA/TRG.  See discussion supra p.12-23; Central Distributors, 5 F.3d at 184; Chaz Construction, L.L.C., 137 Fed. Appx. at *2.  Because the complaint insufficiently pleads proximate causation under prevailing Sixth Circuit precedent, the Plaintiff lacks standing pursuant to § 1964(c).  Accordingly, ROA/TRG's § 1962(d) claim must be DISMISSED.  Chaz Const., LLC, 137 Fed. Appx. at 739 (holding, without identifying the particular RICO claim at issue,

---

[12]  Thus, under Beck and Holmes, § 1964(c) requires that racketeering acts proximately cause the injury complained of by a civil RICO plaintiff in actions pursuant to both §1962(c) and § 1962(d). Cf. Elkins v. Chapman, 36 Fed. Appx. 543, 544 (6th Cir. 2002) ("In order to state a claim under § 1962(c), a complaint must allege that an act of racketeering activity was the cause of the injury."); see also Jones v. Enterprise Rent A Car Co. of Texas, 187 F.Supp.2d 670, 678 (S.D. Tex. 2002) (dismissing plaintiff's RICO claims pursuant to § 1962(a),(b), (c) and (d) where the complaint failed to allege that the defendants' commission of wire fraud, mail fraud, and institutional fraud proximately caused her injuries).

that a "plaintiff[] must plead reliance in order to establish standing in a civil RICO case").

III. Remaining State Law Claims

Having disposed of the Plaintiff's claims under federal law, the Court now turns to ROA/TRG's state law claims.  The exercise by a district court of supplemental, or pendent, jurisdiction over state law claims is governed by 28 U.S.C. § 1367, which expressly permits the Court to decline the exercise of jurisdiction when it has dismissed all claims over which it has original jurisdiction.  28 U.S.C. § 1367(c)(3).  Absent any remaining federal claims against C&H, the Court, in its sound discretion, hereby dismisses without prejudice the Plaintiff's claims against C&H under state law.  See Weeks v. Portage County Executive Offices, 235 F.3d 275, 279-80 (6th Cir. 2000) (district court's decision to decline to exercise supplemental jurisdiction lies within its sound discretion).

CONCLUSION

Based on the foregoing, the motion of the Defendant C&H to dismiss is hereby GRANTED.

**IT IS SO ORDERED** this 5th day of June, 2006.


s/  J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

28