IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

In re

RECIPROCAL OF AMERICA (ROA)
SALES PRACTICES LITIGATION

Master File No. MDL 1551

This Document Relates to:
Civil Action No. 04-2313

ORDER GRANTING MOTION OF DEFENDANT RONALD K. DAVIS, M.D.
TO DISMISS COMPLAINT

INTRODUCTION

Before the Court in this multi-district litigation is the motion of the Defendant Ronald K. Davis, M.D. to dismiss the complaint filed against him by the Plaintiff, Alfred W. Gross ("Gross," "Plaintiff," or the "Receiver"), Commissioner of Insurance of the Commonwealth of Virginia and deputy receiver of Reciprocal of America ("ROA"), a Virginia unincorporated association and reciprocal insurer, and The Reciprocal Group ("TRG"), a Virginia non-stock corporation, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1]

FACTUAL ALLEGATIONS

The Plaintiff has summarized the facts alleged in this litigation as follows:

This case arises from the insolvency of a Virginia reciprocal insurer, ROA, and three Tennessee reciprocal risk retention groups that were largely reinsured by ROA, [Doctors Insurance Reciprocal, Risk Retention Group ("DIR"), The Reciprocal Alliance, Risk Retention Group ("TRA") and American National Lawyers Insurance Reciprocal, Risk Retention Group ("ANLIR")]. ROA was first organized in response to a perceived shortage in the Virginia market of medical liability (especially hospital liability) insurance options. For many years, the company seemed to grow and do well, returning to its hospital-owners substantial dividends.

---

[1] Collectively, ROA and TRG are referred to herein as "ROA/TRG."

The benevolent period during which this growth occurred emboldened management, especially the enterprising attorney (Crews), who had first organized ROA and served as its general counsel.  Together with his law firm, Crews & Hancock, and his associates in senior management and the board of directors (eventually including defendants Bland, Patterson, Kelley, Hudgins, McLean, and Davis, in his capacity as chairman of the board of DIR), Crews took ROA (initially known as [Virginia Professional Underwriters, Inc. ("VPUI") and The Virginia Insurance Reciprocal ("TVIR")]) from a small, single-state hospital insurer to a multi-state major player in the liability insurance market.  During this time the company grew in size and complexity, diversifying its coverage by adding physician and lawyer malpractice, as well as workers' compensation and other types of insurance.  In due course, the three Tennessee risk retention groups were created to avoid some of the burdens of Virginia insurance regulation and to specialize in some of the newer lines of business (physician malpractice for DIR, attorney malpractice for ANLIR, and health care liability for TRA), enabling segregation of risk as well.  Crews participated actively in the management of the four insurance companies which, in many respects, were under common management.  However, each was owned by a different group of policyholders/owners.  Three of the four reciprocal insurance companies (i.e., DIR, TRA, and ANLIR) also qualified as lightly regulated Tennessee risk retention groups, a key reason for their formation.  Those three companies were largely reinsured by ROA, the Virginia reciprocal, so that ultimately the latter became liable for most of their insurance risks.

During the 1970s and 1980s a number of well-publicized insurance insolvencies sensitized the insurance-buying public, especially commercial insureds, to the importance of financial soundness.  Ratings accorded insurers by independent organizations, like A.M. Best, took on added value in the marketplace.  Crews and his associates understood well the need to address that concern as a precursor to successful competition for lucrative new customers.  For a young, and relatively small, insurer like ROA, the appearance of financial stability could be created without actually amassing the necessary capital and surplus, a daunting and very lengthy process.  Instead, they could arrange for a well-respected and well-heeled reinsurer to at least appear to stand behind its obligations through reinsurance.  Of great value, this enabled the reinsured, ROA, to utilize Best's rating of the reinsurer.  For this role, Crews and his associates selected one of the world's largest reinsurers, [General Reinsurance Corporation ("Gen Re")].  From the beginning, Crews had close business and personal ties with Gen Re and its management (including at various times, Reindel, Kellogg, and Seeger).  Together these individuals, along with others, formed an informal "*de facto*" partnership to improve the appearance of ROA's balance sheet and stated surplus by ceding business from ROA to Gen Re.  ROA was accorded superior ratings from <u>Best's Insurance Reports</u> in part because of ROA's reinsurance relationship with Gen Re, which A.M. Best rated A++ Superior. <u>Best's Insurance Reports</u> noted that "ROA's principal reinsurer is Gen Re." From a regulatory perspective, this permitted ROA to reduce the liability it had to

recognize on its books by the amount for which the reinsurer would be liable (referred to in the industry as "reserve credit"). By providing ROA with this reinsurance, Gen Re earned lucrative ceding commissions from ROA. But the arrangement was structured so that, in reality, the risk assumed by Gen Re was minimal. Indeed, Gen Re entered into, and participated in, this arrangement with the full expectation that every year it would earn valuable reinsurance premiums with little danger of experiencing a net loss. At times, the illusion of reinsurance was additionally maintained through deceptive financial reinsurance, in which loans from Gen Re to ROA and [First Virginia Reinsurance, Ltd. ("FVR")] were guised as substantial insurance risk of net loss.

Crews and other members of management also sought to minimize regulatory oversight and taxation of ROA, ANLIR, DIR, and TRA and their owners. Toward this end, Crews formed the offshore Bermuda captive FVR to serve as reinsurer for ROA's physicians and attorney liability insurance business (and later, ROA's net retained share of risk on the DIR and ANLIR business), thereby enabling profits on that business to accumulate on a tax deferred basis. Atlantic Security and Witkowski served as FVR's agents in Bermuda. An offshore reinsurer's profits are not subject to United States taxation so long as the reinsurer does no business in the United States. Crews devised the use of FVR as a means to hold profits from ROA's retained business (for use as surplus to policyholders) while sheltering ROA's physician and lawyer subscribers from taxation on those profits until distribution. But, under Virginia law, reserve credit for reinsurance provided by offshore companies can only be taken to the extent of an acceptable security trust funded and maintained in the U.S. Moreover, this reliance by ROA upon FVR as reinsurer brought the latter within the scrutiny of Virginia insurance officials.

Starting in or about 1990, when regulators began asking too many questions about FVR, Crews' law firm and other defendants arranged for Gen Re to remove FVR from the regulators' scrutiny by providing "accommodation" reinsurance to ROA for all of the business that ROA formerly ceded directly to FVR. Pursuant to this "accommodation reinsurance" arrangement, Gen Re would "accommodate" ROA by acting as a "pass-through" between ROA and FVR, with ROA ceding risk as reinsurance to Gen Re and Gen Re "retroceding" 100% of that risk to FVR. FVR remained the ultimate "retrocessionaire," but the "accommodation" enabled ROA to report only Gen Re (with its strong balance sheet), and not FVR, as a reinsurer of ROA, thereby removing FVR from the scrutiny of regulators. As Gen Re later explained, "Reinsurance assumed by FVR was always intended to be 'accommodation reinsurance.' If this was real reinsurance, rates would have been different.'"

As the insurance enterprise became less lucrative and economic challenges increased, FVR became chronically underfunded to meet its obligations to Gen Re on the risks ceded from ROA to Gen Re to FVR. If FVR had not been removed from

3

scrutiny of ROA's regulators pursuant to the "accommodation" arrangement with Gen Re, ROA's reserve credit for the business ceded would have been at risk, because such a credit could only have been claimed to the extent of FVR's ability to secure its reinsurance obligations.

Unwilling to take on the increased reinsurance risk from ROA's mounting losses, Gen Re eventually demanded in October, 2000, that the "understanding" behind the "accommodation reinsurance" scheme be memorialized in writing--albeit in the 2000 Unreported Side Agreement kept hidden from the public.  Subsequently, ROA's losses grew even worse.  Gen Re feared the possibility that it would be found accountable for what the outside public thought was "real reinsurance," and thus in late 2000 devised a complicated plan which would "virtually eliminate" Gen Re's reinsurance risk of net loss as if "Gen Re were never there."  Effective on or about December 31, 2001, Gen Re ceased providing "accommodation" reinsurance that required it to be at risk for FVR's financial condition.  ROA resumed ceding certain risks directly to FVR, and the Wachovia-FVR Trust was established to secure FVR's reinsurance obligations to ROA.  Wachovia served as trustee of the Wachovia-FVR Trust[,] which also became chronically underfunded.

Crews' law firm, Crews & Hancock, reaped substantial fees for legal work performed for ROA, which fees ultimately benefitted the partners at Crews & Hancock, including Crews and Bland.  Besides Crews, other members of management came and went, but for the relevant years included McLean, Patterson, Hudgins, and Kelley, all of whom benefitted from the business in the way of substantial salaries and perquisites.  A lesser, but significant participant was Davis, who served as Chairman of the Board for DIR, for which he, too, was paid a salary.

Independent auditors and certified actuaries for ROA, ANLIR, DIR, TRA, and FVR also came and went.  However, for the relevant years, the independent auditor was [Pricewaterhouse Coopers, LLP ("PwC")] (whose engagement partner was Stephani) and the certified actuary was Milliman (whose work was performed by Sanders). Milliman (beginning in 1997) and PwC (beginning in 1999) reaped substantial fees for having, and maintaining as clients, ROA, ANLIR, DIR, TRA, and FVR.

Eventually, ROA and DIR experienced extreme financial difficulty, due in large part to the nature of the "accommodation reinsurance" scheme, which enabled the companies to grow at an accelerated rate, and generate disproportionate profits, without ever providing the necessary capital and surplus that is essential to weather the inevitable cycles and developments.  In order to maintain the false appearance of ROA's continued financial viability and therefore enable themselves to continue and maximize the benefits they were receiving from their association with ROA/TRG (or, in some instances to receive preferential payments), the Management Defendants (Crews, Patterson, Hudgins, and Kelley), McLean, the Gen Re Defendants (Gen Re, Seeger, Kellogg, and Reindel), Crews & Hancock, Bland,

4

> Davis, Witkowski, Atlantic Security, Milliman, Sanders, Stephani, PwC, and Wachovia conspired to participate, and did participate, in various fraudulent schemes . . .
>
> The fraudulent schemes included various types of "creative accounting," arbitrary reductions in DIR's and ROA's claim reserves, reinsurance agreements that did not transfer substantial insurance risk of net loss, nondisclosure of modifications to reinsurance agreements that rendered much of ROA's reinsurance receivables from Gen Re illusory, and disguised misappropriations of funds from ROA and the Wachovia-FVR Trust. The defendants appeared to have believed that if they could just conceal ROA's financial troubles long enough, ROA eventually could emerge from a hazardous financial condition without regulators ever being the wiser. Unfortunately, but predictably, things went from bad to worse, and the defendants' success in postponing regulatory intervention resulted in the deepening of ROA's insolvency.
>
> ROA's concealed insolvency finally came to light only after, in late December of 2002, Virginia regulators discovered the 2002 Unreported Side Agreement and its $135 million aggregate cap, and other financial irregularities. . . .

(Deputy Receiver's Resp. and Mem. In Opp'n to Mot. to Dismiss of Def. Ronald K. Davis, M.D. ("Pl.'s Resp.") at pp. 1-7) (internal citations omitted). In the amended complaint, Gross asserts a claim against Davis for conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), as well as common law claims of fraud, civil conspiracy, breach of fiduciary duty, fraudulent transfers and accounting.

## CHOICE OF LAW

The Judicial Panel on Multidistrict Litigation transferred the instant action to this Court from the United States District Court for the Eastern District of Virginia pursuant to 28 U.S.C. §§ 1407. In such circumstances, the law of the transferee forum generally controls with regard to claims under federal law. See e.g., In re Korean Air Lines Disaster of September 1, 1983, 829 F.2d 1171 (D.C. Cir.1987) ("[T]he law of a transferor forum on a federal question ... merits close consideration, but does not have stare decisis effect in a transferee forum situated in another circuit."); In re Litigation

5

Involving Alleged Loss of Cargo from Tug Atlantic Seahorse, Sea Barge 101 Between Puerto Rico and Florida in Dec. 1988, 772 F. Supp. 707, 711 (D. Puerto Rico 1991) (noting that, with respect to federal claims, "[a] transferee district court is bound, ultimately, to follow only the law of its own circuit court and the Supreme Court, and that law must be presumed to be as "correct" a statement of federal law as that of the transferor circuit."); In re National Century Financial Enterprises, Inc., Inv. Litigation, 323 F. Supp.2d 861, 876 (S.D. Ohio 2004) ("the rule in multidistrict litigation is that the transferee court, in interpreting federal law, should apply the law of its own circuit rather than the law of the transferor court's circuit.")

By contrast, to the extent that a matter transferred pursuant to 18 U.S.C. § 1407 concerns issues of state law, a transferee court "must apply the state law that would have applied to the individual cases had they not been transferred for consolidation." In re Temporomandibular Joint (TMJ) Implants Products Liability Litigation, 97 F.3d 1050, 1055 (8th Cir. 1996); see also In re Parmalat Securities Litigation, 412 F. Supp.2d 392, 399 (S.D.N.Y. 2006); In re Air Crash at Detroit Metropolitan Airport, Detroit, Mich. on Aug. 16, 1987, 791 F. Supp. 1204, 1232 (E.D. Mich.1992) ("application of the choice of law rules of the transferor state . . . to all substantive state-law claims and issues" in an action transferred pursuant to § 1407 is a "well-established proposition of law"). Accordingly, as this case was filed in the United States District Court for the Eastern District of Virginia, Virginia's substantive state law, including choice-of-law rules, govern the resolution of all state law claims.

## STANDARD OF REVIEW

The Defendant filed this motion pursuant to Rules 12(b)(6) of the Federal Rules of Civil Procedure. Rule 12(b)(6) permits dismissal of a lawsuit for failure to state a claim upon which relief

could be granted.  See FED. R. CIV. P. 12(b)(6).  The Rule requires the Court to "construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle relief."  Grindstaff v. Green, 133 F.3d 416, 421 (6th Cir. 1998).  "The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim," Conley v. Gibson, 355 U.S. 41, 47 (1957).  However, "[t]o avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all the material elements of the claim."  Wittstock v. Mark a Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003).

## ANALYSIS

### I. Count I: Civil RICO Conspiracy

The Defendant first asserts that the Plaintiff's RICO claim in Count 2 of the amended complaint fails to state a claim upon which relief can be granted and, on that basis, must be dismissed. (Def.'s Mot. Dismiss ("Def.'s Mot.") at 8-12.)  Count 2 alleges a violation of 18 U.S.C § 1962(d), which prohibits conspiracy to violate the section's other provisions. 18 U.S.C § 1962(d). In the amended complaint it is alleged that Davis conspired to violate 18 U.S.C § 1962(c), which states that

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  Specifically, ROA/TRG claims that Davis "conspired with the other RICO

7

Defendants[2] to conduct, or participate (directly or indirectly) in the conduct of, the affairs of the ROA/TRG Enterprise through a pattern of racketeering activity." (Am. Compl. ¶ 120.) In the instant motion, Davis maintains that Plaintiff's § 1962(d) claim must be dismissed as to him because the amended complaint fails to allege facts showing that he knowingly agreed to facilitate the activities of any RICO enterprise.

"To state a claim under § 1962(d), a plaintiff must plead that the defendant agreed to join the conspiracy, agreed to commit predicate acts, and knew that those acts were part of a pattern of racketeering activity." Broad, Vogt & Conant, Inc. v. Alsthom Automation, Inc., 200 F.Supp.2d 756, 759 (E.D. Mich. 2002) (quoting Krear v. Malek, 961 F.Supp. 1065, 1071 (E.D. Mich.1997)). The defendant need not agree to personally commit the two predicate acts constituting the pattern of racketeering activity or to facilitate each and every part of the substantive offense. Salinas v. United States, 522 U.S. 52, 63, 65, 118 S.Ct. 469, 477, 139 L.Ed.2d 352 (1997). "If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators." Id.; Libertad v. Welch, 53 F.3d 428, 445 (1st Cir. 1995) (holding that § 1962(d) "covers direct and indirect participation in a predicate act, including preparation, planning, and direction."). However, to be liable as a conspirator, a defendant "must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive [civil RICO claim.]" Salinas, 522 U.S. at 65, 118 S.Ct. at 477. The agreement to conspire may be established through "[c]ircumstantial evidence which a reasonable person could interpret as showing

---

[2] The "RICO Defendants" include the Management Defendants (Crews, Kelley, Patterson, and Hudgins), Gen Re, Seeger, Kellogg, Reindel, Crews & Hancock, Witkowski, Atlantic Security, Milliman, Sanders, Blance, McLean, Davis, PwC, Stephani, and Wachovia.

participation in a common plan." United States v. Crossley, 224 F.3d 847, 856 (6th Cir. 2000).[3]

The predicate acts constituting the substantive violation in this action are alleged to have taken place over a ten-year period and to have involved nearly twenty Defendants. Of the more than 550 paragraphs detailing the schemes, the amended complaint makes reference to Davis in only twelve. (Am. Compl. ¶¶ 14, 24, 34, 120, 134, 136, 245, 254, 255, 256, 258, 414.) Davis' involvement with the RICO schemes is alleged to have begun in October or November of 2002, shortly before ROA was placed in receivership in January 2003.[4] The sole scheme in which Davis, who served as a member of the Boards of Directors of TRG and FVR as well as Chairman of the Board of Directors of DIR, is alleged to have participated involved the arbitrary write-down of claim reserves by the Management Defendants and McLean. (Am. Compl. ¶¶ 14, 245.)

This practice, which began as early as 1995, was undertaken for the purpose of concealing "from the Companies, their policyholders and creditors, A.M. Best, and regulators, the fact that premiums charged on the DIR book of business had been inadequate, and the fact that losses reinsured by ROA on that book of business were more severe than predicted." (Am. Compl. ¶ 258.) In addition, the write-downs were undertaken to "maintain DIR's RBC above 200% ACL

---

[3] Crossley addressed a claim pursuant to 18 U.S.C. § 371 for conspiracy to commit mail fraud rather than conspiracy under § 1962(d). However, the Supreme Court has instructed that, in evaluating a claim for conspiracy pursuant to § 1962(d), the Court may look to well-established conspiracy principles. Salinas, 522 U.S. at 63,118 S.Ct. at 477. Accordingly, the Court considers Crossley and other cases cited herein that evaluate the sufficiency of conspiracy claims as instructive in this matter.

[4] In addition, Davis is referenced in the scheme to misappropriate $24.4 million of ROA's funds to bolster the Wachovia-FVR Trust. (Am. Compl. ¶¶ 410-416.) In relation to this scheme, the Plaintiff alleges that, on November 29, 2002, Davis, and others, "questioned the propriety of using ROA funds to fund the Wachovia-FVR Trust," but failed to take any action to prevent the improper deposit. (Am. Compl. ¶ 414.) However, in response to the instant motion, Gross argues that Davis' role in the RICO conspiracy was limited to "participation in, and concealment of, arbitrary write-downs of DIR claim reserves." (Pl.'s Resp. at 19.) Accordingly, the Court will not address the complaint's allegation of his involvement in the misappropriation of funds to the Wachovia-FVR Trust.

artificially." (Am. Compl.¶ 258.) Disclosure of the write-downs was allegedly suppressed by the Management Defendants, McLean and Davis "for fear that disclosure would have led to the unraveling [of] the RICO Defendants' schemes." (Am. Compl. ¶ 258.) The complaint does not allege that Davis actively participated in the write-downs, but rather, was "complicit" in the Management Defendants' actions. (Am. Compl. ¶ 245.) Specifically, in October and November of 2002, the complaint asserts that the Senior Vice-President of DIR reported the write-down practice to Davis and that he subsequently failed to take action. (Am. Compl. ¶ 255.) Similarly, Davis did not report the practice during a November 9, 2002 board meeting. (Am. Compl. ¶ 256.)

Because many other RICO defendants are board members and directors, Davis clearly had some association with the alleged coconspirators. Further, taking the allegations in the complaint as true, Davis either knew or was put on notice of the illegal practice of the Management Defendants and McLean to write-down reserves. (Am. Compl. ¶ 255.) However, association with conspirators and awareness of illegal activity alone are not sufficient to demonstrate conspiracy to violate RICO. See United States v. Webb, 359 F.2d 558, 562 (6th Cir.) cert. denied, 385 U.S. 824, 87 S.Ct. 55, 17 L.Ed.2d 61 (1966). ("neither association with conspirators nor knowledge that something illegal is going on by themselves constitute proofs [of] participation in a conspiracy."). While the standard for a conspirator's liability does not require that Davis had a substantial relationship to the overarching conspiracy or with his coconspirators, it does require demonstration that he knowingly agreed to facilitate the scheme. See Salinas, 522 U.S. at 65, 118 S.Ct. at 478 (upholding RICO conspiracy conviction where the defendant "knew about and agreed to facilitate the scheme."); see also United States v. Burgos, 94 F.3d 849, 858 (4th Cir. 1996) ("if [the defendant] joins the conspiracy with an understanding of the unlawful nature thereof and willfully joins in the plan on

10

one occasion, it is sufficient [for liability to attach for] conspiracy, even though he had not participated before and even though he played only a minor part."). At most, it appears that Davis knew about the reserve write-down practice and turned a blind eye to it, acquiesced in it, or perhaps, simply failed to take action in the two months before the schemes were terminated by the placement of ROA into receivership. There is no allegation in the complaint Davis knew that the premiums charged on the DIR book of business were inadequate or that losses reinsured by ROA were more severe than predicted. Similarly, the complaint does not contend that Davis was aware of the RICO Defendants' various other schemes. Because the complaint is devoid of such allegations, there is no basis from which it could be inferred that he shared, and knowingly agreed to facilitate, the common goals of the Management Defendants and McLean to conceal the irregularities in the book of business or to prevent the "unraveling" of the other schemes. See Odesser v. Continental Bank, 676 F. Supp. 1305, 1313 (E.D. Pa. 1987) (finding that allegations that the defendant honored a fraudulent Board resolution despite having been put on notice that the resolution was invalid an insufficient basis from which to infer knowledge to support a § 1962(d) claim.); see also Firestone v. Galbreath, 747 F. Supp. 1556, 1571 (S.D. Ohio 1990) aff'd in part, 976 F.2d 279 (6th Cir.1992) (dismissing RICO action where complaint failed to allege facts demonstrating that the defendants had "deliberate, knowing and specific intent to join the conspiracy . . . ,or . . . agreed with other defendants to inflict the alleged wrong."). Even assuming that Davis did have knowledge of the object or purpose of the reserve write-down scheme, his failure to disclose the practice alone does not indicate an intent or agreement to further that scheme. See United States v. Richardson, 596 F.2d 157, 161 (6th Cir. 1979) (quoting United States v. Williams, 503 F.2d 50 (6th Cir. 1974), *abrogation on other grounds recognized in*, United States v. Crayton, 357 F.3d 560, 564 (6th Cir.

2004)) ("(m)ere knowledge, approval of or acquiescence in the object or the purpose of the conspiracy, without an intention and agreement to cooperate in the crime is not sufficient to make one a conspirator."); see also Salinas, 522 U.S. at 65, 118 S.Ct. at 478 (upholding RICO conspiracy conviction where the defendant "knew about and agreed to facilitate the scheme.").

RICO's "net is woven tightly to trap even the smallest fish." Ft. Wayne Books v. Indiana, 489 U.S. 46, 81 n.24 (1989) (quoting United States v. Elliot, 571 F2d 880, 903 (5th Cir.), cert. denied, 439 U.S. 953 (1978). However, the Court is aware of no authority, and the Plaintiff has not cited to any, finding that an agreement to further a fraudulent scheme can be inferred solely from passive acquiescence in illegal conduct.[5] Without more, the Court concludes that the allegations against Davis do not adequately plead the requisite element of an agreement to participate in the conspiracy, as required under RICO. Accordingly, Gross' § 1962(d) claim as to Defendant Davis is DISMISSED.

### III. Remaining State Law Claims[6]

Having disposed of the Plaintiff's claims under federal law, the Court now turns to ROA/TRG's state law claims against Davis. The exercise by a district court of supplemental, or

---

[5] The Court notes Plaintiff's citation to Clark v. Milam, 847 F.Supp. 409 (S.D. Va. 1994), in which the United States District Court for the Southern District of Virginia held that "allegations that the Defendants knowingly concealed the violations of § 1962(c) by the officers and directors of [the insolvent insurance company] . . . in disregard of their duties to make known to regulatory officials and others the financial transactions . . . that constituted violations of § 1962(c)" were sufficient to state a claim for a § 1962(d) violation even where the complaint failed to allege specific facts demonstrating an agreement to conspire. Clark, 847 F. Supp. at 417-18. In Clark, the defendant auditors knowingly concealed information from insurance regulators in the audits and opinions they issued as part of the professional services they performed for the insolvent insurer. Id. at 419. Because this Court has concluded that the instant complaint lacks allegations demonstrating that Davis knew of the fraudulent § 1962(c) scheme, Clark is distinguishable from the instant matter.

[6] The Court notes that, in response to Davis' motion, the Receiver concedes that he does not have standing to pursue the fraudulent conveyances and accounting claims set forth in the amended complaint. (Pl.'s Resp. at 25.) Accordingly, those claims are DISMISSED.

pendent, jurisdiction over state law claims is governed by 28 U.S.C. § 1367, which expressly permits the Court to decline the exercise of jurisdiction when it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). Absent any remaining federal claims against him, the Court, in its sound discretion, hereby dismisses without prejudice the Plaintiff's claims against Davis under state law. See Weeks v. Portage County Executive Offices, 235 F.3d 275, 279-80 (6th Cir. 2000) (district court's decision to decline to exercise supplemental jurisdiction lies within its sound discretion).

## CONCLUSION

Based on the foregoing, the motion of Defendant Davis to dismiss the RICO claim and state claims for fraudulent conveyances and accounting is hereby GRANTED. The remaining state law claims are dismissed without prejudice.

**IT IS SO ORDERED** this 13th day of June, 2006.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE