IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

In re

RECIPROCAL OF AMERICA (ROA)
SALES PRACTICES LITIGATION

Master File No. MDL 1551

This Document Relates to:
Civil Action No. 04-2078

---

ORDER GRANTING MOTION OF DEFENDANT CREWS & HANCOCK
TO DISMISS FEDERAL RICO CLAIMS
AND GRANTING PLAINTIFF'S REQUEST TO AMEND COMPLAINT

---

INTRODUCTION

Before the Court in this multi-district litigation is the motion of the Defendant, Crews & Hancock, P.L.C. ("Crews & Hancock"), to dismiss the complaint filed against it by the Plaintiff, Paula A. Flowers, Commissioner of Commerce and Insurance for the State of Tennessee (the "Commissioner"), in her capacity as Liquidator for Doctors Insurance Reciprocal, Risk Retention Group ("DIR"), American National Lawyers Insurance Reciprocal, Risk Retention Group ("ANLIR") and The Reciprocal Alliance, Risk Retention Group ("TRA") (referred to collectively herein as the "RRGs"), pursuant to Rules 9(b), 12(b)(3) and 12(b)(6) of the Federal Rules of Civil Procedure.

FACTUAL ALLEGATIONS

The facts alleged in this litigation have been summarized as follows:

> This case arises from the insolvency of a Virginia reciprocal insurer, ROA, and three Tennessee reciprocal risk retention groups that were largely reinsured by ROA, [the RRGs]. ROA was first organized in response to a perceived shortage in the Virginia market of medical liability (especially hospital liability) insurance options. For many years, the company seemed to grow and do well, returning to its hospital-owners substantial dividends. The benevolent period during which this growth occurred emboldened management, especially the enterprising attorney (John William Crews), who had first organized ROA and served as its general counsel. Together with his

law firm, Crews & Hancock, and his associates in senior management and the board of directors (eventually including defendants Bland, Patterson, Kelley, Hudgins, McLean, and Davis, in his capacity as chairman of the board of DIR), Crews took ROA (initially known as [Virginia Professional Underwriters, Inc. ("VPUI") and The Virginia Insurance Reciprocal ("TVIR")]) from a small, single-state hospital insurer to a multi-state major player in the liability insurance market. During this time the company grew in size and complexity, diversifying its coverage by adding physician and lawyer malpractice, as well as workers' compensation and other types of insurance. In due course, the three Tennessee risk retention groups were created to avoid some of the burdens of Virginia insurance regulation and to specialize in some of the newer lines of business (physician malpractice for DIR, attorney malpractice for ANLIR, and health care liability for TRA), enabling segregation of risk as well. Crews participated actively in the management of the four insurance companies which, in many respects, were under common management. However, each was owned by a different group of policyholders/owners. Three of the four reciprocal insurance companies (i.e., DIR, TRA, and ANLIR) also qualified as lightly regulated Tennessee risk retention groups, a key reason for their formation. Those three companies were largely reinsured by ROA, the Virginia reciprocal, so that ultimately the latter became liable for most of their insurance risks.

During the 1970s and 1980s a number of well-publicized insurance insolvencies sensitized the insurance-buying public, especially commercial insureds, to the importance of financial soundness. Ratings accorded insurers by independent organizations, like A.M. Best, took on added value in the marketplace. Crews and his associates understood well the need to address that concern as a precursor to successful competition for lucrative new customers. For a young, and relatively small, insurer like ROA, the appearance of financial stability could be created without actually amassing the necessary capital and surplus, a daunting and very lengthy process. Instead, they could arrange for a well-respected and well-heeled reinsurer to at least appear to stand behind its obligations through reinsurance. Of great value, this enabled the reinsured, ROA, to utilize Best's rating of the reinsurer. For this role, Crews and his associates selected one of the world's largest reinsurers, [General Reinsurance Corporation ("Gen Re")]. From the beginning, Crews had close business and personal ties with Gen Re and its management (including at various times, Reindel, Kellogg, and Seeger). Together these individuals, along with others, formed an informal "*de facto*" partnership to improve the appearance of ROA's balance sheet and stated surplus by ceding business from ROA to Gen Re. ROA was accorded superior ratings from Best's Insurance Reports in part because of ROA's reinsurance relationship with Gen Re, which A.M. Best rated A++ Superior. Best's Insurance Reports noted that "ROA's principal reinsurer is Gen Re." From a regulatory perspective, this permitted ROA to reduce the liability it had to recognize on its books by the amount for which the reinsurer would be liable (referred to in the industry as "reserve credit"). By providing ROA with this reinsurance, Gen Re earned lucrative ceding commissions from ROA. But the

arrangement was structured so that, in reality, the risk assumed by Gen Re was minimal. Indeed, Gen Re entered into, and participated in, this arrangement with the full expectation that every year it would earn valuable reinsurance premiums with little danger of experiencing a net loss. At times, the illusion of reinsurance was additionally maintained through deceptive financial reinsurance, in which loans from Gen Re to ROA and [First Virginia Reinsurance, Ltd. ("FVR")] were guised as substantial insurance risk of net loss.

Crews and other members of management also sought to minimize regulatory oversight and taxation of ROA, ANLIR, DIR, and TRA and their owners. Toward this end, Crews formed the offshore Bermuda captive FVR to serve as reinsurer for ROA's physicians and attorney liability insurance business (and later, ROA's net retained share of risk on the DIR and ANLIR business), thereby enabling profits on that business to accumulate on a tax deferred basis. Atlantic Security and Witkowski served as FVR's agents in Bermuda. An offshore reinsurer's profits are not subject to United States taxation so long as the reinsurer does no business in the United States. Crews devised the use of FVR as a means to hold profits from ROA's retained business (for use as surplus to policyholders) while sheltering ROA's physician and lawyer subscribers from taxation on those profits until distribution. But, under Virginia law, reserve credit for reinsurance provided by offshore companies can only be taken to the extent of an acceptable security trust funded and maintained in the U.S. Moreover, this reliance by ROA upon FVR as reinsurer brought the latter within the scrutiny of Virginia insurance officials.

Starting in or about 1990, when regulators began asking too many questions about FVR, Crews' law firm and other defendants arranged for Gen Re to remove FVR from the regulators' scrutiny by providing "accommodation" reinsurance to ROA for all of the business that ROA formerly ceded directly to FVR. Pursuant to this "accommodation reinsurance" arrangement, Gen Re would "accommodate" ROA by acting as a "pass-through" between ROA and FVR, with ROA ceding risk as reinsurance to Gen Re and Gen Re "retroceding" 100% of that risk to FVR. FVR remained the ultimate "retrocessionaire," but the "accommodation" enabled ROA to report only Gen Re (with its strong balance sheet), and not FVR, as a reinsurer of ROA, thereby removing FVR from the scrutiny of regulators. As Gen Re later explained, "Reinsurance assumed by FVR was always intended to be 'accommodation reinsurance.' If this was real reinsurance, rates would have been different.'"

As the insurance enterprise became less lucrative and economic challenges increased, FVR became chronically underfunded to meet its obligations to Gen Re on the risks ceded from ROA to Gen Re to FVR. If FVR had not been removed from scrutiny of ROA's regulators pursuant to the "accommodation" arrangement with Gen Re, ROA's reserve credit for the business ceded would have been at risk, because such a credit could only have been claimed to the extent of FVR's ability to

secure its reinsurance obligations.

Unwilling to take on the increased reinsurance risk from ROA's mounting losses, Gen Re eventually demanded in October, 2000, that the "understanding" behind the "accommodation reinsurance" scheme be memorialized in writing--albeit in the 2000 Unreported Side Agreement kept hidden from the public. Subsequently, ROA's losses grew even worse. Gen Re feared the possibility that it would be found accountable for what the outside public thought was "real reinsurance," and thus in late 2000 devised a complicated plan which would "virtually eliminate" Gen Re's reinsurance risk of net loss as if "Gen Re were never there." Effective on or about December 31, 2001, Gen Re ceased providing "accommodation" reinsurance that required it to be at risk for FVR's financial condition. ROA resumed ceding certain risks directly to FVR, and the Wachovia-FVR Trust was established to secure FVR's reinsurance obligations to ROA. Wachovia served as trustee of the Wachovia-FVR Trust[,] which also became chronically underfunded.

Crews' law firm, Crews & Hancock, reaped substantial fees for legal work performed for ROA, which fees ultimately benefitted the partners at Crews & Hancock, including Crews and Bland. Besides Crews, other members of management came and went, but for the relevant years included McLean, Patterson, Hudgins, and Kelley, all of whom benefitted from the business in the way of substantial salaries and perquisites. A lesser, but significant participant was Davis, who served as Chairman of the Board for DIR, for which he, too, was paid a salary.

Independent auditors and certified actuaries for ROA, ANLIR, DIR, TRA, and FVR also came and went. However, for the relevant years, the independent auditor was [Pricewaterhouse Coopers, LLP ("PwC")] (whose engagement partner was Stephani) and the certified actuary was Milliman (whose work was performed by Sanders). Milliman (beginning in 1997) and PwC (beginning in 1999) reaped substantial fees for having, and maintaining as clients, ROA, ANLIR, DIR, TRA, and FVR.

Eventually, ROA and DIR experienced extreme financial difficulty, due in large part to the nature of the "accommodation reinsurance" scheme, which enabled the companies to grow at an accelerated rate, and generate disproportionate profits, without ever providing the necessary capital and surplus that is essential to weather the inevitable cycles and developments. In order to maintain the false appearance of ROA's continued financial viability and therefore enable themselves to continue and maximize the benefits they were receiving from their association with ROA/TRG (or, in some instances to receive preferential payments), the Management Defendants (Crews, Patterson, Hudgins, and Kelley), McLean, the Gen Re Defendants (Gen Re, Seeger, Kellogg, and Reindel), Crews & Hancock, Bland, Davis, Witkowski, Atlantic Security, Milliman, Sanders, Stephani, PwC, and Wachovia conspired to participate, and did participate, in various fraudulent schemes . . .

> The fraudulent schemes included various types of "creative accounting," arbitrary reductions in DIR's and ROA's claim reserves, reinsurance agreements that did not transfer substantial insurance risk of net loss, nondisclosure of modifications to reinsurance agreements that rendered much of ROA's reinsurance receivables from Gen Re illusory, and disguised misappropriations of funds from ROA and the Wachovia-FVR Trust. The defendants appeared to have believed that if they could just conceal ROA's financial troubles long enough, ROA eventually could emerge from a hazardous financial condition without regulators ever being the wiser. Unfortunately, but predictably, things went from bad to worse, and the defendants' success in postponing regulatory intervention resulted in the deepening of ROA's insolvency.
>
> ROA's concealed insolvency finally came to light only after, in late December of 2002, Virginia regulators discovered the 2002 Unreported Side Agreement and its $135 million aggregate cap, and other financial irregularities. . . .

(Deputy Receiver's Resp. and Mem. In Opp'n to Mot. to Dismiss of Def. Ronald K. Davis, M.D. at pp. 1-7) (internal citations omitted).

With respect to the RRGs, Flowers avers in this action that, from 1993 to 1995, ROA and each of the RRGs entered into reinsurance agreements in which the RRGs ceded between 90 and 100 percent of their risk to ROA. (Compl. at ¶¶ 78-80) Thereafter, that risk was retroceded to Gen Re which was in turn retroceded to FVR. (Compl. at ¶ 81) Following the formation of the RRGs, ROA entered into a retrocession arrangement with Gen Re to transfer the insurance risk of the RRGs that had been ceded by them to ROA. (Compl. at ¶ 82) It has been alleged that, "[b]ecause the RRGs depended on ROA for their financial viability, th[e] harm . . . perpetrated on ROA/TRG was also perpetrated on the RRGs. Damages incurred by the RRGs arose out of the same series of transactions and occurrences by the same parties that caused damage to ROA/TRG." (Compl. at ¶ 88) Flowers has alleged in this action claims of violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq.; RICO conspiracy in violation of 18 U.S.C. § 1962(d); as well as fraud; civil conspiracy; unjust enrichment; negligence; breach of fiduciary

duty; fraudulent transfers and preferences; misappropriation; and malpractice under Tennessee state law. The complaint herein is similar to and relies heavily upon that filed in a companion suit in this multi-district action captioned Gross v. General Reinsurance, et al., No. 04-2313 (W.D. Tenn.)

ARGUMENTS OF THE PARTIES AND ANALYSIS

*Venue under Fed. R. Civ. P. 12(b)(3)*[1]

Crews & Hancock first argues that venue is improper in this district as to the Plaintiff's RICO and common law claims. Fed. R. Civ. P. 12(b)(3) permits dismissal of a lawsuit for improper venue. "Venue requirements exist for the benefit of defendants." Richards v. Aramark Servs., Inc., 108 F.3d 925, 928 (8th Cir. 1997) (quoting Hoover Group, Inc. v. Custom Metalcraft, Inc., 84 F.3d 1408, 1410 (Fed. Cir. 1996)). The statute governing venue for federal RICO claims, 18 U.S.C. § 1965(a), provides in pertinent part that "[a]ny civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs." Under 28 U.S.C. § 1391(b), the general venue statute, a civil action may "be brought only in . . . a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . ." "One of the central purposes of statutory venue is to ensure that a defendant is not 'haled into a remote district, having no real relationship to the dispute.'" Id. (quoting Woodke v. Dahm, 70 F.3d 983, 985 (8th Cir. 1995)); see also PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc., 138 F.3d 65, 71-72 (2d Cir. 1998) (recognizing same purpose of RICO venue provision). The term "substantial part" as used in the general venue statute includes "any forum with a substantial connection to the plaintiff's claim."

[1]Unlike other cases in this litigation, no choice of law issue has been raised here, as the instant complaint was originally filed in Tennessee.

First of Mich. Corp. v. Bramlet, 141 F.3d 260, 263 (6th Cir. 1998). Venue under the RICO provision and 28 U.S.C. § 1391(b) need not be considered separately, as the general venue statute has been held applicable to RICO claims. See Multi-Media Int'l, LLC v. Promag Retail Servs., 343 F.Supp.2d 1024, 1034 n.8 (D. Kan. 2004); see also City of N.Y. v. Cyco.Net, Inc., 383 F.Supp.2d 526, 544 (S.D.N.Y. 2005) (a plaintiff may lay venue in accordance with either § 1965 or § 1391 in case involving RICO claims).

It is the position of this Defendant that venue is lacking on the grounds that the substantial part of the actions alleged occurred in Virginia, where its offices are located, and that no specific conduct has been claimed to have occurred in Tennessee. Crews & Hancock served as general counsel to ROA/TRG, FVR and the RRGs. The Plaintiff asserts that Crews & Hancock intentionally chose to form the RRGs in Tennessee and that Defendant John William Crews, along with his lawfirm, Crews & Hancock, arranged the creation and capital funding of the RRGs in Tennessee. It has been alleged in this case that the Defendants schemed to improperly prolong the life of the RRGs and ROA, their parent company, following reversal of their financial fortunes. The Plaintiff avers that, in furtherance of the scheme, this Defendant, along with others, utilized illegal and unreported side agreements, funds transfers, arbitrary write-downs and other improper transactions, and that affirmative misrepresentations were made to regulators such as the Tennessee Department of Commerce and Industry and endorsing associations including the Tennessee State Bar. According to the Plaintiff, Crews and others assisted in fraudulent reporting to Tennessee regulators, misappropriation of funds from the RRGs and concealment. In arguing that venue is proper, the Plaintiff also points out that the Judicial Panel on MultiDistrict Litigation has determined that, of all the forums implicated by the claims of all plaintiffs against the Defendants, the state of Tennessee

bore the strongest nexus to all claims.

The venue statute does not provide that venue lies only in the district with *the* most substantial contacts with the dispute; but, rather, that venue may be proper in more than one district, so long as "*a* substantial part of the events occurred in the challenged venue, even if a greater part of the events occurred elsewhere." <u>Amphion, Inc. v. Buckeye Elec. Co.</u>, 285 F.Supp.2d 943, 946 (E.D. Mich. 2003) (citing <u>Greenblatt v. Gluck</u>, 265 F.Supp.2d 346, 352 (S.D.N.Y. 2003) (emphasis added). The Court finds that the facts alleged reflect the existence of contacts and connections between Crews & Hancock and the state of Tennessee. Accordingly, the motion to dismiss for improper venue is DENIED. The Court now turns to Crews & Hancock's arguments under Rules 9(b) and 12(b)(6).

*Standard of Review for Dismissal Pursuant to Rules 9(b) and 12(b)(6)*

Rule 12(b)(6) permits dismissal of a lawsuit for failure to state a claim upon which relief could be granted. <u>See</u> Fed. R. Civ. P. 12(b)(6). The Rule requires the Court to "construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle relief." <u>Grindstaff v. Green</u>, 133 F.3d 416, 421 (6th Cir. 1998). "The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim," <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957). However, "[t]o avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all the material elements of the claim." <u>Wittstock v. Mark A. Van Sile, Inc.</u>, 330 F.3d 899, 902 (6th Cir. 2003).

Rule 9(b) provides that "[i]n all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b). The Rule serves to put defendants on

notice of the conduct complained of by the plaintiff to ensure that they are provided sufficient information to formulate a defense. Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 679 (6th Cir. 1988). The Sixth Circuit interprets the particularity requirement "liberally, . . . requiring a plaintiff, at a minimum, to allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." Coffey v. Foamex L.P., 2 F.3d 157, 162 (6th Cir.1993) (internal quotations and citations omitted); Blount Fin. Servs., Inc. v. Walter E. Heller and Co., 819 F.2d 151, 152 (6th Cir. 1987) ("Fraud alleged in a RICO civil complaint for mail fraud must state with particularity the false statement of fact made by the defendant which the plaintiff relied on and the facts showing the plaintiff's reliance on defendant's false statement of fact."); see also Evans v. Pearson Enter., Inc., 434 F.3d 839, 852 -853 (6th Cir. 2006) (affirming dismissal of fraud action where plaintiff failed to plead reliance with particularity as required by Rule 9(b)).

In ruling on a motion pursuant to Rule 9(b), a court must read the particularity requirement in harmony with the "policy of simplicity in pleading" advanced by Fed. R. Civ. P. 8, which requires that a complaint provide only a "short and plain statement of the claim." Michaels Bldg. Co., 848 F.2d at 679 (quoting Fed. R. Civ. P. 8). Accordingly, courts should not be "too exacting" or "demand clairvoyance from pleaders" in determining whether the requirements of Rule 9(b) have been met. Id. at 681. Rather, "if the defendant has fair notice of the charges against him, [Rule 9(b)] is satisfied." Shapiro v. Merrill Lynch & Co., 634 F. Supp. 587, 593 -594 (S.D. Ohio 1986); see also Michaels Bldg. Co., 848 F.2d at 680. However, "a district court need not accept claims that consist of no more than mere assertions and unsupported or unsupportable conclusions." Sanderson v. HCA - The Health Care Co., No 04-6342, 2006 WL 1302479, at *2 (6th Cir. 2006).

*Dismissal of RICO Claims*

In Count 1 of the complaint, the Plaintiff alleges that Crews & Hancock, among others, violated RICO, codified at 18 U.S.C. § 1961 et seq., which provides that

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). In order to establish a RICO violation, the Plaintiff must show that Crews & Hancock engaged in "(1) conduct, (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). "In addition, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the [predicate acts] constituting the violation." Id. at 496, 105 S.Ct. at 3285; see also 18 U.S.C. § 1964(c). In the instant motion, Crews & Hancock allege that the Plaintiff has failed to state a claim for a violation of RICO and, on that basis, contend that the complaint must be dismissed.[2]

A "pattern of racketeering activity" is demonstrated by "at least two acts of racketeering activity, one of which occurred after the effective date of [RICO] and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1962(c), § 1961(5). In addition, proof of a pattern of racketeering activity requires a showing that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." H.J., Inc., v. Nw. Bell Tel. Co., 492 U.S. 229, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). In the instant action, Plaintiff's RICO claim is premised on predicate acts of mail and wire fraud. (Compl. ¶¶ 214, 232.) Section 1961(1) enumerates specific acts which constitute

[2]In so doing, Crews & Hancock have incorporated by reference their arguments seeking dismissal of the RICO claims alleged in Gross.

racketeering activity, including acts of mail fraud indictable under the federal mail fraud statute, 18 U.S.C. § 1341,[3] and acts of wire fraud indictable under the federal wire fraud statute, 18 U.S.C. § 1343.[4] 18 U.S.C. § 1961(1)(B). In order to be "indictable" and thus, to sustain a claim under the RICO Act, each element of the predicate act must be proved. Cent. Distrib. v. Conn, 5 F.3d 181, 183-84 (6th Cir.1993). Moreover, as noted above, to survive a motion to dismiss pursuant to Rule 9(b), the complaint must plead the circumstances of the mail and wire fraud with particularity. Fed. R. Civ. P. 9(b).

"The elements of mail and wire fraud are: (1) a scheme to defraud, and (2) use of the mails,or of an interstate electronic communication, respectively, in furtherance of the scheme." Advocacy Org. for Patients & Providers v. Auto Club Ins. Assoc., 176 F.3d 315, 322 (6th Cir.1999); see also

---

[3] 18 U.S.C. § 1341, provides in relevant part that

> [w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341.

[4] 18 U.S.C. 1343 provides that

> [w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both . . .

18.U.S.C. § 1343.

Carpenter v. United States, 484 U.S. 19, 25 n.6, 108 S.Ct. 316, 320 n.6 (1987) (noting that the same analysis applies to offenses under both the mail and wire fraud statutes). The Sixth Circuit has defined a

> scheme to defraud as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the designed end. In other words, in order to present a cognizable claim for fraud, the plaintiff[] must show that [the defendants] made a material misrepresentation of fact that was calculated or intended to deceive persons of reasonable prudence and comprehension, and must also show that [the] plaintiff[] in fact relied upon that material misrepresentation.

VanDenBroeck v. CommonPoint Mortgage Co., 210 F.3d 696, 701 (6th Cir. 2000) (internal quotations and citations omitted); see also Advocacy Org., 176 F.3d at 322 (quoting Kenty v. Bank One, Columbus, N.A., 92 F.3d 384, 389-90 (6th Cir.1996)); Cent. Distrib., 5 F.3d at 184; Blount Fin. Servs., Inc., 819 F.2d at 152-53.

In Neder v. United States, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), the United States Supreme Court held that the "common-law requirements of 'justifiable reliance' and 'damages' . . . plainly have no place in the federal [mail and wire] fraud statutes." Neder, 527 U.S. at 24-25, 119 S.Ct. at 1841. In reaching this conclusion, the Supreme Court relied on the express language of the fraud statutes, noting that, by imposing such requirements, the statutes' prohibition on the "scheme to defraud," rather than the completed fraud, would be thwarted. Id. However, as noted in the quoted passage from VanDenBroeck, Sixth Circuit case law consistently espouses a reliance requirement to establish RICO claims. See VanDenBroeck, 210 F.3d at 701. In Chaz Construction, L.L.C. v. Codell, LLC, 137 F. App'x 735 (6th Cir. 2005), the Sixth Circuit addressed this seeming conflict and determined that, while, to be consistent with Neder, a "plaintiff need not plead detrimental reliance as an *element* of each predicate act of mail or wire fraud underlying his RICO claims," reliance must be demonstrated to establish standing in a civil RICO case. Brown v.

Cassens Transp. Co., 409 F.Supp.2d 793, 807 (E.D. Mich. 2005) (citing Chaz Constr., L.L.C., 137 F.App'x at *2.) (emphasis added). In reaching this conclusion, the Sixth Circuit distinguished Neder on the basis that, unlike a criminal prosecution under the federal mail fraud statute, a plaintiff must have standing to pursue civil RICO claims.[5] Chaz Constr., L.L.C., 137 F.App'x at *2-3.

RICO's statutory standing provision, 18 U.S.C. § 1964(c), provides a private cause of action under RICO for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). In interpreting this provision, the United States Supreme Court has held that "[a] plaintiff's right to sue under § 1964(c). . . requires a showing that the defendant[s'] violation was the proximate cause of the plaintiff's injury." Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 112 S.Ct. 1311, 1312 (1992) (concerning standing in a RICO action predicated on acts of securities fraud); see also Anza v. Ideal Steel Supply Corp., 126 S.Ct. 1991 (U.S. June 5, 2006) (No. 04-433). According to the Holmes court, in this context,"proximate cause" requires "some direct relation between the injury asserted and the injurious conduct alleged." Id. at 268, 112 S.Ct. 1311; see also Anza, 2006 WL 1519365, at *6 ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries"); Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (finding, in RICO action based on predicate acts of mail and wire fraud, that a plaintiff's damages must "flow from the commission of the predicate acts"); Trollinger v. Tyson Foods, Inc., 370 F.3d 602, 612 (6th Cir. 2004) (citing Holmes for the proposition that RICO

---

[5]As indicated in the quoted passage from VanDenBroeck, see supra p.10, courts in this circuit considering RICO claims predicated on acts of mail and wire fraud often conflate the standing issue with discussion of the existence of the predicate acts. VanDenBroeck, 210 F.3d at 701 (holding, in a civil RICO case based upon predicate acts of mail and wire fraud, that the plaintiff must plead that he "relied upon [a] material misrepresentation" to establish the fraud statutes' requisite "scheme to defraud"). In light of Neder and Chaz Construction, the Court will address the matters separately.

statutory standing requires a showing of proximate cause).

The Sixth Circuit has interpreted § 1964(c)'s causation requirement to require a plaintiff to plead reliance in order to state a civil RICO claim predicated on acts of fraud.[6] See Chaz Constr., L.L.C., 137 F.App'x at *2; Cent. Distrib., 5 F.3d at 184; Blount Fin. Servs., Inc., 819 F.2d at 152 ; Brown, 409 F. Supp.2d at 807; Moon v. Harrison Piping Supply, 375 F.Supp.2d 577, 597 (E.D. Mich. 2005) (citing Grantham & Mann, Inc. v. Am. Safety Prod.., Inc., 831 F.2d 596, 605 (6th Cir.1987)); Armbruster v. K-H Corp., 206 F.Supp.2d 870, 898 (E.D. Mich.2002) (holding that a civil RICO complaint based upon predicate acts of mail fraud must plead the plaintiff's reliance upon the defendant's misrepresentation); Paycom Billing Servs., Inc. v. Payment Res. Int'l, 212 F.Supp.2d 732, 736 (W.D. Mich.2002) (holding that a civil RICO complaint based upon predicate acts of mail fraud must plead the plaintiff's reliance upon the defendant's material misrepresentation). The reliance requirement has been further interpreted to mean that "[a plaintiff] cannot maintain a civil RICO claim [predicated on mail or wire fraud] against . . . defendants absent evidence that the defendants made misrepresentations or omissions of material fact to [the plaintiff] and evidence that [the plaintiff] relied on those misrepresentations or omissions to its detriment." Cent. Distrib., 5 F.3d at 184.

---

[6]Several other circuits similarly impose reliance as a standing requirement for RICO actions involving fraud. See Summit Props. Inc. v. Hoechst Celanese Corp., 214 F.3d 556, 562 (5th Cir.2000) ("when civil RICO damages are sought for injuries resulting from fraud, a general requirement of reliance by the plaintiff is a commonsense liability limitation"); Chisolm v. TranSouth Fin. Corp., 95 F.3d 331, 337 (4th Cir. 1996) (explaining that the Fourth Circuit's requirement that civil RICO plaintiffs demonstrate detrimental reliance "ensures the existence of a 'direct relation between the injury asserted and the injurious conduct alleged' required under Holmes); Appletree Square I, Ltd. P'ship v. W.R. Grace & Co., 29 F.3d 1283, 1286 (8th Cir.1994) ("In order to establish injury to business or property 'by reason of' a predicate act of mail or wire fraud, a plaintiff must establish detrimental reliance on the alleged fraudulent acts."); Metromedia Co. v. Fugazy, 983 F.2d 350, 368 (2d Cir.1992), *abrogated on other grounds as recognized in* Yung v. Lee ,432 F.3d 142, 147-48 (2d Cir.2005) ( "[i]n the context of an alleged RICO predicate act of mail fraud, we have stated that to establish the required causal connection, the plaintiff was required to demonstrate that the defendant's misrepresentations were relied on.")

Among many arguments as to why the Plaintiff's RICO claim should be dismissed, Crews & Hancock assert that Plaintiff has failed to make this required showing. Specifically, the Defendant argues that the complaint relies entirely on allegations of misrepresentations or omissions to regulators rather than to ROA/TRG. Because the complaint fails, other than in conclusory fashion, to assert that Crews & Hancock made misrepresentations or omissions to the RRGs *and* that the RRGs relied on them to their detriment, Crews & Hancock contends that the Plaintiff lacks standing under RICO. In response to Crews & Hancock's assertions, the Plaintiff alleges that the RRGs as well as their policyholders suffered injury as a result of its reliance on "the RICO Defendants'"[7] racketeering activity, comprised of multiple acts of mail and wire fraud based on various alleged schemes to defraud. In support of this contention, the Commissioner directs the Court to the following specific paragraphs of the complaint in which reliance is alleged:

¶ 204 The subscriber/insureds of the RRGs were also damaged in that they continued to rely on the RRGs to provide them with viable insurance.

¶ 205 For example, the Tennessee Bar Association endorsed ANLIR to its membership. This recommendation was made upon a review of the ANLIR insurance rating, which was procured through ANLIR's relationship with ROA, TRG, and Gen Re. Thousands of licensed attorneys in Tennessee (as in other states when ANLIR was endorsed by state or local bar associations) chose ANLIR as their legal malpractice carrier based on the recommendation by the Tennessee Bar Association.

¶ 206 In the summer of 2002, members of the Professional Liability Committee of the Tennessee Bar Association began to question the continued advisability of endorsing ANLIR. In a series of meetings, [Defendant Robert L.] Sanders and certain of the Management Defendants assured the Committee that ANLIR remained actuarially sound, thereby inducing the Committee to recommend that the Tennessee Bar Association continue to endorse ANLIR. These assurances were made by Sanders and the Management Defendants in spite of their knowledge that the Loss Portfolio Transfer and the 2002

[7]The RICO Defendants are defined in the complaint as Patterson, Crews, Hudgins, Kelley, McLean, Bland, Kellogg, Seeger, Migel, Reindel, Sanders, Witkowski, Gen Re, Milliman, Crews & Hancock and Atlantic Security. (Compl. at ¶ 24)

Unreported Side Agreement had left ROA, ANLIR's reinsurer, financially impaired.

¶ 234 The RRGs, the [Tennessee Department of Commerce and Insurance ("TDCI")], and the insureds of the RRGs justifiably and reasonably relied to their detriment on the material misrepresentations and omissions by the RICO Defendants.

¶ 238 As previously described herein, the Defendants made multiple materially false misrepresentations to the RRGs, the TDCI, and the subscriber/insureds of the RRGs upon which they justifiably and reasonably relied to their detriment.

¶ 239 Said representations were made with the knowledge and intent that they would be relied upon, and/or the representations were made negligently and/or wantonly and/or willfully and/or recklessly and/or intentionally.

Even assuming that the omissions and misrepresentations alleged in the complaint to have been made by Crews & Hancock were made to the RRGs, the Court, after a review of the more than 279 paragraphs of the complaint, agrees with Crews & Hancock that detrimental reliance has not adequately been plead. Pursuant to Rule 9(b), reliance must be plead with particularity. Blount Fin. Servs., 819 F.2d at 152 ("Fraud alleged in a RICO civil complaint for mail fraud must state with particularity the false statement of fact made by the defendant which the plaintiff relied on and the facts showing the plaintiff's reliance on defendant's false statement of fact."); see also Dowling v. Select Portfolio Servicing, Inc., No. 2:05-CV-049, 2006 WL 571895, *7 (S.D. Ohio March 7, 2006) ("the plaintiff must plead the element of reliance with particularity."); Evans, 434 F.3d at 852 -853 (affirming dismissal of fraud action where plaintiff failed to plead reliance with particularity as required by Rule 9(b)); McGee v. City of Warrensville Heights, 16 F.Supp.2d 837, 850 (N.D. Ohio 1998) (dismissing RICO action where complaint failed to allege misrepresentations or reliance with particularity); Gould, Inc. v. Mitsui Mining & Smelting Co., Ltd., 750 F.Supp. 838, 842-43 (N.D. Ohio 1990) (finding that both the false statement or omission and the reliance thereon by the plaintiff must be pled with particularity in civil RICO action based on mail or wire fraud).

Paragraphs 204, 234, 238 and 239 lack factual details concerning reliance and, at most, offer only general and conclusory statements of detrimental reliance. Such allegations cannot survive a motion to dismiss pursuant to Rule 9(b). See Blount Fin. Servs., 819 F.2d at 152; see also Piccone v. Bd. of Dir. of Doctors Hosp. of Staten Island, Inc., No. 97 Civ. 8182(MBM), 2000 WL 1219391, *5 (S.D.N.Y. Aug. 8, 2000) (finding complaint paragraph containing no factual allegations and stating in a conclusory fashion that plaintiff relied on misrepresentations and omissions insufficient to establish reliance).

Paragraphs 205 and 206 allege that the Tennessee Bar Association was led to endorse ANLIR in accordance with various fraudulent schemes committed by some of the defendants. In addition, they fail to demonstrate reliance by the RRGs. Specifically, the allegations lack an explanation as to whether and how the RRGs relied on acts of mail or wire fraud committed by Crews & Hancock[8] and fail to demonstrate that the injury cited resulted from the RRGs' reliance thereon. Taking as true the allegations contained in these paragraphs, at most, they assert that fraudulent actions were undertaken by defendants in this action which resulted in injury to policyholders of at least one of the RRGs. However, such a tenuous relationship between the RICO predicate acts and injury is not sufficient to establish standing pursuant to 18 U.S.C. § 1964(c) in this Circuit. See Line v. Astro Mfg. Co., Inc., 993 F. Supp. 1033, 1038 (E.D. Ky. 1998) (dismissing RICO claim where complaint failed to allege with particularity the facts showing the plaintiff's reliance on the defendants' statements or omissions.) Rather, to survive a motion to dismiss pursuant to Rule 9(b), the Plaintiff must plead with particularity that the RRGs relied on the cited acts of mail

[8]Indeed, the only Defendant specifically named in the referenced allegations, Sanders, was, according to Flowers' complaint, a principal of Defendant Milliman USA, Inc. (Compl. at ¶¶ 8-9) The Management Defendants as referenced in ¶ 206 are defined in the complaint as Crews, Kelley, McLean, Patterson and Hudgins. (Compl. at ¶ 22)

and wire fraud by Crews & Hancock and, as a result of that reliance, suffered injury. See Blount Fin. Servs., 819 F.2d at 152. At the most, the referenced allegations charge that the Tennessee Bar Association relied on the assurances made by Sanders and others and that its member lawyers relied on the association's endorsement in purchasing insurance. It is also worth noting here that, while Flowers argues in her response to the instant motion that she has standing to bring this action on behalf of the RRGs and the policyholders, the complaint itself states only that she "brings this action in her capacity as Liquidator for DIR, ANLIR, and TRA." (Compl. at ¶ 2) Thus, injury suffered by the policyholders does not, in this Court's view, establish standing on the part of the Commissioner.

As noted above, the Sixth Circuit is not alone in imposing a reliance requirement to establish proximate cause in civil RICO actions predicated on fraud. See supra p.14 n.6; see also Summit Prop. Inc. v. Hoechst Celanese Corp., 214 F.3d 556, 560 (5th Cir. 2000) (noting that "most other circuits . . . require a showing of detrimental reliance" in civil RICO fraud actions and listing cases). The Fifth Circuit has explained that the requirement is consistent with Holmes' "admonition that federal courts employ traditional notions of proximate cause when assessing the nexus between a plaintiff's injuries and the underlying RICO violation." Id. at 560. "For a misrepresentation to cause an injury, there must be reliance. Knowledge of the truth defeats a claim of fraud because it eliminates the deceit as the "but for" cause of the damages." Sandwich Chief of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co., 319 F.3d 205, 218-19 (5th Cir. 2003).

However, other courts have found no basis for interpreting a reliance requirement in RICO's standing provision to demonstrate causation. For example, in Systems Management, Inc. v. Loiselle, 303 F.3d 100 (1st Cir. 2002), the First Circuit Court of Appeals rejected finding such a requirement by reasoning that

> [i]t is true that at common law a civil action for fraud ordinarily requires proof that the defrauded plaintiff relied upon the deception, and some courts have imported this

> requirement into RICO actions where the predicate acts comprise mail or wire fraud. But RICO bases its own brand of civil liability simply on the commission of specified criminal acts-here, criminal fraud-so long as they comprise a "pattern of racketeering activity"; and criminal fraud under the federal statute does not require "reliance" by anyone: it is enough that the defendant sought to deceive, whether or not he succeeded. . . .
>
> Perhaps there is some surface incongruity in allowing a civil RICO plaintiff to recover for fraudulent acts even though the same plaintiff could not (for lack of reliance) recover for fraud at common law. But Congress structured its civil remedy to allow recovery for harm caused by defined criminal acts, including violation of section 1341; and, as noted, the federal mail fraud statute does not require reliance. Thus, under a literal reading of RICO-the presumptive choice in interpretation-nothing more than the criminal violation and resulting harm is required.
>
> This is not a conclusive argument; common law (and other) concepts can often be imported to flesh out a federal statute. Indeed, we assume here that Congress intended to require not only "but for" but also "proximate cause" to link the criminal act with the harm to the plaintiff, even though the statute says nothing specific on this point. But proximate cause-largely a proxy for foreseeability-is not only a general condition of civil liability at common law but is almost essential to shape and delimit a rational remedy: otherwise the chain of causation could be endless.
>
> By contrast, reliance is a specialized condition that happens to have grown up with common law fraud. Reliance is doubtless the most obvious way in which fraud can cause harm, but it is not the only way . . . There is no good reason here to depart from RICO's literal language by importing a reliance requirement into RICO.

Sys. Mgmt., Inc., 303 F.3d at 103-4; see accord Anza, 2006 WL 1519365, at *15-17 (Thomas, J., dissenting) (citing Sys. Mgmt., Inc.).

In Holmes, the Supreme Court reasoned that requiring that proximate cause, interpreted as a "direct relation between the injury asserted and the injurious conduct alleged" would sufficiently ensure deterrence of injurious conduct because "directly injured victims can generally be counted on to vindicate the law . . . without any of the problems attendant upon suits by plaintiffs injured more remotely." Holmes, 503 U.S. at 269-70, 112 S.Ct. at 1318-19. In the instant case, the Plaintiff appears to be arguing both a direct injury on the part of the RRGs and indirect, derivative injury arising from that suffered by ROA. With respect to a claim of direct injury as a result of alleged

fraudulent conduct by Crews & Hancock, the Plaintiff has not demonstrated that *the RRGs* relied to *their* detriment on misrepresentations or omissions alleged herein that were directed to *them*. Therefore, under Sixth Circuit precedent, Flowers has no standing to pursue RICO claims on behalf of the RRGs.

The Court notes that, in what appears to be a means to reconcile this seeming inconsistency in the law, some Circuits which require reliance to establish standing pursuant to 18 U.S.C. § 1964(c) have adopted a "target theory" exception, employed most commonly in cases of competitor fraud.[9] See e.g. Proctor & Gamble Co. v. Amway Corp., 242 F.3d 539, 564-65 (5th Cir. 2001) ("noting that the Fifth Circuit permits "a target of a fraud that did not itself rely on the fraud [to] pursue a RICO claim if the other elements of proximate causation are present."); Mid Atlantic Telecom, Inc. v. Long Distance Servs., Inc., 18 F.3d 260, 263-64 (4th Cir. 1994) (remanding to allow plaintiff additional discovery to determine whether it was the "target" of the defendant's fraud). Pursuant to this theory, reliance is excused "when the plaintiff can demonstrate injury as a direct and contemporaneous result of fraud committed against a third party, because in this limited context there is a sufficient 'direct relation between the injury asserted and the injurious conduct alleged' to comport with the RICO requirement of proximate cause." Sandwich Chief of Tex., Inc., 319 F.3d at 223. In Proctor & Gamble, the exception was employed where a competitor lured the

---

[9]In Anza, the Supreme Court, considering a case of competitor fraud, held that "[a] RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense." Anza, 2006 WL 1519365, at *6. However, in reaching that conclusion, the Court noted that, under the facts of the case, there was no direct relationship between the purported injury and the injurious conduct as required under Holmes. Id. at *6. Further, the Court explicitly declined to address whether a showing of reliance was required to establish standing under RICO. Id. at *7.

Because the target exception, as discussed herein, requires that the plaintiff suffer a direct injury, it appears that the exception does not conflict with the Supreme Court's opinion in Anza. However, because of the recency of the opinion, circuits applying the exception have not yet had occasion to consider the issue.

plaintiff's customers away by fraud directed, not at the plaintiff, but rather at the plaintiff's customers. Specifically, the defendant spread a rumor among Proctor & Gamble's customers that caused them to cease purchasing the company's products. Proctor & Gamble Co., 242 F.3d at 564-65. Because no misrepresentation was directed at the plaintiff, the plaintiff was unable to demonstrate reliance. However, the Fifth Circuit excused the requirement, finding that proximate cause was satisfied because the plaintiff was the target of the scheme to defraud and suffered direct injury as its result. Sandwich Chief of Tex., Inc., 319 F.3d at 221-23; cf. Anza, 2006 WL 1519365, at *6 (finding that where injury is indirect, a "RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense"); but see Johnson Enter. of Jacksonville, Inc. v. FPL Group, Inc., 162 F.3d 1290, 1318 (11th Cir.1998) (noting that a plaintiff's injury is not proximately caused by a defendant's misrepresentations when the injury results only from the detrimental reliance of a third party).

In Sandwich, the Fifth Circuit considered application of the target exception to a case in which regulators rather than the plaintiffs were deceived. In that action, an insured employer brought a class action suit under RICO against casualty insurance companies that charged excessive premiums on worker's compensation insurance policies claiming that the plaintiff policyholders were injured as a result of the defendants' misrepresentations to regulators regarding the premiums charged. Id. at 211-13. Similar to the instant action, the Sandwich defendants claimed that, since the alleged misrepresentations were directed to and relied upon by *regulators*, not the plaintiffs, proximate cause was not satisfied. While the court left open the possibility that defrauding a regulator could, in some instances proximately cause injury and thus, fall within the Circuit's target exception, it declined to apply the exception because, in order for the policyholder to be injured,

> it would always be necessary for the regulator to be deceived *and* for the policyholder to pay an unlawfully-inflated premium. Although disclosure of the true

> premium to a regulator could *prevent* injury to policyholders by prompting the regulator to interdict the carrier's attempt to bill at an inflated rate, concealment of inflated premiums would not result in direct and contemporaneous injury to the policyholder without the additional act of billing. [Thus,] [t]he regulator's reliance on the fraudulent act would not alone be enough to result in a direct and contemporaneous injury to a policyholder that satisfies RICO's proximate cause requirement.

Id. at 224 (emphasis in original). Here, it appears that the injuries claimed by the RRGs were the direct result of the fraudulent schemes by Crews & Hancock and others undertaken to deceive regulators and on which the regulators relied. However, as noted above, the Sixth Circuit has not adopted the target theory and continues to require that a civil RICO plaintiff demonstrate its personal reliance on a misrepresentation or omission made to it by the defendants. Because this Court is bound by the law of this Circuit, and because the complaint does not plead reliance with particularity, the Plaintiff's § 1962(c) claim must be DISMISSED.

To the extent the Plaintiff seeks recovery for indirect or derivative injury based on the RRGs' financial and/or contractual relationship with ROA, dismissal of such claims is also appropriate. In her Complaint, Flowers avers that "[t]he acts of fraud, the conspiracies, the misrepresentations, and the acts of negligence that Commissioner Gross alleges in his action against the persons or entities named herein gave rise to damages suffered not only by ROA/TRG, but also by the RRGs. A significant portion of the monetary injury claimed by Commissioner Gross in his lawsuit directly relates to ROA's inability to pay claims submitted and/or incurred by the RRGs and their policyholders." (Compl. at ¶ 51) However, as the Sixth Circuit recently observed in Trollinger, RICO standing has been consistently denied "to parties who suffer derivative or passed-on injuries." Trollinger, 370 F.3d at 614 (citing cases).

Finally, the Court notes that Plaintiff is not without recourse for the wrongs alleged in this action. As noted in In re Teledyne Defense Contracting Derivative Litigation,

> . . . RICO was not intended to federalize internal corporate relationships. If the Corporation and its shareholders were in fact injured by the alleged actions or inactions of the [defendant officers and directors], they are free to pursue traditional breach of fiduciary duty corporate remedies under state law.

In re Teledyne Defense, 849 F. Supp. at 1377.

Count I also alleges that Crews & Hancock violated 18 U.S.C. § 1962(d), which prohibits conspiracy to violate the section's other substantive provisions.[10] 18 U.S.C. § 1962(d). The standing requirement of 18 U.S.C. § 1964(c) applies to all claims brought pursuant to RICO, including conspiracy claims under § 1964(d). Beck v. Prupis, 529 U.S. 494, 500-01, 120 S.Ct. 1608, 1613-14, 146 L.Ed.2d 561 (2000). Accordingly, to have standing to pursue a civil RICO conspiracy claim, the Plaintiff must allege that the RRGs were "'injured by reason of' a 'conspiracy.'" Id. (quoting 18 U.S.C. §§ 1964(c), 1962(d)). In Beck, the United States Supreme Court held"that a person may not bring suit under § 1964(c) predicated on a violation of § 1962(d) for injuries caused by an overt act [in furtherance of the racketeering conspiracy] that is not an act of racketeering or otherwise unlawful under the statute." Beck, 529 U.S. at 507, 120 S.Ct. at 1617. Thus, to state a claim for civil RICO conspiracy under § 1964(c), the Plaintiff must allege that the RRGs suffered injury as a proximate result of an overt act in furtherance of the conspiracy that is *itself* an act of racketeering activity or otherwise unlawful under RICO.[11]

Although the complaint does not specifically identify the conspiratorial acts engaged in by

---

[10]Specifically, the statute provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

[11]Thus, under Beck and Holmes, § 1964(c) requires that racketeering acts proximately cause the injury complained of by a civil RICO plaintiff in actions pursuant to both §1962(c) and § 1962(d). Cf. Elkins v. Chapman, 36 Fed. Appx. 543, 544 (6th Cir. 2002) ("In order to state a claim under § 1962(c), a complaint must allege that an act of racketeering activity was the cause of the injury."); see also Jones v. Enter. Rent A Car Co. of Tex., 187 F.Supp.2d 670, 678 (S.D. Tex. 2002) (dismissing plaintiff's RICO claims pursuant to § 1962(a),(b), (c) and (d) where the complaint failed to allege that the defendants' commission of wire fraud, mail fraud, and institutional fraud proximately caused her injuries).

Crews & Hancock, the Court, for purposes of this motion, assumes that such acts encompass the racketeering acts of mail and wire fraud alleged elsewhere in the complaint. However, as discussed above, the complaint fails to allege that the RRGs were injured as a proximate result of those racketeering acts because it does not plead with particularity facts demonstrating reliance by the RRGs. See discussion supra; Cent. Distrib., 5 F.3d at 184; Chaz Constr., L.L.C., 137 F.App'x at *2. Because the complaint insufficiently pleads proximate causation under prevailing Sixth Circuit precedent, the Plaintiff lacks standing pursuant to § 1964(c). Accordingly, the § 1962(d) claim must be DISMISSED. Chaz Constr., LLC, 137 F.App'x at 739 (holding, without identifying the particular RICO claim at issue, that a "plaintiff[] must plead reliance in order to establish standing in a civil RICO case").

*State Law Claims*

In addition to the Plaintiff's RICO claims, the complaint also asserts claims under state law for, among others, breach of fiduciary duty, common law fraud, and conspiracy under state law. Rather than attempting to mold RICO to fit the particulars of these claims, they may be more properly addressed under existing state law frameworks. The Plaintiff's state law claims will be addressed by the Court in a separate order.

*Plaintiff's Request to Amend Complaint*

In her response to the motion to dismiss, Flowers requested that, to the extent the Court concluded her claims lacked the necessary specificity and/or particularity, she be permitted to amend her complaint. Motions to amend a complaint are governed by Rule 15 of the Federal Rules of Civil Procedure, which instructs that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Denial of such a request may be warranted, however, where there exists "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies

by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment." Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); Morse v. McWhorter, 290 F.3d 795, 800 (6th Cir. 2002).

In reply to Flowers' response, Crews & Hancock suggests only that amendment would be futile, considering the input of much time and talent already expended in these cases. Although the Court recognizes that futility may be found where the amendment would not withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6), it cannot say at this point based on the information before it that the Plaintiff could not come forward with facts sufficient to establish detrimental reliance on fraudulent misrepresentations or omissions supportive of standing under § 1964(c). See Morse, 290 F.3d at 800 (finding that, in securities fraud cases, "leave to amend is particularly appropriate where the complaint does not allege fraud with particularity"). Accordingly, the Plaintiff's request to amend the complaint in order to cure this deficiency is GRANTED.

CONCLUSION

Based on the foregoing, the motion of Defendant Crews & Hancock to dismiss the federal RICO claims alleged in this case is hereby GRANTED. Further, for the reasons set forth herein, the Plaintiff may amend her complaint within 60 days of the entry of this order.

**IT IS SO ORDERED** this 6th day of July, 2006.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE