IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

In re

RECIPROCAL OF AMERICA (ROA)
SALES PRACTICES LITIGATION

Master File No. MDL 1551

This Document Relates to:
Civil Action No. 04-2294

---

## ORDER GRANTING MOTION OF DEFENDANTS GENERAL REINSURANCE CORPORATION, THOMAS M. REINDEL, TOMMY N. KELLOGG AND VICTORIA J. SEEGER TO DISMISS SECOND AMENDED COMPLAINT

---

## INTRODUCTION

Before the Court in this multi-district litigation is the motion of the Defendants, General Reinsurance Corporation ("Gen Re"), Thomas M. Reindel, Tommy N. Kellogg and Victoria J. Seeger (collectively, the "Gen Re Defendants") to dismiss the second amended complaint filed against them by the Plaintiffs, Missouri Health Plan ("MHP"); Hospital Services Group, Inc. ("HSG"); Healthcare Services Association ("HSA"); Providers Insurance Consultants, Inc. ("ProCon"); and Medical Liability Alliance ("MLA") (collectively referred to herein as the "MHP Plaintiffs" or the "Plaintiffs"), all of which are Missouri entities engaged in business dealings with Reciprocal of America ("ROA"), a Virginia unincorporated association and reciprocal insurer, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

## FACTUAL ALLEGATIONS

The facts in this litigation have been summarized as follows:

This case arises from the insolvency of a Virginia reciprocal insurer, ROA, and three Tennessee reciprocal risk retention groups that were largely reinsured by ROA, DIR, TRA and ANLIR. ROA was first organized in response to a perceived shortage in the Virginia market of medical liability (especially hospital liability) insurance

1

options.  For many years, the company seemed to grow and do well, returning to its hospital-owners substantial dividends.  The benevolent period during which this growth occurred emboldened management, especially the enterprising attorney (John William Crews), who had first organized ROA and served as its general counsel. Together with his law firm, Crews & Hancock, and his associates in senior management and the board of directors (eventually including defendants Richard W.E. Bland, Kenneth Patterson, Judith A. Kelley, Carolyn B. Hudgins, Gordon D. McLean, and Ronald K. Davis, M.D. in his capacity as chairman of the board of DIR), Crews took ROA (initially known as [Virginia Professional Underwriters, Inc. ("VPUI") and The Virginia Insurance Reciprocal ("TVIR")]) from a small, single-state hospital insurer to a multi-state major player in the liability insurance market. During this time the company grew in size and complexity, diversifying its coverage by adding physician and lawyer malpractice, as well as workers' compensation and other types of insurance.  In due course, the three Tennessee risk retention groups were created to avoid some of the burdens of Virginia insurance regulation and to specialize in some of the newer lines of business (physician malpractice for DIR, attorney malpractice for ANLIR, and health care liability for TRA), enabling segregation of risk as well.  Crews participated actively in the management of the four insurance companies which, in many respects, were under common management.     However, each was owned by a different group of policyholders/owners.  Three of the four reciprocal insurance companies (i.e., DIR, TRA, and ANLIR) also qualified as lightly regulated Tennessee risk retention groups, a key reason for their formation.  Those three companies were largely reinsured by ROA, the Virginia reciprocal, so that ultimately the latter became liable for most of their insurance risks.

During the 1970s and 1980s a number of well-publicized insurance insolvencies sensitized the insurance-buying public, especially commercial insureds, to the importance of financial soundness.  Ratings accorded insurers by independent organizations, like A.M. Best, took on added value in the marketplace.  Crews and his associates understood well the need to address that concern as a precursor to successful competition for lucrative new customers.  For a young, and relatively small, insurer like ROA, the appearance of financial stability could be created without actually amassing the necessary capital and surplus, a daunting and very lengthy process.  Instead, they could arrange for a well-respected and well-heeled reinsurer to at least appear to stand behind its obligations through reinsurance.  Of great value, this enabled the reinsured, ROA, to utilize Best's rating of the reinsurer. For this role, Crews and his associates selected one of the world's largest reinsurers, Gen Re.  From the beginning, Crews had close business and personal ties with Gen Re and its management (including at various times, Reindel, Kellogg, and Seeger). Together these individuals, along with others, formed an informal "*de facto*" partnership to improve the appearance of ROA's balance sheet and stated surplus by ceding business from ROA to Gen Re.  ROA was accorded superior ratings from Best's Insurance Reports in part because of ROA's reinsurance relationship with Gen

2

Re, which A.M. Best rated A++ Superior.  Best's Insurance Reports noted that "ROA's principal reinsurer is Gen Re." From a regulatory perspective, this permitted ROA to reduce the liability it had to recognize on its books by the amount for which the reinsurer would be liable (referred to in the industry as "reserve credit").  By providing ROA with this reinsurance, Gen Re earned lucrative ceding commissions from ROA.  But the arrangement was structured so that, in reality, the risk assumed by Gen Re was minimal.  Indeed, Gen Re entered into, and participated in, this arrangement with the full expectation that every year it would earn valuable reinsurance premiums with little danger of experiencing a net loss.  At times, the illusion of reinsurance was additionally maintained through deceptive financial reinsurance, in which loans from Gen Re to ROA and [First Virginia Reinsurance, Ltd. ("FVR")] were guised as substantial insurance risk of net loss.

Crews and other members of management also sought to minimize regulatory oversight and taxation of ROA, ANLIR, DIR, and TRA and their owners.  Toward this end, Crews formed the offshore Bermuda captive FVR to serve as reinsurer for ROA's physicians and attorney liability insurance business (and later, ROA's net retained share of risk on the DIR and ANLIR business), thereby enabling profits on that business to accumulate on a tax deferred basis.  Atlantic Security and Witkowski served as FVR's agents in Bermuda.  An offshore reinsurer's profits are not subject to United States taxation so long as the reinsurer does no business in the United States.  Crews devised the use of FVR as a means to hold profits from ROA's retained business (for use as surplus to policyholders) while sheltering ROA's physician and lawyer subscribers from taxation on those profits until distribution.  But, under Virginia law, reserve credit for reinsurance provided by offshore companies can only be taken to the extent of an acceptable security trust funded and maintained in the U.S.  Moreover, this reliance by ROA upon FVR as reinsurer brought the latter within the scrutiny of Virginia insurance officials.

Starting in or about 1990, when regulators began asking too many questions about FVR, Crews' law firm and other defendants arranged for Gen Re to remove FVR from the regulators' scrutiny by providing "accommodation" reinsurance to ROA for all of the business that ROA formerly ceded directly to FVR.  Pursuant to this "accommodation reinsurance" arrangement, Gen Re would "accommodate" ROA by acting as a "pass-through" between ROA and FVR, with ROA ceding risk as reinsurance to Gen Re and Gen Re "retroceding" 100% of that risk to FVR.  FVR remained the ultimate "retrocessionaire," but the "accommodation" enabled ROA to report only Gen Re (with its strong balance sheet), and not FVR, as a reinsurer of ROA, thereby removing FVR from the scrutiny of regulators.  As Gen Re later explained, "Reinsurance assumed by FVR was always intended to be 'accommodation reinsurance.'  If this was real reinsurance, rates would have been different.'"

As the insurance enterprise became less lucrative and economic challenges

increased, FVR became chronically underfunded to meet its obligations to Gen Re on the risks ceded from ROA to Gen Re to FVR. If FVR had not been removed from scrutiny of ROA's regulators pursuant to the "accommodation" arrangement with Gen Re, ROA's reserve credit for the business ceded would have been at risk, because such a credit could only have been claimed to the extent of FVR's ability to secure its reinsurance obligations.

Unwilling to take on the increased reinsurance risk from ROA's mounting losses, Gen Re eventually demanded in October, 2000, that the "understanding" behind the "accommodation reinsurance" scheme be memorialized in writing--albeit in the 2000 Unreported Side Agreement kept hidden from the public. Subsequently, ROA's losses grew even worse. Gen Re feared the possibility that it would be found accountable for what the outside public thought was "real reinsurance," and thus in late 2000 devised a complicated plan which would "virtually eliminate" Gen Re's reinsurance risk of net loss as if "Gen Re were never there." Effective on or about December 31, 2001, Gen Re ceased providing "accommodation" reinsurance that required it to be at risk for FVR's financial condition. ROA resumed ceding certain risks directly to FVR, and the Wachovia-FVR Trust was established to secure FVR's reinsurance obligations to ROA. Wachovia served as trustee of the Wachovia-FVR Trust[,] which also became chronically underfunded.

Crews' law firm, Crews & Hancock, reaped substantial fees for legal work performed for ROA, which fees ultimately benefitted the partners at Crews & Hancock, including Crews and Bland. Besides Crews, other members of management came and went, but for the relevant years included McLean, Patterson, Hudgins, and Kelley, all of whom benefitted from the business in the way of substantial salaries and perquisites. A lesser, but significant participant was Davis, who served as Chairman of the Board for DIR, for which he, too, was paid a salary.

Independent auditors and certified actuaries for ROA, ANLIR, DIR, TRA, and FVR also came and went. However, for the relevant years, the independent auditor was [Pricewaterhouse Coopers, LLP ("PwC")] (whose engagement partner was Stephani) and the certified actuary was Milliman (whose work was performed by Sanders). Milliman (beginning in 1997) and PwC (beginning in 1999) reaped substantial fees for having, and maintaining as clients, ROA, ANLIR, DIR, TRA, and FVR.

Eventually, ROA and DIR experienced extreme financial difficulty, due in large part to the nature of the "accommodation reinsurance" scheme, which enabled the companies to grow at an accelerated rate, and generate disproportionate profits, without ever providing the necessary capital and surplus that is essential to weather the inevitable cycles and developments. In order to maintain the false appearance of ROA's continued financial viability and therefore enable themselves to continue and maximize the benefits they were receiving from their association with ROA/TRG (or, in some instances to receive preferential payments), the Management

> Defendants (Crews, Patterson, Hudgins, and Kelley), McLean, the Gen Re Defendants (Gen Re, Seeger, Kellogg, and Reindel), Crews & Hancock, Bland, Davis, Witkowski, Atlantic Security, Milliman, Sanders, Stephani, PwC, and Wachovia conspired to participate, and did participate, in various fraudulent schemes . . .

> The fraudulent schemes included various types of "creative accounting," arbitrary reductions in DIR's and ROA's claim reserves, reinsurance agreements that did not transfer substantial insurance risk of net loss, nondisclosure of modifications to reinsurance agreements that rendered much of ROA's reinsurance receivables from Gen Re illusory, and disguised misappropriations of funds from ROA and the Wachovia-FVR Trust. The defendants appeared to have believed that if they could just conceal ROA's financial troubles long enough, ROA eventually could emerge from a hazardous financial condition without regulators ever being the wiser. Unfortunately, but predictably, things went from bad to worse, and the defendants' success in postponing regulatory intervention resulted in the deepening of ROA's insolvency.

> ROA's concealed insolvency finally came to light only after, in late December of 2002, Virginia regulators discovered the 2002 Unreported Side Agreement and its $135 million aggregate cap, and other financial irregularities. . . .

(Deputy Receiver's Resp. and Mem. In Opp'n to Mot. to Dismiss of Def. Ronald K. Davis, M.D. at pp. 1-7) (internal citations omitted).

According to the complaint, MHP is a not-for-profit provider of professional and general liability insurance to hospitals located in Missouri. (Second Am. Compl. at ¶ 1) HSG, a wholly-owned subsidiary of HSA, provides management services to MHP. (Second Am. Compl. at ¶¶ 2, 3) Not-for-profit corporation HSA was formed to assist its members in offering healthcare services. (Second Am. Compl. at ¶ 3) ProCon is an insurance agency and broker and MLA is a provider of professional and general liability insurance in the health care industry. (Second Am. Compl. at ¶¶ 4, 5) The MHP Plaintiffs allege that the Gen Re Defendants were aware of and utilized their business relationship with ROA to induce the MHP Plaintiffs to enter into certain agreements. The Plaintiffs aver that they terminated the business combination agreements effective April 11, 2002

when they discovered the financial condition of ROA has deteriorated.  (Second Am. Compl. at ¶¶ 32, 33)  The MHP Plaintiffs have instituted this action alleging against these Defendants violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., fraudulent misrepresentation, negligent misrepresentation, conspiracy and common law constructive fraud.

<u>CHOICE OF LAW</u>

The Judicial Panel on Multidistrict Litigation transferred the instant action to this Court from the United States District Court for the Western District of Missouri pursuant to 28 U.S.C. §§ 1407. In such circumstances, the law of the transferee forum generally controls with regard to claims under federal law.  <u>See</u> <u>e.g.</u>, <u>In re Korean Air Lines Disaster of Sept. 1, 1983</u>, 829 F.2d 1171 (D.C. Cir.1987) ("[T]he law of a transferor forum on a federal question . . . merits close consideration, but does not have stare decisis effect in a transferee forum situated in another circuit."); <u>In re Litig. Involving Alleged Loss of Cargo from Tug Atlantic Seahorse, Sea Barge 101 Between P.R. & Fla. in Dec. 1988</u>, 772 F.Supp. 707, 711 (D.P.R. 1991) (noting that, with respect to federal claims, "[a] transferee district court is bound, ultimately, to follow only the law of its own circuit court and the Supreme Court, and that law must be presumed to be as "correct" a statement of federal law as that of the transferor circuit."); <u>In re Nat'l Century Fin. Enter., Inc., Inv. Litig.</u>, 323 F.Supp.2d 861, 876 (S.D. Ohio 2004) ("the rule in multidistrict litigation is that the transferee court, in interpreting federal law, should apply the law of its own circuit rather than the law of the transferor court's circuit.")

By contrast, to the extent that a matter transferred pursuant to 18 U.S.C. § 1407 concerns issues of state law, a transferee court "must apply the state law that would have applied to the

individual cases had they not been transferred for consolidation." In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig., 97 F.3d 1050, 1055 (8th Cir. 1996); see also In re Parmalat Sec. Litig., 412 F.Supp.2d 392, 399 (S.D.N.Y. 2006); In re Air Crash at Detroit Metro. Airport, Detroit, Mich. on Aug. 16, 1987, 791 F.Supp. 1204, 1232 (E.D. Mich.1992) ("application of the choice of law rules of the transferor state . . . to all substantive state-law claims and issues" in an action transferred pursuant to § 1407 is a "well-established proposition of law").  Accordingly, as this case was filed in the United States District Court for the Western District of Missouri, Missouri's substantive state law, including choice-of-law rules, govern the resolution of all state law claims.


## STANDARD OF REVIEW

As noted above, the Gen Re Defendants have filed this motion pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.  Rule 12(b)(6) permits dismissal of a lawsuit for failure to state a claim upon which relief could be granted.  See Fed. R. Civ. P. 12(b)(6).  The Rule requires the Court to "construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle relief."  Grindstaff v. Green, 133 F.3d 416, 421 (6th Cir. 1998).  "[T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim," Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957).  However, "[t]o avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all the material elements of the claim."  Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003).

Rule 9(b) provides that "[i]n all averments of fraud . . . the circumstances constituting fraud

. . . shall be stated with particularity." Fed. R. Civ. P. 9(b).  The Rule serves to put defendants on notice of the conduct complained of by the plaintiff to ensure that they are provided sufficient information to formulate a defense.  Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 679 (6th Cir. 1988).  The Sixth Circuit interprets the particularity requirement "liberally, . . . requiring a plaintiff, at a minimum, to allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud."  Coffey v. Foamex L.P., 2 F.3d 157, 162 (6th Cir.1993) (internal quotations and citations omitted); Blount Fin. Serv., Inc. v. Walter E. Heller & Co., 819 F.2d 151, 152 (6th Cir. 1987) ("Fraud alleged in a RICO civil complaint for mail fraud must state with particularity the false statement of fact made by the defendant which the plaintiff relied on and the facts showing the plaintiff's reliance on defendant's false statement of fact."); see also Evans v. Pearson Enter., Inc., 434 F.3d 839, 852-53 (6th Cir. 2006) (affirming dismissal of fraud action where plaintiff failed to plead reliance with particularity as required by Rule 9(b)).

In ruling on a motion pursuant to Rule 9(b), a court must read the particularity requirement in harmony with the "policy of simplicity in pleading" advanced by Fed. R. Civ. P. 8, which requires that a complaint provide only a "short and plain statement of the claim."  Michaels Bldg. Co., 848 F.2d at 679 (quoting Fed. R. Civ. P. 8).  Accordingly, courts should not be "too exacting" or "demand clairvoyance from pleaders" in determining whether the requirements of Rule 9(b) have been met.  Id. at 681.  Rather, "if the defendant has fair notice of the charges against him, [Rule 9(b)] is satisfied."  Shapiro v. Merrill Lynch & Co., 634 F.Supp. 587, 593 -594 (S.D. Ohio 1986); see also Michaels Bldg. Co., 848 F.2d at 680.  However, "a district court need not accept claims that consist of no more than mere assertions and unsupported or unsupportable conclusions."  Sanderson v. HCA

- The Health Care Co., No 04-6342, 2006 WL 1302479, *2 (6th Cir. May 12, 2006), pet. for cert. filed, 75 U.S.L.W. 3074 (No. 06-220).

ANALYSIS

I. Violation of RICO, 18 U.S.C. § 1962(c)

In their second amended complaint, the MHP Plaintiffs allege that the Gen Re Defendants, among others, violated Section 1962(c) of RICO, which provides that

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  In order to establish a RICO violation, the Plaintiffs must show that the Gen Re Defendants engaged in "(1) conduct, (2) of an enterprise (3) through a pattern (4) of racketeering activity."  Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985).  "In addition, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the [predicate acts] constituting the violation."  Id. at 496, 105 S.Ct. at 3285; see also 18 U.S.C. § 1964(c).  In the instant motion, the Gen Re Defendants allege that the MHP Plaintiffs have failed to state a claim for a violation of RICO and, on that basis, contend that the complaint must be dismissed.

A "pattern of racketeering activity" is demonstrated by "at least two acts of racketeering activity, one of which occurred after the effective date of [RICO] and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity."  18 U.S.C. § 1962(c), § 1961(5).  In addition, proof of a pattern of racketeering activity requires a showing that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."  H.J., Inc., v. NW Bell Tel. Co., 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106

9

L.Ed.2d 195 (1989).  In the instant action, the MHP Plaintiffs' RICO claims are premised on predicate acts of mail and wire fraud.  (Second Am. Compl. at ¶ 126)  Section 1961(1) enumerates specific acts which constitute racketeering activity, including acts of mail fraud indictable under the federal mail fraud statute, 18 U.S.C. § 1341,[1] and acts of wire fraud indictable under the federal wire fraud statute, 18 U.S.C. § 1343.[2]  18 U.S.C. § 1961(1)(B).  In order to be "indictable" and thus, to sustain a claim under the RICO Act, each element of the predicate act must be proved.  Cent. Distrib. v. Conn, 5 F.3d 181, 183-84 (6th Cir.1993).  Moreover, as noted above, to survive a motion to dismiss pursuant to Rule 9(b), the complaint must plead the circumstances of the mail and wire fraud with particularity.  Fed. R. Civ. P. 9(b).

"The elements of mail and wire fraud are: (1) a scheme to defraud, and (2) use of the mails,

---

[1] 18 U.S.C. § 1341, provides in relevant part that
[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.
18 U.S.C. § 1341.

[2] 18 U.S.C. 1343 provides that
[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both . . .
18.U.S.C. § 1343.

or of an interstate electronic communication, respectively, in furtherance of the scheme." Advocacy

Org. for Patients & Providers v. Auto Club Ins. Assoc., 176 F.3d 315, 322 (6th Cir.1999); see also

Carpenter v. U.S., 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 320 (1987) (noting that the same analysis

applies to offenses under both the mail and wire fraud statutes).  The Sixth Circuit has defined a

> scheme to defraud as intentional fraud, consisting in deception intentionally
> practiced to induce another to part with property or to surrender some legal right, and
> which accomplishes the designed end.   In other words, in order to present a
> cognizable claim for fraud, the plaintiff[] must show that [the defendants] made a
> material misrepresentation of fact that was calculated or intended to deceive persons
> of reasonable prudence and comprehension, and must also show that [the] plaintiff[]
> in fact relied upon that material misrepresentation.

VanDenBroeck v. CommonPoint Mortgage Co., 210 F.3d 696, 701 (6th Cir. 2000) (internal

quotations and citations omitted); see also Advocacy Org., 176 F.3d at 322 (quoting Kenty v. Bank

One, Columbus, N.A., 92 F.3d 384, 389-90 (6th Cir.1996)); Cent. Distrib., 5 F.3d at 184; Blount Fin.

Serv., Inc., 819 F.2d at 152-53.

        In Neder v. United States, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), the United

States Supreme Court held that the "common-law requirements of 'justifiable reliance' and

'damages' . . . plainly have no place in the federal [mail and wire] fraud statutes." Neder, 527 U.S.

at 24-25, 119 S.Ct. at 1841.  In reaching this conclusion, the Supreme Court relied on the express

language of the fraud statutes, noting that, by imposing such requirements, the statutes' prohibition

on the "scheme to defraud," rather than the completed fraud, would be thwarted.  Id.  However, as

noted in the quoted passage from VanDenBroeck, Sixth Circuit case law consistently espouses a

reliance requirement to establish RICO claims.  VanDenBroeck, 210 F.3d at 701.  In Chaz Constr.,

L.L.C. v. Codell, LLC, 137 F. App'x 735 (6th Cir. 2005), the Sixth Circuit addressed this seeming

conflict and determined that, while, to be consistent with Neder, a "plaintiff need not plead

detrimental reliance as an *element* of each predicate act of mail or wire fraud underlying his RICO claims," reliance must be demonstrated to establish standing in a civil RICO case. Brown v. Cassens Transp. Co., 409 F.Supp.2d 793, 807 (E.D. Mich. 2005) (citing Chaz Constr., L.L.C., 137 F.App'x at *2.) (emphasis added). In reaching this conclusion, the Sixth Circuit distinguished Neder on the basis that, unlike a criminal prosecution under the federal mail fraud statute, a plaintiff must have standing to pursue civil RICO claims.[3] Chaz Constr., L.L.C., 137 F.App'x at *2-3.

RICO's statutory standing provision, 18 U.S.C. § 1964(c), provides a private cause of action under RICO for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). In interpreting this provision, the United States Supreme Court has held that "[a] plaintiff's right to sue under § 1964(c). . . requires a showing that the defendants'] violation was the proximate cause of the plaintiff's injury." Holmes v. Sec. Investor Protection Corp., 503 U.S. 258, 258, 112 S.Ct. 1311, 1312 (1992) (concerning standing in a RICO action predicated on acts of securities fraud); see also Anza v. Ideal Steel Supply Corp., __ U.S. __, 126 S.Ct. 1991, 1994, 164 L.Ed.2d 720 (2006). According to the Holmes court, in this context,"proximate cause" requires "some direct relation between the injury asserted and the injurious conduct alleged." Id. at 268, 112 S.Ct. 1311; Anza, ___ U.S. ___, 126 S.Ct. at 1998 ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."); see also Sedima, S.P.R.L., 473 U.S. at 497, 105 S.Ct. at 3285 (finding, in RICO action based on predicate acts of mail and wire

---

[3]   As indicated in the quoted passage from VanDenBroeck, see supra p.11, courts in this circuit considering RICO claims predicated on acts of mail and wire fraud often conflate the standing issue with discussion of the existence of the predicate acts. VanDenBroeck, 210 F.3d at 701 (holding, in a civil RICO case based upon predicate acts of mail and wire fraud, that the plaintiff must plead that he "relied upon [a] material misrepresentation" to establish the fraud statutes' requisite "scheme to defraud"). In light of Neder and Chaz Construction, the Court will address the matters separately.

fraud, that a plaintiff's damages must "flow from the commission of the predicate acts."); Trollinger v. Tyson Foods, Inc., 370 F.3d 602, 612 (6th Cir. 2004) (citing Holmes for the proposition that RICO statutory standing requires a showing of proximate cause).

The Sixth Circuit has interpreted § 1964(c)'s causation requirement to require a plaintiff to plead reliance in order to state a civil RICO claim predicated on acts of fraud.[4]  See Chaz Constr., L.L.C., 137 F.App'x at *2; Cent. Distrib., 5 F.3d at 184; Blount Fin. Serv., Inc., 819 F.2d at 152 ; Brown, 409 F.Supp.2d at 807; Moon v. Harrison Piping Supply, 375 F.Supp.2d 577, 597 (E.D. Mich. 2005), rev'd in part on other grounds, ___ F.3d ___, 2006 WL 2772763 (6th Cir. Sept. 28, 2006) (citing Grantham & Mann, Inc. v. Am. Safety Prod.., Inc., 831 F.2d 596, 605 (6th Cir.1987)); Armbruster v. K-H Corp., 206 F.Supp.2d 870, 898 (E.D. Mich.2002) (holding that a civil RICO complaint based upon predicate acts of mail fraud must plead the plaintiff's reliance upon the defendant's misrepresentation); Paycom Billing Serv., Inc. v. Payment Res. Int'l, 212 F.Supp.2d 732, 736 (W.D. Mich. 2002) (holding that a civil RICO complaint based upon predicate acts of mail fraud must plead the plaintiff's reliance upon the defendant's material misrepresentation).  The reliance requirement has been further interpreted to mean that "[a plaintiff] cannot maintain a civil RICO

---

[4]  Several other circuits similarly impose reliance as a standing requirement for RICO actions involving fraud.  See Summit Prop. Inc. v. Hoechst Celanese Corp., 214 F.3d 556, 562 (5th Cir.2000) ("when civil RICO damages are sought for injuries resulting from fraud, a general requirement of reliance by the plaintiff is a commonsense liability limitation"); Chisolm v. TranSouth Fin. Corp., 95 F.3d 331, 337 (4th Cir. 1996) (explaining that the Fourth Circuit's requirement that civil RICO plaintiffs demonstrate detrimental reliance "ensures the existence of a 'direct relation between the injury asserted and the injurious conduct alleged' required under Holmes); Appletree Square I, Ltd. P'ship v. W.R. Grace & Co., 29 F.3d 1283, 1286 (8th Cir.1994) ("In order to establish injury to business or property 'by reason of' a predicate act of mail or wire fraud, a plaintiff must establish detrimental reliance on the alleged fraudulent acts."); Metromedia Co. v. Fugazy, 983 F.2d 350, 368 (2d Cir.1992), abrogated on other grounds as recognized in Yung v. Lee ,432 F.3d 142, 147-48 (2d Cir.2005) ("[i]n the context of an alleged RICO predicate act of mail fraud, we have stated that to establish the required causal connection, the plaintiff was required to demonstrate that the defendant's misrepresentations were relied on.").

claim [predicated on mail or wire fraud] against . . . defendants absent evidence that the defendants made misrepresentations or omissions of material fact to [the plaintiff] and evidence that [the plaintiff] relied on those misrepresentations or omissions to its detriment."  Cent. Distrib., 5 F.3d at 184.

Among many arguments as to why the MHP Plaintiffs' RICO claims should be dismissed, the Gen Re Defendants assert that these Plaintiffs have failed to make this required showing. Specifically, the Defendants argue that the complaints provide only conclusory allegations and fail to identify who, when or how anyone relied on misrepresentations or omissions by the Gen Re Defendants.  In addition, they contend that, even if reliance is demonstrated, the complaints should be dismissed because, as "sophisticated parties," such reliance by the Plaintiffs was not reasonable.

In response to the Gen Re Defendants' assertions, the MHP Plaintiffs incorporate by reference arguments contained in the response of Alfred W. Gross, Commissioner of Insurance, Bureau of Insurance, State Corporation Commission of the Commonwealth of Virginia and Deputy Receiver of ROA and TRG, in companion case No. 04-2313, to motions for dismiss filed by various defendants in this multi-district litigation.  Gross concedes reliance must be pled in order to establish proximate causation.  However, he argues that, because the complaint does not allege that the misrepresentations were contained in the mail or wire communications made in furtherance of the fraudulent schemes, reliance on those transmissions need not be demonstrated.  Rather, according to Gross, the complaint must allege that the misrepresentations or omissions, furthered by the wire or mail communications, must have been relied upon.  In their response, the MHP Plaintiffs maintain the Gen Re Defendants were aware MHP was relying on the accuracy of ROA's financial statements in considering and entering into their business combination and were complicit in the use by ROA

14

of the relationship between it and Gen Re as a marketing tool to induce MHP to agree.  In support

of their contention that proximate cause is adequately pled, the MHP Plaintiffs direct the Court to

the following specific paragraphs of the second amended complaint:[5]

> ¶ 128      The plaintiffs did not benefit from the unlawful acts of the defendants. Plaintiffs were injured in their business as a proximate result of such violation of 18 U.S.C. § 1962(c), sustaining damages in an undetermined amount.

> ¶ 134      Defendants knew that the aforementioned secret side agreements, the Companies' true loss reserving practices, and other acts or practices were required to be disclosed to Plaintiffs, insurance regulators, insurance rating services, and the general public.

> ¶ 135      Defendants intended that Plaintiffs, insurance regulators, insurance rating services, and the general public would rely upon Defendants['] false representations and would assume ROA's and related entities' financial status was as it appeared and that there were no secret side agreements, unknown loss reserving practices, or other unknown acts or practices.

> ¶ 152      The Subordinated Note referenced in Exhibit A became due and payable on October 11, 2002, six (6) months after termination by plaintiffs of the proposed business combination.  Although demand for payment of the Note was made, the Note has not been repaid.

(Second Am. Compl. at ¶¶ 128, 134, 135, 152)

        The Court, after a review of the some 170 allegations contained in the second amended

complaint, agrees with the Gen Re Defendants that detrimental reliance has not adequately been

---

[5]In incorporating by reference portions of the <u>Gross</u> response to motions to dismiss, it is unclear whether the MHP Plaintiffs also intended to incorporate herein the specific allegations contained in the <u>Gross</u> amended complaint upon which Gross relied in his argument that proximate cause had been adequately plead.  However, even assuming such an intention on the part of the MHP Plaintiffs, the <u>Gross</u> allegations identified in Gross's response, for reasons set forth in the Court's order granting the motions to dismiss, were found to be insufficient to satisfy Rule 9(b).

plead by the MHP Plaintiffs.  Pursuant to Rule 9(b), reliance must be plead with particularity. Blount Fin. Serv., Inc., 819 F.2d at 152 ("Fraud alleged in a RICO civil complaint for mail fraud must state with particularity the false statement of fact made by the defendant which the plaintiff relied on and the facts showing the plaintiff's reliance on defendant's false statement of fact."); see also Dowling v. Select Portfolio Serv., Inc., No. 2:05-CV-049, 2006 WL 571895, *7 (S.D. Ohio Mar. 7, 2006) ("the plaintiff must plead the element of reliance with particularity."); Evans, 434 F.3d at 852-53 (affirming dismissal of fraud action where plaintiff failed to plead reliance with particularity as required by Rule 9(b)); McGee v. City of Warrensville Heights, 16 F.Supp.2d 837, 850 (N.D. Ohio 1998) (dismissing RICO action where complaint failed to allege misrepresentations or reliance with particularity); Gould, Inc. v. Mitsui Mining & Smelting Co., Ltd., 750 F.Supp. 838, 842-43 (N.D. Ohio 1990) (finding that both the false statement or omission and the reliance thereon by the plaintiff must be pled with particularity in civil RICO action based on mail or wire fraud).

Paragraph 128 of the second amended complaint lacks factual details concerning reliance and, at most, offers only general and conclusory statements of detrimental reliance.  Such allegations cannot survive a motion to dismiss pursuant to Rule 9(b).  See Blount Fin. Serv., Inc., 819 F.2d at 152; see also Piccone v. Bd. of Dir. of Doctors Hosp. of Staten Island, Inc., No. 97 Civ. 8182(MBM), 2000 WL 1219391, *5 (S.D.N.Y. Aug. 8, 2000) (finding complaint paragraph containing no factual allegations and stating in a conclusory fashion that plaintiff relied on misrepresentations and omissions insufficient to establish reliance).

Similarly, paragraphs 134 and 135 fail to allege any fraudulent action by the Gen Re Defendants on which the MHP Plaintiffs could have relied to their detriment.  Even assuming the Gen Re Defendants were alleged to have been involved in these fraudulent schemes, the allegations

16

are deficient for failure to demonstrate reliance by the Plaintiffs.  Specifically, the allegations lack an explanation as to whether and how the MHP Plaintiffs relied on misrepresentations or omissions committed by the Gen Re Defendants and fail to demonstrate that the injury cited resulted from the Plaintiffs' reliance thereon.  To survive a motion to dismiss pursuant to Rule 9(b), the Plaintiffs must plead with particularity that they relied on acts of mail and wire fraud (i.e. a scheme to defraud furthered by use of the mails or wires) by the Gen Re Defendants, and as a result of that reliance, suffered injury.  Blount Fin. Serv., Inc., 819 F.2d at 152.

Finally, paragraph 152 is contained in a section of the second amended complaint alleging tortious breach of contract against Defendants Crews & Hancock, Crews, Patterson, Kelley, Hudgins, Bland and McLean, not the Gen Re Defendants.  Therefore, paragraph 152 offers no support whatever for a RICO claim against these Defendants.

Absent from these allegations, and fatal to the Plaintiffs' claim, are facts demonstrating that the MHP Plaintiffs relied on the misrepresentations and omissions of the Gen Re Defendants to their detriment.  Because the complaint fails to plead facts demonstrating that the injuries asserted by the Plaintiffs were suffered in reliance on fraudulent conduct by the Defendants, the Court cannot conclude that the conduct was the proximate cause of their injuries.

As noted above, the Sixth Circuit is not alone in imposing a reliance requirement to establish proximate cause in civil RICO actions predicated on fraud.  See supra p.13 n.4; see also Summit Prop. Inc., 214 F.3d at 560 (noting that "most other circuits . . . require a showing of detrimental reliance" in civil RICO fraud actions and listing cases).  The Fifth Circuit has explained that the requirement is consistent with Holmes' "admonition that federal courts employ traditional notions of proximate cause when assessing the nexus between a plaintiff's injuries and the underlying RICO

violation." Id. at 560. "For a misrepresentation to cause an injury, there must be reliance. Knowledge of the truth defeats a claim of fraud because it eliminates the deceit as the "but for" cause of the damages." Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co., 319 F.3d 205, 218-19 (5th Cir. 2003).

However, other courts have found no basis for interpreting a reliance requirement in RICO's standing provision to demonstrate causation. For example, in Systems Management, Inc. v. Loiselle, 303 F.3d 100 (1st Cir. 2002), the First Circuit Court of Appeals rejected finding such a requirement by reasoning that

> [i]t is true that at common law a civil action for fraud ordinarily requires proof that the defrauded plaintiff relied upon the deception, and some courts have imported this requirement into RICO actions where the predicate acts comprise mail or wire fraud. But RICO bases its own brand of civil liability simply on the commission of specified criminal acts-here, criminal fraud-so long as they comprise a "pattern of racketeering activity"; and criminal fraud under the federal statute does not require "reliance" by anyone: it is enough that the defendant sought to deceive, whether or not he succeeded. . . .

> Perhaps there is some surface incongruity in allowing a civil RICO plaintiff to recover for fraudulent acts even though the same plaintiff could not (for lack of reliance) recover for fraud at common law. But Congress structured its civil remedy to allow recovery for harm caused by defined criminal acts, including violation of section 1341; and, as noted, the federal mail fraud statute does not require reliance. Thus, under a literal reading of RICO-the presumptive choice in interpretation-nothing more than the criminal violation and resulting harm is required.

> This is not a conclusive argument; common law (and other) concepts can often be imported to flesh out a federal statute. Indeed, we assume here that Congress intended to require not only "but for" but also "proximate cause" to link the criminal act with the harm to the plaintiff, even though the statute says nothing specific on this point. But proximate cause-largely a proxy for foreseeability-is not only a general condition of civil liability at common law but is almost essential to shape and delimit a rational remedy: otherwise the chain of causation could be endless.

> By contrast, reliance is a specialized condition that happens to have grown up with common law fraud. Reliance is doubtless the most obvious way in which fraud can

18

cause harm, but it is not the only way . . . There is no good reason here to depart
from RICO's literal language by importing a reliance requirement into RICO.

Sys. Mgmt., Inc., 303 F.3d at 103-4; see accord Anza, ___ U.S. ___, 126 S.Ct. at 2006-09 (Thomas,

J., dissenting) (citing Sys. Mgmt., Inc.).

In Holmes, the Supreme Court reasoned that requiring that proximate cause, interpreted as

a "direct relation between the injury asserted and the injurious conduct alleged" would sufficiently

ensure deterrence of injurious conduct because "directly injured victims can generally be counted

on to vindicate the law . . . without any of the problems attendant upon suits by plaintiffs injured

more remotely." Holmes, 503 U.S. at 269-70, 112 S.Ct. at 1318-19.  Because the MHP Plaintiffs

have not demonstrated that *they* relied to *their* detriment on misrepresentations or omissions alleged

herein that were directed to *them* by these Defendants, under Sixth Circuit precedent, they do not

have standing to pursue RICO claims.

Finally, the Court notes that the MHP Plaintiffs are not without recourse for the wrongs

alleged in this action.  As noted in In re Teledyne Defense Contracting Derivative Litigation, 849

F.Supp. 1369, 1377 (C.D. Cal. 1993), "RICO was not intended to federalize . . . corporate

relationships.  If [a] Corporation and its shareholders were in fact injured by the alleged actions or

inactions of the [defendants], they are free to pursue traditional . . . remedies under state law."  In

addition to the MHP Plaintiffs' RICO claims, the second amended complaint also asserts claims

under state law.  Rather than attempting to mold RICO to fit the particulars of these claims, they

may be more properly addressed under existing state law frameworks.

## II. Violation of RICO, 18 U.S.C. § 1962(d)

The Plaintiffs also allege that the Gen Re Defendants violated 18 U.S.C. § 1962(d), which

prohibits conspiracy to violate the section's other substantive provisions.[6] 18 U.S.C. § 1962(d).  The

standing requirement of 18 U.S.C. § 1964(c) applies to all claims brought pursuant to RICO,

including conspiracy claims under § 1964(d).  Beck v. Prupis, 529 U.S. 494, 500-01, 120 S.Ct. 1608,

1613-14, 146 L.Ed.2d 561 (2000).  Accordingly, to have standing to pursue a civil RICO conspiracy

claim, the MHP Plaintiffs must allege that they were "'injured by reason of' a 'conspiracy.'"  Id.

(quoting 18 U.S.C. §§ 1964(c), 1962(d)).  In Beck, the United States Supreme Court held"that a

person may not bring suit under § 1964(c) predicated on a violation of § 1962(d) for injuries caused

by an overt act [in furtherance of the racketeering conspiracy] that is not an act of racketeering or

otherwise unlawful under the statute."  Beck, 529 U.S. at 507, 120 S.Ct. at 1617.  Thus, to state a

claim for civil RICO conspiracy under § 1964(c), the Plaintiffs must allege that they suffered injury

as a proximate result of an overt act in furtherance of the conspiracy that is *itself* an act of

racketeering activity or otherwise unlawful under RICO.[7]

Although the complaint does not specifically identify the conspiratorial acts engaged in by

the Gen Re Defendants, the Court, for purposes of this motion, assumes that such acts encompass

the racketeering acts of mail and wire fraud alleged elsewhere in the complaint.  However, as

discussed above, the complaint fails to allege that the Plaintiffs were injured as a proximate result

of those racketeering acts because they do not plead with particularity facts demonstrating reliance

---

[6] Specifically, the statute provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. § 1962(d).

[7] Thus, under Beck and Holmes, § 1964(c) requires that racketeering acts proximately cause the injury complained of by a civil RICO plaintiff in actions pursuant to both §1962(c) and § 1962(d).  Cf. Elkins v. Chapman, 36 F.App'x 543, 544 (6th Cir. 2002) ("In order to state a claim under § 1962(c), a complaint must allege that an act of racketeering activity was the cause of the injury."); see also Jones v. Enter. Rent A Car Co. of Tex., 187 F.Supp.2d 670, 678 (S.D. Tex. 2002) (dismissing plaintiff's RICO claims pursuant to § 1962(a),(b), (c) and (d) where the complaint failed to allege that the defendants' commission of wire fraud, mail fraud, and institutional fraud proximately caused her injuries).

by the MHP Plaintiffs.  See Cent. Distrib., 5 F.3d at 184; Chaz Constr., L.L.C., 137 F. App'x at *2.

Because the complaint insufficiently pleads proximate causation under prevailing Sixth Circuit

precedent, the MHP Plaintiffs lack standing pursuant to § 1964(c).  Accordingly, their § 1962(d)

claims must be DISMISSED.  Chaz Const., LLC, 137 F.App'x at 739 (holding, without identifying

the particular RICO claim at issue,  that a "plaintiff[] must plead reliance in order to establish

standing in a civil RICO case").

### III.  The MHP Plaintiffs' Remaining State Law Claims

Having disposed of the Plaintiffs' claims under federal law, the Court now turns to their

Missouri state law claims.  The exercise by a district court of supplemental, or pendent, jurisdiction

over state law claims is governed by 28 U.S.C. § 1367, which expressly permits the Court to decline

the exercise of jurisdiction when it has dismissed all claims over which it has original jurisdiction.

28 U.S.C. § 1367(c)(3).  Absent any remaining federal claims against the Gen Re Defendants, the

Court, in its sound discretion, hereby dismisses without prejudice the MHP Plaintiffs' claims against

the Gen Re Defendants under state law.  See Weeks v. Portage County Executive Offices, 235 F.3d

275, 279-80 (6th Cir. 2000) (district court's decision to decline to exercise supplemental jurisdiction

lies within its sound discretion).

### IV.  Plaintiffs' Request to Amend Complaint

In their response to the motion to dismiss, the MHP Plaintiffs request that, to the extent the

Court concludes that their claims lack the necessary specificity and/or particularity, they be

permitted to amend their complaint.  Motions to amend a complaint are governed by Rule 15 of the

Federal Rules of Civil Procedure, which instructs that leave to amend "shall be freely given when

justice so requires."  Fed. R. Civ. P. 15(a).  Denial of such a request may be warranted, however,

where there exists "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment." Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); Morse v. McWhorter, 290 F.3d 795, 800 (6th Cir. 2002).

Here, there is no basis from which the Court can infer bad faith or dilatory motive on the part of these Plaintiffs. While there have been amendments to the complaint, there have been no failures to cure deficiencies by amendments previously allowed. Further, the Court cannot say at this point, based on the information before it, that amendment would be futile because the MHP Plaintiffs could not come forward with facts sufficient to establish detrimental reliance on fraudulent misrepresentations or omissions supportive of standing under § 1964(c). See Morse, 290 F.3d at 800 (finding that, in securities fraud cases, "leave to amend is particularly appropriate where the complaint does not allege fraud with particularity"). Finally, the Court notes that the Gen Re Defendants have not opposed the Plaintiffs' request demonstrating that undue prejudice would result. The Court finds no basis from which such prejudice could be inferred. Accordingly, the request to amend the second amended complaint in order to cure this deficiency is GRANTED.

<u>CONCLUSION</u>

Based on the foregoing, the motion of Defendants Gen Re, Reindel, Kellog and Seeger to dismiss the second amended complaint is hereby GRANTED as to the federal RICO claims against them. The state claims against these Defendants are dismissed without prejudice. Finally, for the reasons set forth herein, the Plaintiffs may amend their complaint within 60 days of the entry of this order.

**IT IS SO ORDERED** this 29th day of September, 2006.

s/  J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE