IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

In re

RECIPROCAL OF AMERICA (ROA)
SALES PRACTICES LITIGATION

Master File No. MDL 1551

This Document Relates to:
Civil Action No. 04-2078

_____

ORDER DISMISSING AMENDED COMPLAINT AS TO DEFENDANT BLAND
_____

INTRODUCTION

On September 21, 2006, Defendant Crews & Hancock, P.L.C. ("C&H") moved to dismiss

the amended complaint filed by the Plaintiff, Paula A. Flowers, Commissioner of Commerce and

Insurance for the State of Tennessee ("Commissioner"), in her capacity as Liquidator for Doctors

Insurance Reciprocal, Risk Retention Group ("DIR"), American National Lawyers Insurance

Reciprocal, Risk Retention Group ("ANLIR") and The Reciprocal Alliance, Risk Retention Group

("TRA") (collectively, the "RRGs"),[1] pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of

Civil Procedure.  Defendant Richard W.E. Bland subsequently filed notice with the Court indicating

that he joined in the motion.  However, the Court has previously ruled on C&H's motion to dismiss

Flowers' original complaint but has not yet considered her assertions against Bland.  Therefore, the

Court deemed it necessary to address the claims as to Bland in a separate order.  Herein, the Court

will only address the Commissioner's amended complaint.

_____

[1]Subsequent to the filing of the motion, Leslie A. Newman succeeded Paula A. Flowers
as Commissioner of the Tennessee Department of Commerce and Insurance and liquidator for
the RRGs.  (See Order dated Mar. 1, 2007, Doc. No. 386)  However, for purposes of this order
and to avoid confusion, the Court will refer to the Plaintiff as "Flowers."

FACTUAL ALLEGATIONS

The facts in this litigation have been summarized as follows:

This case arises from the insolvency of a Virginia reciprocal insurer, ROA, and three Tennessee reciprocal risk retention groups that were largely reinsured by ROA, DIR, TRA and ANLIR.  ROA was first organized in response to a perceived shortage in the Virginia market of medical liability (especially hospital liability) insurance options.  For many years, the company seemed to grow and do well, returning to its hospital-owners substantial dividends.  The benevolent period during which this growth occurred emboldened management, especially the enterprising attorney (Crews), who had first organized ROA and served as its general counsel.  Together with his law firm, Crews & Hancock, and his associates in senior management and the board of directors (eventually including defendants Bland, Patterson, Kelley, Hudgins, McLean, and Davis, in his capacity as chairman of the board of DIR), Crews took ROA (initially known as [Virginia Professional Underwriters, Inc. ("VPUI") and The Virginia Insurance Reciprocal ("TVIR")]) from a small, single-state hospital insurer to a multi-state major player in the liability insurance market. During this time the company grew in size and complexity, diversifying its coverage by adding physician and lawyer malpractice, as well as workers' compensation and other types of insurance.  In due course, the three Tennessee risk retention groups were created to avoid some of the burdens of Virginia insurance regulation and to specialize in some of the newer lines of business (physician malpractice for DIR, attorney malpractice for ANLIR, and health care liability for TRA), enabling segregation of risk as well.  Crews participated actively in the management of the four insurance companies which, in many respects, were under common management.   However, each was owned by a different group of policyholders/owners.  Three of the four reciprocal insurance companies (i.e., DIR, TRA, and ANLIR) also qualified as lightly regulated Tennessee risk retention groups, a key reason for their formation.  Those three companies were largely reinsured by ROA, the Virginia reciprocal, so that ultimately the latter became liable for most of their insurance risks.

During the 1970s and 1980s a number of well-publicized insurance insolvencies sensitized the insurance-buying public, especially commercial insureds, to the importance of financial soundness.  Ratings accorded insurers by independent organizations, like A.M. Best, took on added value in the marketplace. Crews and his associates understood well the need to address that concern as a precursor to successful competition for lucrative new customers.  For a young, and relatively small, insurer like ROA, the appearance of financial stability could be created without actually amassing the necessary capital and surplus, a daunting and very lengthy process.  Instead, they could arrange for a well-respected and well-heeled reinsurer to at least appear to stand behind its obligations through reinsurance.  Of great value, this enabled the reinsured, ROA, to utilize Best's rating of the reinsurer.

For this role, Crews and his associates selected one of the world's largest reinsurers, Gen Re.  From the beginning, Crews had close business and personal ties with Gen Re and its management (including at various times, Reindel, Kellogg, and Seeger).  Together these individuals, along with others, formed an informal "*de facto*" partnership to improve the appearance of ROA's balance sheet and stated surplus by ceding business from ROA to Gen Re.  ROA was accorded superior ratings from Best's Insurance Reports in part because of ROA's reinsurance relationship with Gen Re, which A.M. Best rated A++ Superior.  Best's Insurance Reports noted that "ROA's principal reinsurer is Gen Re."  From a regulatory perspective, this permitted ROA to reduce the liability it had to recognize on its books by the amount for which the reinsurer would be liable (referred to in the industry as "reserve credit").  By providing ROA with this reinsurance, Gen Re earned lucrative ceding commissions from ROA.  But the arrangement was structured so that, in reality, the risk assumed by Gen Re was minimal.  Indeed, Gen Re entered into, and participated in, this arrangement with the full expectation that every year it would earn valuable reinsurance premiums with little danger of experiencing a net loss.  At times, the illusion of reinsurance was additionally maintained through deceptive financial reinsurance, in which loans from Gen Re to ROA and [First Virginia Reinsurance, Ltd. ("FVR")] were guised as substantial insurance risk of net loss.

Crews and other members of management also sought to minimize regulatory oversight and taxation of ROA, ANLIR, DIR, and TRA and their owners.  Toward this end, Crews formed the offshore Bermuda captive FVR to serve as reinsurer for ROA's physicians and attorney liability insurance business (and later, ROA's net retained share of risk on the DIR and ANLIR business), thereby enabling profits on that business to accumulate on a tax deferred basis.  Atlantic Security and Witkowski served as FVR's agents in Bermuda.  An offshore reinsurer's profits are not subject to United States taxation so long as the reinsurer does no business in the United States.  Crews devised the use of FVR as a means to hold profits from ROA's retained business (for use as surplus to policyholders) while sheltering ROA's physician and lawyer subscribers from taxation on those profits until distribution.  But, under Virginia law, reserve credit for reinsurance provided by offshore companies can only be taken to the extent of an acceptable security trust funded and maintained in the U.S.  Moreover, this reliance by ROA upon FVR as reinsurer brought the latter within the scrutiny of Virginia insurance officials.

Starting in or about 1990, when regulators began asking too many questions about FVR, Crews' law firm and other defendants arranged for Gen Re to remove FVR from the regulators' scrutiny by providing "accommodation" reinsurance to ROA for all of the business that ROA formerly ceded directly to FVR.  Pursuant to this "accommodation reinsurance" arrangement, Gen Re would "accommodate" ROA by acting as a "pass-through" between ROA and FVR, with ROA ceding risk as reinsurance to Gen Re and Gen Re "retroceding" 100% of that risk to FVR.  FVR remained the ultimate "retrocessionaire," but the "accommodation" enabled ROA to

report only Gen Re (with its strong balance sheet), and not FVR, as a reinsurer of ROA, thereby removing FVR from the scrutiny of regulators.  As Gen Re later explained, "Reinsurance assumed by FVR was always intended to be 'accommodation reinsurance.'  If this was real reinsurance, rates would have been different.'"

As the insurance enterprise became less lucrative and economic challenges increased, FVR became chronically underfunded to meet its obligations to Gen Re on the risks ceded from ROA to Gen Re to FVR.  If FVR had not been removed from scrutiny of ROA's regulators pursuant to the "accommodation" arrangement with Gen Re, ROA's reserve credit for the business ceded would have been at risk, because such a credit could only have been claimed to the extent of FVR's ability to secure its reinsurance obligations.

Unwilling to take on the increased reinsurance risk from ROA's mounting losses, Gen Re eventually demanded in October, 2000, that the "understanding" behind the "accommodation reinsurance" scheme be memorialized in writing--albeit in the 2000 Unreported Side Agreement kept hidden from the public.  Subsequently, ROA's losses grew even worse.  Gen Re feared the possibility that it would be found accountable for what the outside public thought was "real reinsurance," and thus in late 2000 devised a complicated plan which would "virtually eliminate" Gen Re's reinsurance risk of net loss as if "Gen Re were never there."  Effective on or about December 31, 2001, Gen Re ceased providing "accommodation" reinsurance that required it to be at risk for FVR's financial condition.  ROA resumed ceding certain risks directly to FVR, and the Wachovia-FVR Trust was established to secure FVR's reinsurance obligations to ROA.  Wachovia served as trustee of the Wachovia-FVR Trust[,] which also became chronically underfunded.

Crews' law firm, Crews & Hancock, reaped substantial fees for legal work performed for ROA, which fees ultimately benefitted the partners at Crews & Hancock, including Crews and Bland.  Besides Crews, other members of management came and went, but for the relevant years included McLean, Patterson, Hudgins, and Kelley, all of whom benefitted from the business in the way of substantial salaries and perquisites.  A lesser, but significant participant was Davis, who served as Chairman of the Board for DIR, for which he, too, was paid a salary.

Independent auditors and certified actuaries for ROA, ANLIR, DIR, TRA, and FVR also came and went.  However, for the relevant years, the independent auditor was [Pricewaterhouse Coopers, LLP ("PwC")] (whose engagement partner was Stephani) and the certified actuary was Milliman (whose work was performed by Sanders).  Milliman (beginning in 1997) and PwC (beginning in 1999) reaped substantial fees for having, and maintaining as clients, ROA, ANLIR, DIR, TRA, and FVR.

Eventually, ROA and DIR experienced extreme financial difficulty, due in large part

to the nature of the "accommodation reinsurance" scheme, which enabled the companies to grow at an accelerated rate, and generate disproportionate profits, without ever providing the necessary capital and surplus that is essential to weather the inevitable cycles and developments.  In order to maintain the false appearance of ROA's continued financial viability and therefore enable themselves to continue and maximize the benefits they were receiving from their association with ROA/TRG (or, in some instances to receive preferential payments), the Management Defendants (Crews, Patterson, Hudgins, and Kelley), McLean, the Gen Re Defendants (Gen Re, Seeger, Kellogg, and Reindel), Crews & Hancock, Bland, Davis, Witkowski, Atlantic Security, Milliman, Sanders, Stephani, PwC, and Wachovia conspired to participate, and did participate, in various fraudulent schemes . . .

The fraudulent schemes included various types of "creative accounting," arbitrary reductions in DIR's and ROA's claim reserves, reinsurance agreements that did not transfer substantial insurance risk of net loss, nondisclosure of modifications to reinsurance agreements that rendered much of ROA's reinsurance receivables from Gen Re illusory, and disguised misappropriations of funds from ROA and the Wachovia-FVR Trust.  The defendants appeared to have believed that if they could just conceal ROA's financial troubles long enough, ROA eventually could emerge from a hazardous financial condition without regulators ever being the wiser.  Unfortunately, but predictably, things went from bad to worse, and the defendants' success in postponing regulatory intervention resulted in the deepening of ROA's insolvency.

ROA's concealed insolvency finally came to light only after, in late December of 2002, Virginia regulators discovered the 2002 Unreported Side Agreement and its $135 million aggregate cap, and other financial irregularities. . . .

(Deputy Receiver's Resp. and Mem. In Opp'n to Mot. to Dismiss of Def. Ronald K. Davis, M.D. at pp. 1-7) (internal citations omitted).  Flowers alleges violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., as well as various claims under Tennessee state law.

STANDARD OF REVIEW

The instant motion was filed pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.  Rule 12(b)(6) permits dismissal of a lawsuit for failure to state a claim upon which relief could be granted.  See Fed. R. Civ. P. 12(b)(6).  The Rule requires the Court to "construe the

complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle relief." Grindstaff v. Green, 133 F.3d 416, 421 (6th Cir. 1998). "The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim." Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957). However, "[t]o avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all the material elements of the claim." Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003).

Rule 9(b) provides that "[i]n all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b). The Rule serves to put defendants on notice of the conduct complained of by the plaintiff to ensure that they are provided sufficient information to formulate a defense. Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 679 (6th Cir. 1988). The Sixth Circuit interprets the particularity requirement "liberally, . . . requiring a plaintiff, at a minimum, to allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." Coffey v. Foamex L.P., 2 F.3d 157, 162 (6th Cir. 1993) (internal quotations and citations omitted); Blount Fin. Serv., Inc. v. Walter E. Heller & Co., 819 F.2d 151, 152 (6th Cir. 1987) ("Fraud alleged in a RICO civil complaint for mail fraud must state with particularity the false statement of fact made by the defendant which the plaintiff relied on and the facts showing the plaintiff's reliance on defendant's false statement of fact."); see also Evans v. Pearson Enter., Inc., 434 F.3d 839, 852-53 (6th Cir. 2006) (affirming dismissal of fraud action where plaintiff failed to plead reliance with particularity as required by Rule 9(b)).

In ruling on a motion pursuant to Rule 9(b), a court must read the particularity requirement in harmony with the "policy of simplicity in pleading" advanced by Federal Rule of Civil Procedure 8, which requires that a complaint provide only a "short and plain statement of the claim." Michaels Bldg. Co., 848 F.2d at 679 (quoting Fed. R. Civ. P. 8). Accordingly, courts should not be "too exacting" or "demand clairvoyance from pleaders" in determining whether the requirements of Rule 9(b) have been met. Id. at 681. Rather, "if the defendant has fair notice of the charges against him, [Rule 9(b)] is satisfied." Shapiro v. Merrill Lynch & Co., 634 F. Supp. 587, 593-94 (S.D. Ohio 1986); see also Michaels Bldg. Co., 848 F.2d at 680. However, "a district court need not accept claims that consist of no more than mere assertions and unsupported or unsupportable conclusions." Sanderson v. HCA - The Health Care Co., 447 F.3d 873, 876 (6th Cir.), cert. denied, ___ U.S. ___, 127 S. Ct. 303, 166 L. Ed. 2d 155 (2006).

## ANALYSIS

### I. Violation of RICO, 18 U.S.C. § 1962(c)

Flowers has alleged in both her original and amended complaints that Bland, among others, violated Section 1962(c) of RICO, which provides that

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). In order to establish a RICO violation, the Plaintiff must show that this Defendant engaged in "(1) conduct, (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S. Ct. 3275, 3285, 87 L. Ed. 2d 346 (1985). "In addition, the plaintiff only has standing if, and can only recover to the extent that, [she] has been injured in [her] business or property by the [predicate acts] constituting the violation." Id.

7

at 496, 105 S. Ct. at 3285; see also 18 U.S.C. § 1964(c).  It is argued in the instant motion that the

Commissioner has failed to state a claim for a violation of RICO and, on that basis, that the amended

complaint must be dismissed.

A "pattern of racketeering activity" is demonstrated by "at least two acts of racketeering

activity, one of which occurred after the effective date of [RICO] and the last of which occurred

within ten years . . . after the commission of a prior act of racketeering activity."  18 U.S.C. §

1962(c), § 1961(5).  In addition, proof of a pattern of racketeering activity requires a showing that

"the racketeering predicates are related, and that they amount to or pose a threat of continued

criminal activity."  H.J., Inc., v. Nw. Bell Tel. Co., 492 U.S. 229, 109 S. Ct. 2893, 2900, 106 L. Ed.

2d 195 (1989).  In the instant action, Flowers' RICO claims are premised on predicate acts of mail

and wire fraud.  Section 1961(1) enumerates specific acts which constitute racketeering activity,

including acts of mail fraud indictable under the federal mail fraud statute, 18 U.S.C. § 1341,[2] and

acts of wire fraud indictable under the federal wire fraud statute, 18 U.S.C. § 1343.[3]  18 U.S.C. §

---

[2]18 U.S.C. § 1341, provides in relevant part that

[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341.

[3]18 U.S.C. 1343 provides that
[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations,

1961(1)(B).  In order to be "indictable" and, thus, to sustain a claim under the RICO Act, each

element of the predicate act must be proved.  Central Distrib. v. Conn, 5 F.3d 181, 183-84 (6th Cir.

1993).  Moreover, as noted above, to survive a motion to dismiss pursuant to Fed. R. Civ. P. 9(b),

the complaint must plead the circumstances of the mail and wire fraud with particularity.  Fed. R.

Civ. P. 9(b).

"The elements of mail and wire fraud are: (1) a scheme to defraud, and (2) use of the mails,

or of an interstate electronic communication, respectively, in furtherance of the scheme." Advocacy

Org. for Patients & Providers v. Auto Club Ins. Assoc., 176 F.3d 315, 322 (6th Cir. 1999); see also

Carpenter v. United States, 484 U.S. 19, 25 n.6, 108 S. Ct. 316, 320 n.6, 98 L. Ed. 2d 275 (1987)

(noting that the same analysis applies to offenses under both the mail and wire fraud statutes).  The

Sixth Circuit has defined a

> scheme to defraud as intentional fraud, consisting in deception intentionally
> practiced to induce another to part with property or to surrender some legal right, and
> which accomplishes the designed end.  In other words, in order to present a
> cognizable claim for fraud, the plaintiff[] must show that [the defendants] made a
> material misrepresentation of fact that was calculated or intended to deceive persons
> of reasonable prudence and comprehension, and must also show that [the] plaintiff[]
> in fact relied upon that material misrepresentation.

VanDenBroeck v. CommonPoint Mortgage Co., 210 F.3d 696, 701 (6th Cir. 2000) (internal

quotations and citations omitted); see also Brown v. Cassens Transp. Co., 492 F.3d 640, 643 (6th

Cir. 2007); Advocacy Org., 176 F.3d at 322 (quoting Kenty v. Bank One, Columbus, N.A., 92 F.3d

384, 389-90 (6th Cir. 1996)); Central Distrib., 5 F.3d at 184; Blount Fin. Serv., Inc., 819 F.2d at

152-53.

---

> or promises, transmits or causes to be transmitted by means of wire, radio, or television
> communication in interstate or foreign commerce, any writings, signs, signals, pictures,
> or sounds for the purpose of executing such scheme or artifice, shall be fined under this
> title or imprisoned not more than 20 years, or both . . .

18.U.S.C. § 1343.

RICO's statutory standing provision, 18 U.S.C. § 1964(c), provides a private cause of action under RICO for "[a]ny person injured in his business or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c).  In interpreting this provision, the United States Supreme Court has held that "[a] plaintiff's right to sue under § 1964(c). . . requires a showing that the defendants'] violation was the proximate cause of the plaintiff's injury."  Holmes v. Sec. Investor Protection Corp., 503 U.S. 258, 112 S. Ct. 1311, 1312, 117 L. Ed. 2d 532 (1992) (concerning standing in a RICO action predicated on acts of securities fraud); see also Anza v. Ideal Steel Supply Corp., __ U.S. __, 126 S. Ct. 1991, 1994, 164 L. Ed. 2d 720 (2006).  According to the Holmes court, in this context, "proximate cause" requires "some direct relation between the injury asserted and the injurious conduct alleged."  Holmes, 503 U.S. at 268, 112 S. Ct. at 1318; see also Anza, 126 S. Ct. at 1998 ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."); Sedima, 473 U.S. at 497, 105 S. Ct. at 3285 (finding, in RICO action based on predicate acts of mail and wire fraud, that a plaintiff's damages must "flow from the commission of the predicate acts."); Trollinger v. Tyson Foods, Inc., 370 F.3d 602, 612 (6th Cir. 2004) (citing Holmes for the proposition that RICO statutory standing requires a showing of proximate cause).

The Sixth Circuit has interpreted § 1964(c)'s causation requirement to require a plaintiff to plead reliance in order to state a civil RICO claim predicated on acts of fraud.[4]  See Brown v.

_____

[4]Several other circuits similarly impose reliance as a standing requirement for RICO actions involving fraud.  See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212 (4th Cir.), cert. denied, 543 U.S. 979, 125 S. Ct. 479, 160 L. Ed. 2d 356 (2004) ("To recover civil RICO damages, . . . an individual must allege that he was injured 'by reason of' the pattern of racketeering activity.  To meet this burden with respect to mail fraud and wire fraud, a plaintiff must '*plausibly* allege both that he detrimentally relied in some way on the fraudulent mailing or wire and that the mailing or wire was a proximate cause of the alleged injury to his business or property.") (emphasis in original); Bank of China, N.Y. Branch v. NBM LLC, 359 F.3d 171, 176 (2d Cir. 2004), cert. dismissed, 546 U.S. 1026, 126 S. Ct. 675, 163 L. Ed. 2d 545 (2005) ("It is well established in this Circuit that where mail fraud is the predicate act for a civil RICO claim, the proximate cause element articulated in Holmes requires the plaintiff to

Cassens Transp. Co., 492 F.3d 640, 643 (6th Cir. 2007); Chaz Constr., LLC v. Codell, 137 F.App'x

735, 738-39 (6th Cir. 2005); Central Distrib., 5 F.3d at 184; Blount Fin. Serv., Inc., 819 F.2d at 152;

Moon v. Harrison Piping Supply, 375 F. Supp. 2d 577, 597 (E.D. Mich. 2005), aff'd in part & rev'd

in part on other grounds, 465 F.3d 719 (6th Cir. 2006) (citing Grantham & Mann, Inc. v. Am. Safety

Prod., Inc., 831 F.2d 596, 605 (6th Cir. 1987)); Armbruster v. K-H Corp., 206 F. Supp. 2d 870, 898

(E.D. Mich. 2002) (holding that a civil RICO complaint based upon predicate acts of mail fraud

must plead the plaintiff's reliance upon the defendant's misrepresentation); Paycom Billing Serv.,

Inc. v. Payment Res. Int'l, 212 F. Supp. 2d 732, 736 (W.D. Mich. 2002) (holding that a civil RICO

complaint based upon predicate acts of mail fraud must plead the plaintiff's reliance upon the

defendant's material misrepresentation).  The reliance requirement has been further interpreted in

this circuit to mean that "[a plaintiff] cannot maintain a civil RICO claim [predicated on mail or wire

fraud] against . . . defendants absent evidence that the defendants made misrepresentations or

omissions of material fact to [the plaintiff] and evidence that [the plaintiff] relied on those

misrepresentations or omissions to its detriment."  See Central Distrib., 5 F.3d at 184.  In its most

recent visit to the issue, this circuit reiterated that "the well-established precedent of this circuit

requires that a civil RICO plaintiff alleging mail or wire fraud plead reliance, that is, that a defendant

made fraudulent misrepresentations to the plaintiff on which the plaintiff relied."  Brown, 492 F.3d

at 643.

        In a series of orders, this Court granted motions filed by various defendants to dismiss

Flowers' amended complaint on the grounds that she failed to satisfy the standing requirement for

_____

show reasonable reliance."); Summit Props. Inc. v. Hoechst Celanese Corp., 214 F.3d 556, 562 (5th Cir.
2000) ("when civil RICO damages are sought for injuries resulting from fraud, a general requirement of
reliance by the plaintiff is a commonsense liability limitation"); Appletree Square I, Ltd. P'ship v. W.R.
Grace & Co., 29 F.3d 1283, 1286 (8th Cir. 1994) ("In order to establish injury to business or property 'by
reason of' a predicate act of mail or wire fraud, a plaintiff must establish detrimental reliance on the
alleged fraudulent acts.").

the federal RICO claim.[5]  Thereafter, the Plaintiff sought and was granted permission to amend her complaint in order to cure deficiencies identified by the Court.  The gravamen of the instant motion is that the amended complaint also falls short of the pleading requirements for such a claim.  Bland is alleged to be a member of C&H, an officer of ROA and of the attorneys-in-fact of each of the RRGs, vice president of the attorneys-in-fact for ANLIR and TRA, and assistant secretary of the attorney-in-fact for DIR.  It is asserted in the instant motion that the Commissioner has failed to sufficiently allege reliance on acts of mail or wire fraud committed by Bland.

It appears from a review of the docket that the Plaintiff did not file a response to the instant motion.[6]  However, upon a review of the 332-allegation amended complaint, the Court finds that nowhere therein does the Plaintiff aver that *Bland made any material misrepresentation or omission directly to the RRGs, their policyholders, or to the Plaintiff herself as a regulator.*[7]  Bland is named in the amended complaint as a "RICO Defendant" along with Kenneth R. Patterson; John William Crews; Carolyn B. Hudgins; Judith A. Kelley; Crews & Hancock, P.L.C.; Tom N. Kellogg; Victoria J. Seeger; Christopher J. Migel; Thomas M. Reindel; Gordon D. McLean; Richard Witkowski;

---

[5]Applying Sixth Circuit precedent, this Court held in its previous orders that "[w]ith respect to . . . injury as a result of alleged fraudulent conduct by [the moving Defendants], the Plaintiff has not demonstrated that *the RRGs* relied to *their* detriment on misrepresentation or omissions alleged herein that were directed to *them*."  (See e.g. Order Granting Mot. of Defs. John William Crews, Judith A. Kelley & Gordon D. McLean to Dismiss Fed. RICO Claims & Granting Pl.'s Req. to Am. Compl. at 20) (emphasis in original).

[6]Although it is the usual practice of this Court to enter a show cause order pursuant to Fed. R. Civ. P. 41(b) upon a party's failure to respond to a dispositive motion, the Court assumes based on the history of this case that the failure to respond was an oversight.

[7]Indeed, it appears Flowers lacks standing to sue based on alleged misrepresentations to anyone but herself, as the Sixth Circuit has rejected the notion that mail or wire fraud directed at a third party can form the basis of a RICO claim.  See Brown, 492 F.3d at 645 n.2 ("Our court has explicitly rejected this approach, requiring that a plaintiff be the target of any alleged fraud").  In any case, the Court need not address this question, as it finds the amended complaint wanting on other grounds.

General Reinsurance Corporation and Atlantic Security, Ltd.  See Piccone v. Bd. of Dir. of Doctors Hosp. of Staten Island, Inc., 97 Civ. 8182(MBM), 2000 WL 1219391, at *6 (S.D.N.Y. Aug. 28, 2000) ("in cases with multiple defendants, Rule 9(b) requires that the complaint allege facts that specify each defendant's connection to the fraud.  General allegations against a group of defendants are insufficient"); Adler v. Berg Harmon Assoc., 790 F. Supp. 1222, 1228 (S.D.N.Y. 1992) ("Plaintiffs cannot satisfy Rule 9(b) by masking the lack of factual allegations against each defendant through broad allegations which combine the acts of several defendants to create the impression that all engaged in every aspect of the alleged fraud").  Of the Plaintiff's 332 allegations, approximately seven refer directly to Bland.  These allegations aver that an internal C&H memorandum to Bland referred to a contemplated loss portfolio transfer between ROA and a reinsurer and that Bland provided Sanders with copies of certain side agreements by facsimile. None of these allegations indicate that *Bland* made statements to the Plaintiff, the RRGs, insureds or policyholders.  Thus, Flowers has failed to adequately plead that the "[f]raud connected with [the] mail or wire fraud . . . involve[d] misrepresentations or omissions flowing from the defendant to the plaintiff."  Paycom Billing Serv., Inc. v. Payment Res. Int'l, 212 F. Supp. 2d 732, 736 (W.D. Mich. 2002); see also Brown, 492 F.3d at 646 n.2; Cent. Distrib., 5 F.3d at 184.  As the Court finds that Flowers' amended complaint fails to establish fraud pursuant to the requirements of Rule 9(b), her substantive RICO claims against Bland are DISMISSED.

    II. Violation of RICO, 18 U.S.C. § 1962(d)

    Flowers also alleges that the Defendants, including Bland, violated 18 U.S.C. § 1962(d), which prohibits conspiracy to violate the section's other substantive provisions.[8]  18 U.S.C. §

---

    [8]Specifically, the statute provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. § 1962(d).

1962(d).  The standing requirement of 18 U.S.C. § 1964(c) applies to all claims brought pursuant to RICO, including conspiracy claims under § 1964(d).  Beck v. Prupis, 529 U.S. 494, 500-01, 120 S. Ct. 1608, 1613-14, 146 L. Ed. 2d 561 (2000).  Accordingly, to have standing to pursue a civil RICO conspiracy claim, the Commissioner must allege "'injur[y] by reason of' a 'conspiracy.'"  See id. (quoting 18 U.S.C. §§ 1964(c), 1962(d)).  In Beck, the United States Supreme Court held"that a person may not bring suit under § 1964(c) predicated on a violation of § 1962(d) for injuries caused by an overt act [in furtherance of the racketeering conspiracy] that is not an act of racketeering or otherwise unlawful under the statute."  Beck, 529 U.S. at 507, 120 S. Ct. at 1617. Thus, to state a claim for civil RICO conspiracy under § 1964(c), the Plaintiff must allege that injury as a proximate result of an overt act in furtherance of the conspiracy that is *itself* an act of racketeering activity or otherwise unlawful under RICO.[9]

Although the amended complaint does not specifically identify the conspiratorial acts engaged in by Bland, the Court, for purposes of this motion, assumes that such acts encompass the racketeering acts of mail and wire fraud alleged elsewhere in the amended complaint.  However, as discussed above, the amended complaint fails to allege injury as a proximate result of those racketeering acts because it does not plead with particularity facts demonstrating misrepresentations by Bland.  See Central Distrib., 5 F.3d at 184; Chaz Constr., L.L.C., 137 F.App'x at 735.  Because the amended complaint insufficiently pleads with respect to the substantive RICO violation under

---

[9]Thus, under Beck and Holmes, § 1964(c) requires that racketeering acts proximately cause the injury complained of by a civil RICO plaintiff in actions pursuant to both §1962(c) and § 1962(d).  Cf. Elkins v. Chapman, 36 F.App'x 543, 544 (6th Cir. 2002) ("In order to state a claim under § 1962(c), a complaint must allege that an act of racketeering activity was the cause of the injury."); see also Jones v. Enter. Rent A Car Co. of Tex., 187 F. Supp. 2d 670, 678 (S.D. Tex. 2002) (dismissing plaintiff's RICO claims pursuant to § 1962(a),(b), (c) and (d) where the complaint failed to allege that the defendants' commission of wire fraud, mail fraud, and institutional fraud proximately caused her injuries).

prevailing Sixth Circuit precedent, Flowers lacks standing pursuant to § 1964(c).  Accordingly, her

§ 1962(d) claims against Bland must be DISMISSED.  See Chaz Constr., LLC, 137 F.App'x at 739

(holding, without identifying the particular RICO claim at issue, that a "plaintiff[] must plead

reliance in order to establish standing in a civil RICO case").

### III.    Remaining State Law Claims.

The exercise by a district court of supplemental, or pendent, jurisdiction over state law

claims is governed by 28 U.S.C. § 1367, which expressly permits the Court to decline the exercise

of jurisdiction when it has dismissed all claims over which it has original jurisdiction.  28 U.S.C.

§ 1367(c)(3).  Absent any remaining federal claims against Bland, the Court, in its sound discretion,

hereby dismisses without prejudice the Plaintiff's claims against him under state law.  See Weeks

v. Portage County Executive Offices, 235 F.3d 275, 279-80 (6th Cir. 2000) (district court's decision

to decline to exercise supplemental jurisdiction lies within its sound discretion).

### IV.    Further Amendment of Complaint.

Finally, Plaintiff's responses to similar motions to dismiss the amended complaint filed by

co-Defendants contain a footnote which states that she "reserves the right to file a Third Amended

Complaint should the Court find that plaintiff's RICO allegations are insufficient."  (See Pl. Paula

A. Flowers' Resp. to the Defs. John William Crews, Judith A. Kelley & Gordon D. McLean's Mot.

to Dismiss Flowers' Am. Compl. at 30 n.16).  Assuming she intended to amend with respect to

Bland, the right to file a third amended complaint is not Flowers' to reserve.  Motions to amend a

complaint are governed by Rule 15 of the Federal Rules of Civil Procedure, which permits

amendment *"once* as a matter of course. . . . Otherwise, a party may amend the party's pleading only

by leave of court or by written consent of the adverse party."  Fed. R. Civ. P. 15(a) (emphasis

added).  The Plaintiff has not sought leave of the Court to again amend her complaint and there is

nothing to suggest Bland has consented thereto.

While it is true leave to amend "shall be freely given when justice so requires," <u>see</u> Fed. R.

Civ. P. 15(a), denial of such a request may be warranted where there exists "undue delay, bad faith

or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments

previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment,

[or] futility of the amendment." <u>Foman v. Davis</u>, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d

222 (1962); <u>Morse v. McWhorter</u>, 290 F.3d 795, 800 (6th Cir. 2002). Here, despite 332 allegations

and multiple attempts, the Plaintiff is still unable to adequately plead her RICO claim and the Court

frankly remains unconvinced that another bite at the apple would yield a different result. Leave to

amend is, therefore, DENIED. <u>See</u> <u>Odyssey Re (London) Ltd.</u>, 85 F. Supp. 2d at 304 n.27 (in case

involving dismissal of RICO mail and wire fraud claims, leave to amend denied where "plaintiff has

already had an opportunity to replead after specific warnings as to a complaint's deficiencies").

CONCLUSION

Based on the foregoing, the Plaintiff's claims against Defendant Bland are DISMISSED and

leave to amend the complaint is DENIED.

**IT IS SO ORDERED** this 27th day of September, 2007.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE