IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

In re

                                                Master File No. MDL 1551

RECIPROCAL OF AMERICA (ROA)
SALES PRACTICES LITIGATION               This Document Relates to:
                                                Civil Action No. 04-2078

---

ORDER GRANTING MOTION OF DEFENDANTS GENERAL REINSURANCE
CORPORATION, TOMMY N. KELLOGG, CHRISTOPHER MIGEL,
THOMAS M. REINDEL AND VICTORIA J. SEEGER
TO DISMISS AMENDED COMPLAINT

---

INTRODUCTION AND BACKGROUND

Before the Court in this multi-district litigation is the motion (Doc. No. 62) of the

Defendants, General Reinsurance Corporation ("Gen Re"), Tommy N. Kellogg, Christopher Migel,

Thomas N. Reindel and Victoria J. Seeger[1] (collectively, the "Gen Re Defendants"),[2] to dismiss the

amended complaint filed by the Plaintiff, Paula A. Flowers, Commissioner of Commerce and

Insurance for the State of Tennessee (sometimes referred to herein as the "Commissioner"), in her

capacity as Liquidator for Doctors Insurance Reciprocal, Risk Retention Group ("DIR"), American

National Lawyers Insurance Reciprocal, Risk Retention Group ("ANLIR") and The Reciprocal

Alliance, Risk Retention Group ("TRA") (referred to collectively herein as the "RRGs"),[3] pursuant

---

[1]The individual Defendants have joined in the motion of Gen Re by notice entered on the
docket on September 22, 2006.

[2]According to the amended complaint, Kellogg, Migel, Reindel and Seeger are officers of
Gen Re.

[3]In an order entered March 1, 2007, subsequent to the filing of the amended complaint at
issue and the motion to dismiss currently before the Court, Leslie A. Newman was substituted as
the Plaintiff in this action, as she succeeded Flowers as Commissioner and Liquidator of the
RRGs.  However, in the name of consistency, the Commissioner will be referred to herein as

to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

The facts alleged in this litigation have been summarized in the Court's previous orders on motions to dismiss and need not be repeated here.  As in her original complaint, Flowers has alleged in her amended pleading claims of violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq.; RICO conspiracy in violation of 18 U.S.C. § 1962(d); as well as fraud; civil conspiracy; unjust enrichment; negligence; breach of fiduciary duty; fraudulent transfers and preferences; misappropriation and negligent handling of trust funds; and malpractice under Tennessee state law.[4]  On June 12, 2006, this Court granted the motion of the Gen Re Defendants to dismiss Flowers' original complaint on the grounds that she failed to satisfy the standing requirement for the federal RICO claim.  Thereafter, the Plaintiff sought and was granted permission to amend her complaint in order to cure the deficiencies identified by the Court.  The gravamen of the instant motion to dismiss is that she has again fallen short of the pleading requirements for such a claim.

<u>ANALYSIS OF THE PARTIES' ARGUMENTS</u>

*Standard of Review for Dismissal Pursuant to Rules 9(b) and 12(b)(6)*

Rule 12(b)(6) permits dismissal of a lawsuit for failure to state a claim upon which relief could be granted.  <u>See</u> Fed. R. Civ. P. 12(b)(6).  The Rule requires the Court to "construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle relief."  <u>Grindstaff v. Green</u>, 133 F.3d 416, 421 (6th Cir. 1998).  "The

_____

"Flowers" rather than "Newman."

[4]Some state law claims have not been alleged as to all Defendants.

2

Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which [she] bases [her] claim." Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957). However, "[t]o avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all the material elements of the claim." Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003).

Rule 9(b) provides that "[i]n all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b). The Rule serves to put defendants on notice of the conduct complained of by the plaintiff to ensure that they are provided sufficient information to formulate a defense. Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 679 (6th Cir. 1988). The Sixth Circuit interprets the particularity requirement "liberally, . . . requiring a plaintiff, at a minimum, to allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." Coffey v. Foamex L.P., 2 F.3d 157, 162 (6th Cir.1993) (internal quotations and citations omitted); Blount Fin. Servs., Inc. v. Walter E. Heller & Co., 819 F.2d 151, 152 (6th Cir. 1987) ("Fraud alleged in a RICO civil complaint for mail fraud must state with particularity the false statement of fact made by the defendant which the plaintiff relied on and the facts showing the plaintiff's reliance on defendant's false statement of fact."); see also Evans v. Pearson Enter., Inc., 434 F.3d 839, 852 -53 (6th Cir. 2006) (affirming dismissal of fraud action where plaintiff failed to plead reliance with particularity as required by Rule 9(b)). In ruling on a motion pursuant to Rule 9(b), a court must read the particularity requirement in harmony with the "policy of simplicity in pleading" advanced by Fed. R. Civ. P. 8, which requires that a complaint provide only a "short and plain statement of the claim." Michaels Bldg. Co., 848 F.2d at 679

(quoting Fed. R. Civ. P. 8).  However, "a district court need not accept claims that consist of no more than mere assertions and unsupported or unsupportable conclusions." Sanderson v. HCA - The Health Care Co., 447 F.3d 873, 876 (6th Cir.), cert. denied, ___ U.S. ___, 127 S. Ct. 303, 166 L. Ed. 2d 155 (2006).

### *Substantive RICO Claims*

As she did in her original complaint, the Plaintiff alleges in Count 1 of the amended pleading that the Gen Re Defendants, along with others, violated RICO, codified at 18 U.S.C. § 1961 et seq., which provides that

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  In order to establish a RICO violation, the Plaintiff must show that these Defendants engaged in "(1) conduct, (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S. Ct. 3275, 3285, 87 L. Ed. 2d 346 (1985).  Flowers' RICO claim is premised on predicate acts of mail and wire fraud, which "are forms of 'racketeering activity' for purposes of RICO." See Anza v. Ideal Steel Supply Corp., ___ U.S. ___, 126 S. Ct. 1991, 1995, 164 L. Ed. 2d 720 (2006); 18 U.S.C. § 1341, 1343, 1961(1)(B). In order to be "indictable" and thus, to sustain a claim under the RICO Act, each element of the predicate act must be proved.  Cent. Distrib. v. Conn, 5 F.3d 181, 183-84 (6th Cir.1993), cert. denied, 512 U.S. 1207, 114 S. Ct. 2678, 129 L. Ed. 2d 812 (1994).  Moreover, as noted above, to survive a motion to dismiss pursuant to Rule 9(b), the amended complaint must plead the circumstances of the mail and wire fraud with particularity.  See Fed. R. Civ. P. 9(b).

"The elements of mail and wire fraud are: (1) a scheme to defraud, and (2) use of the mails,or

of an interstate electronic communication, respectively, in furtherance of the scheme." <u>Advocacy</u> <u>Org. for Patients & Providers v. Auto Club Ins. Assoc.</u>, 176 F.3d 315, 322 (6th Cir.1999), <u>cert.</u> <u>denied</u>, 528 U.S. 871, 120 S. Ct. 172, 145 L. Ed. 2d 145 (1999); <u>see also Carpenter v. United States</u>, 484 U.S. 19, 25 n.6, 108 S. Ct. 316, 320 n.6, 98 L. Ed. 2d 275 (1987) (noting that the same analysis applies to offenses under both the mail and wire fraud statutes). The Sixth Circuit has defined a

> scheme to defraud as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the designed end. In other words, in order to present a cognizable claim for fraud, the plaintiff[] must show that [the defendants] made a material misrepresentation of fact that was calculated or intended to deceive persons of reasonable prudence and comprehension, and must also show that [the] plaintiff[] in fact relied upon that material misrepresentation.

<u>VanDenBroeck v. CommonPoint Mortgage Co.</u>, 210 F.3d 696, 701 (6th Cir. 2000), <u>reh'g denied</u> (Feb. 13, 2001) (internal quotations and citations omitted); <u>see also Advocacy Org.</u>, 176 F.3d at 322 (quoting <u>Kenty v. Bank One, Columbus, N.A.</u>, 92 F.3d 384, 389-90 (6th Cir.1996)); <u>Cent. Distrib.</u>, 5 F.3d at 184; <u>Blount Fin. Servs., Inc.</u>, 819 F.2d at 152-53. RICO's reliance requirement has been interpreted to mean that "[a plaintiff] cannot maintain a civil RICO claim [predicated on mail or wire fraud] against . . . defendants absent evidence that the defendants made misrepresentations or omissions of material fact to [the plaintiff] and evidence that [the plaintiff] relied on those misrepresentations or omissions to its detriment." <u>Cent. Distrib.</u>, 5 F.3d at 184; <u>see also Brown v.</u> <u>Cassens Transp. Co.</u>, 492 F.3d 640, 643 (6th Cir. 2007) (the well-established precedent of this circuit requires that a civil RICO plaintiff alleging mail or wire fraud plead reliance, that is, that a defendant made fraudulent representations to the plaintiff on which the plaintiff relied").

Applying Sixth Circuit precedent, this Court held in its previous order dismissing Flowers' RICO claims against the Gen Re Defendants that "because ROA/TRG and the RRGs have not

demonstrated that *they* relied to *their* detriment on misrepresentations or omissions alleged herein that were directed to *them*, under Sixth Circuit precedent, they do not have standing to pursue RICO claims." (Order Granting Mot. of Defs. General Reinsurance Corp., Thomas M. Reindel, Tommy N. Kellogg, Victoria J. Seeger & Christopher Migel to Dismiss the Coordinated Receiver Actions at 26) (emphasis in original).  The Gen Re Defendants assert herein that Plaintiff has failed to sufficiently allege reliance on acts of mail or wire fraud committed by them.  In response, the Plaintiff points to certain paragraphs of the 332-allegation amended complaint:

> ¶ 100   The Management Defendants [Kenneth R. Patterson, Carolyn B. Hudgins, John William "Bill" Crews, Gordon D. McLean and Judith A. Kelley], with the complicity and cooperation of Reindel at Gen Re, and of [Richard] Witkowski at Atlantic Security, engaged in a scheme to make loans from Gen Re to FVR, but to disguise and misrepresent those loans as reinsurance. The "reinsurance" agreements were intended to inflate artificially and improperly FVR's surplus for the business originally written by the RRGs, reinsured by ROA, and then retroceded to Gen Re.  This is so-called "pass-through" reinsurance.  That is, this is the portion of the RRG ceded reinsurance that was ceded from the RRGs to ROA and in turn "passed through" to Gen Re and was in turn retroceded ("passed through" again) to FVR.  The intent of these "reinsurance" agreements was to deceive Gen Re's regulators regarding FVR's ability to satisfy its obligations as a reinsurer of Gen Re.

> ¶ 101   On information and belief, the parties also intended that Gen Re would incur no substantial insurance risk of net loss to itself, in that FVR's obligations under the Gen Re loans would be guaranteed by ROA, and Gen Re's purported "reinsurance" of ROA for this pass-through business was merely an accommodation. The Management Defendants concealed from regulators ROA's guaranty of FVR's obligations to Gen Re, thereby misrepresenting and falsely stating the financial condition of ROA.  If the regulators had known the true financial condition of ROA, ROA would not have been permitted to continue to operate and, because of the dependence of the RRGs on ROA, the RRGs also would not have been permitted to operate.

> ¶ 103   As DIR began to suffer serious losses in the mid 1990s Crews and the Management Defendants concocted schemes to artificially inflate the surplus of DIR held by FVR.   On information and belief, Gen Re actively encouraged and assisted in the formulation of these schemes. The purpose of the schemes as described herein was to create the appearance of

reinsurance so that the DIR monies held by FVR would be artificially inflated with no corresponding liability entry on the books. The purpose of the subterfuge and mischaracterization of the transactions was threefold: (1) to deceive regulators, (2) to deceive the Board of Directors of each RRG, (3) to deceive the public (policyholders, A.M. Best, etc.), and (4) to induce MHP to invest in ROA. The Management Defendants, Director and Officer Defendants [Patterson, Crews, Hudgins, Kelley and Richard W.E. Bland] and RICO Defendants [Patterson, Crews, Hudgins, Kelley, McLean, Richard W.E. "Dicky" Bland, Kellogg, Seeger, Migel, Reindel, Robert Sanders, Witkowski, Gen Re, Milliman USA, Inc., Crews & Hancock, P.L.C. and Atlantic Security] and the Management Defendants knew that there was little or no transfer risk in these transactions and they could not be appropriately booked as an asset nor could they be appropriately characterized as reinsurance. In fact, they were loans and there were no obligations to repay them to Gen Re.

¶ 105   Later, in 1998, the RICO defendants again conspired to use schemes using "loans" misrepresented as reinsurance. In late 1998, certain of the RICO defendants (including at least Gen Re, Kellogg, Reindel, Seeger, Patterson, Hudgins, Witkowski, and Atlantic Security) caused ROA to enter into agreements with Gen Re and FVR that were variously referred to as "aggregate stop loss/funding cover," "loans," "FVR Cover," "FVR Stop Loss," and "finite contracts" (referred to herein as the "Gen Re Loans"). On information and belief, these agreements took the appearance of risk-transferring reinsurance agreements between Gen Re (as reinsurer) and FVR (as reinsured). As modified by "non-contractual understandings," however, these transactions were actually loans from Gen Re to FVR (*i.e.,* a type of financial reinsurance), guaranteed by ROA. Financial reinsurance can be deceptive or illusory when it is utilized to create an inaccurate appearance that substantial insurance risk of net loss has been transferred from the reinsured to the reinsurer, thereby inflating the reinsured's surplus to policyholders. Such arrangements (sometimes called "Surplus Relief Insurance") are typically structured so that risk does indeed appear to be transferred, but the risk is so remote or improbable of occurrence as to be insubstantial. In such cases, even assuming all aspects of the arrangement are available for review, extensive actuarial or financial analysis is normally required in order to ascertain whether the risk being transferred is, in fact, material.

¶ 106   On information and belief, these deceptive reinsurance agreements (*i.e.,* guaranteed loans) were executed to inflate FVR's surplus for the pass-through business retroceded from Gen Re to FVR, with the intent of deceiving Gen Re's regulators regarding FVR's ability to satisfy its obligations under the Retrospection Agreements. On information and belief, the parties also

7

intended that Gen Re would incur no substantial insurance risk of net loss to itself, in that FVR's obligations under the Gen Re Loans would be guaranteed by ROA, and that Gen Re's purported "reinsurance" of ROA was merely an accommodation.

¶ 107    On November 30, 1998, by mail communication, Reindel (in Connecticut) sent Patterson (in Virginia) an "updated proposal for the aggregate stop loss/funding cover."  The letter was copied to Gen Re's Migel and Seeger.  This proposal indicated that there would be "Contractual Terms and Conditions" modified by "Assumptions and Non-Contractual Understandings."  Pursuant to the proposed contracts, 1998 premiums of $1 million would be ceded for $2 million of coverage attaching to 135% of the Net Subject Premium, 1999 premiums of $2 million would be ceded for $10 million of coverage attaching at 100% of Net Subject premium.  However, this purported reinsurance would be modified by "Non-Contractual Understandings" so that:

If cover gets hit, the expectation is that Company will renew at higher attachments to help make the reinsurer whole.  Long term understanding is that Reinsurer makes Fee and that contract balance is zero or positive by 12/31/03.

CONTRACT BALANCE:    Equals Premium Ceded less Fee less Incurred Losses (including IBNR) plus interest debits and credits on Cash Balance

INTEREST:    Equals Premium Ceded less Fee less Paid Losses plus Interest credits and debits

FEE:    Option 1:  6% of Ceded Premiums

Option 2:  4% of Ceded Premiums plus 5% of any of negative contract balance calculated quarterly.

These proposed transactions were to be in the manner of guaranteed loans, not risk-transferring reinsurance.  On information and belief, this proposal was further negotiated before the terms were finalized.

¶ 108    On February 8, 1999, in a wire communication to Patterson, Reindel indicated that his notes on the "FVR Cover Non-Contractual Understandings" indicated that:

1.    Fees are 6% of losses/premium.

2.    The 2M "loan" in 1998 needs to be paid back by

8

12/31/00.  The 3M "loan" needs to be paid back by
12.31.01  All losses need to be paid back plus Fees.

3.      You will need to pay us back through FVIR [ROA]
        surplus if FVR surplus is inadequate.

This wire communication was copied to Gen Re's Migel, and Seeger
and Kellogg, as well as to Hudgins.

¶ 109   A February 9, 2000 wire communication from Reindel (in Connecticut) to
Patterson (in Virginia), copied to Gen Re's Migel, Seeger and Kellogg,
confirms that these finite agreements were, in reality, lines of credit "to be
noncontractually paid back."  Reindel indicated that Gen Re was committed
to providing "the previously agreed 3M in limits for 1999 which follow the
2M provided in 1998" and discussed the possibility of an additional $3
million loan for 1999, to raise the line of credit to $8 million total.  The
November 30, 1998, February 9, 1999, and February 16, 2000,
correspondence, read together, suggests that repayment of the "loans" would
take the form of a commutation of the purported reinsurance agreements,
with Gen Re refunding FVR the ceded "premiums" minus (a) a fee of 6% of
ceded "premiums," (b) interest debits and credits on the cash balance, and (c)
any losses that Gen Re might actually be called upon to pay under the
purported reinsurance (*i.e.,* "hits" on the "cover").  As the February 16, 2000
communication explained:

The original intent of this cover is to provide a booking benefit and
not a cash loan.  It is designed to be paid back or commuted before
we are out of cash.

¶ 110   An October 18, 2002, wire communication from Witkowski to ROA
personnel discloses:  "FVR paid a premium of 120,000 for the 2,000,000
cover in 1998 and a further 360,000 for 6,000,000 cover in 1999."  This
suggests that FVR was able to inflate its surplus by booking a "reinsurance"
benefit for the Gen Re Loans, the repayment of which was guaranteed by
ROA.

¶ 111   A June 15, 2000, communication, together with other [sic] on June 14 and
15, 2000 suggests that Gen Re was experiencing problems reconciling
Milliman's reserve numbers for FVR with numbers that Gen Re was
reporting to Gen Re's regulators in order to claim a credit for its purported
retrocession of risk to FVR.  The Gen Re Loans were said to "play into this
also," apparently referring to the fact that a portion of FVR's claimed surplus
was attributable to Gen Re Loans.

¶ 112   By wire communication to Patterson and Hudgins dated April 23, 2001,
Reindel referred to moving forward with "an ROA 2001 accident year stop

loss cover as a way of balancing our experience on the finite covers on the DIR and ANLIR books," and noted that the premium for the cover would be $706,667 with a limit of $2 million. On information and belief, the phrase "balancing our experience on the finite covers" referred to the "If cover gets hit" provision of the Gen Re Loans (*i.e.,* ROA's obligation to make good on any loss that Gen [R]e might actually be called upon to pay under the deceptive reinsurance agreements between Gen [R]e and FVR). In fact, ROA paid the $706,667 "premium" for the "ROA 2001 accident year stop loss cover," which, on information and belief, really was ROA's reimbursement to Gen Re for losses Gen Re had paid under its 1998 and 1999 deceptive reinsurance of FVR losses. On information and belief, based on wire communications from October 21, 2002 and October 18, 2002, ROA sought reimbursement from FVR, and Witkowski was told, in response to his questioning, that: "Gen Re incurred the $706,667 and then was reimbursed by ROA for reasons of expediency."

¶ 113   By wire communication dated December 20, 2001, Reindel (in Connecticut) informed Patterson and Hudgins (in Virginia) that certain of the "Finite contracts" would be commuted as part of the "LPT" transaction. This was the "repayment" of the Gen Re Loans anticipated by the November 30, 1998, February 9, 1999, and February 16, 2000 correspondence.

¶ 114   Gen Re's willingness to provide the Gen Re loans was made contingent upon ROA's signing of Endorsement 12 to Reinsurance Agreement A264 between ROA and Gen Re ("Endorsement 12"). On information and belief, Endorsement 12 was executed on February 5, 1999.

¶ 115   Endorsement 12 provided, effectively, that if Patterson ceased to be President and CEO of ROA at any time prior to October 1, 2001, Gen Re would have the option of increasing the risk charge to ROA. On information and belief, Gen Re insisted upon Endorsement 12 because of Patterson's complicity in, and necessity to, the non-contractual understandings.

¶ 119   On information and belief, contemporaneously with filing ROA's 1998, 1999, 2000, and 2001 annual statements, Patterson and Hudgins mailed copies to Gen [R]e which therefore had actual knowledge that Patterson and Hudgins had not accounted for or disclosed the Gen [R]e Loans.

¶ 120   "The ROA 2001 accident year stop loss cover," structured as purported reinsurance with a $706,667 premium and a limit of $2 million, was, in fact, a reimbursement by ROA of Gen Re's "hits" on the finite covers on the DIR and ANLIR books of FVR's pass-through business, and was not intended to transfer to Gen Re any substantial insurance risk of net loss to itself. Pursuant to VA. CODE ANN. § 38.2-1316.6, the "ROA 2001 accident stop loss cover" is deemed, *prima facie*, to have been arranged for the purpose principally of deception or financial statement distortion.

10

¶ 122    The RICO Defendants made use of wire and mail communications in negotiating and implementing the loans from Gen Re to FVR, and the guaranty by ROA.

Flowers also made reference to Paragraphs 85-89, 93-97, 124-34, 147-52, 162-73, 178, 180-89, 196-98, 200, 203, 212, 214, 223-34, 256-57 and 259-60 of her amended complaint.

Nowhere in these allegations does the Plaintiff aver that *the Gen Re Defendants* in particular made any material misrepresentation or omission *directly to the RRGs, their policyholders, or to the Plaintiff herself as a regulator*.[5]  See Piccone v. Bd. of Dir. of Doctors Hosp. of Staten Island, Inc., 97 Civ. 8182(MBM), 2000 WL 1219391, at *6 (S.D.N.Y. Aug. 28, 2000) ("in cases with multiple defendants, Rule 9(b) requires that the complaint allege facts that specify each defendant's connection to the fraud.  General allegations against a group of defendants are insufficient"); Adler v. Berg Harmon Assoc., 790 F. Supp. 1222, 1228 (S.D.N.Y. 1992) ("Plaintiffs cannot satisfy Rule 9(b) by masking the lack of factual allegations against each defendant through broad allegations which combine the acts of several defendants to create the impression that all engaged in every aspect of the alleged fraud").  Thus, Flowers has failed to adequately plead that the "[f]raud connected with [the] mail or wire fraud . . . involve[d] misrepresentations or omissions flowing from the defendant to the plaintiff."  Paycom Billing Serv., Inc., 212 F. Supp. 2d at 736; see also Cent. Distrib., 5 F.3d at 184.  As the Court finds that Flowers' amended complaint fails to establish fraud pursuant to the requirements of Rule 9(b), her substantive RICO claims against the Gen Re Defendants are DISMISSED.

_____

[5]Indeed, it appears Flowers lacks standing to sue based on alleged misrepresentations to anyone but herself, as the Sixth Circuit has rejected the notion that mail or wire fraud directed at a third party can form the basis of a RICO claim.  See Brown, 492 F.3d at 645 n.2 ("Our court has explicitly rejected this approach, requiring that a plaintiff be the target of any alleged fraud").  The Plaintiff's invitation to the Court to adopt the so-called "target theory" is without support in this circuit.  See id.

*RICO Conspiracy Claims*

The Plaintiff's claims against the Gen Re Defendants under 18 U.S.C. § 1962(d), which prohibits conspiracy to violate the section's other substantive provisions,[6] are also DISMISSED. The standing requirement of 18 U.S.C. § 1964(c) applies to all claims brought pursuant to RICO, including conspiracy claims under § 1964(d).  Beck v. Prupis, 529 U.S. 494, 500-01, 120 S. Ct. 1608, 1613-14, 146 L. Ed. 2d 561 (2000).  Thus, to have standing to pursue a civil RICO conspiracy claim, the Plaintiff must sufficiently allege "'injur[y] by reason of' a 'conspiracy.'" Id. (quoting 18 U.S.C. §§ 1964(c), 1962(d)).  In Beck, the United States Supreme Court held"that a person may not bring suit under § 1964(c) predicated on a violation of § 1962(d) for injuries caused by an overt act [in furtherance of the racketeering conspiracy] that is not an act of racketeering or otherwise unlawful under the statute." Id. at 507, 120 S. Ct. at 1617.  Based on the amended complaint's failure to allege with particularity facts demonstrating acts of racketeering on the part of the Gen Re Defendants, dismissal of the § 1962(d) claim is warranted.  See Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings, 85 F. Supp. 2d 282, 303 (S.D.N.Y. 2000), aff'd 2 F.App'x 109 (2d Cir. 2001) (dismissal of RICO conspiracy count appropriate where claims for mail and wire fraud had been dismissed).

*Remaining State Law Claims*

Although the Court in its original order found that diversity jurisdiction appeared to be present in this case, Flowers advises in her response to the dispositive motion that diversity does not in fact exist on the grounds that Defendant PwC is a limited liability partnership having partners in the state of Tennessee.  She further requests that the Court, as it did in the related action of Gross v. General Reinsurance, et al., No. 2:04-cv-02313 (W.D. Tenn.), exercise its discretion and dismiss

---

[6]Specifically, the statute provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. § 1962(d).

the state claims without prejudice.  The exercise by a district court of supplemental, or pendent, jurisdiction over state law claims is governed by 28 U.S.C. § 1367, which expressly permits the Court to decline the exercise of jurisdiction when it has dismissed all claims over which it has original jurisdiction.  28 U.S.C. § 1367(c)(3).  Absent any remaining federal claims against the Gen Re Defendants, the Court, in its sound discretion, hereby dismisses without prejudice the Plaintiff's claims against the Gen Re Defendants under state law.  See Weeks v. Portage County Executive Offices, 235 F.3d 275, 279-80 (6th Cir. 2000) (district court's decision to decline to exercise supplemental jurisdiction lies within its sound discretion).

### Further Amendment of Complaint

Finally, Plaintiff's response contains a footnote which states that she "reserves the right to file a Third Amended Complaint should the Court find that plaintiff's RICO allegations are insufficient." (Pl. Paula A. Flowers' Resp. to the Def. General Reinsurance Corp.'s Mot. to Dismiss Flowers' Am. Compl. at 37 n.13)  However, the right to file a third amended complaint is not Flowers' to reserve.  Motions to amend a complaint are governed by Rule 15 of the Federal Rules of Civil Procedure, which permits amendment "once as a matter of course. . . . Otherwise, a party may amend the party's pleading only by leave of court or by written consent of the adverse party." Fed. R. Civ. P. 15(a) (emphasis added).  Since there is no indication the Gen Re Defendants have consented to additional amendment of the complaint, Flowers may only amend with leave of the Court.

While it is true leave to amend "shall be freely given when justice so requires," see Fed. R. Civ. P. 15(a), denial of such a request may be warranted where there exists "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment,

13

[or] futility of the amendment." <u>Foman v. Davis</u>, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962); <u>Morse v. McWhorter</u>, 290 F.3d 795, 800 (6th Cir. 2002). Here, despite 332 allegations, the Plaintiff is still unable to adequately plead her RICO claims and the Court frankly remains unconvinced that another bite at the apple would yield a different result. Leave to amend is, therefore, DENIED. <u>See</u> <u>Odyssey Re (London) Ltd.</u>, 85 F. Supp. 2d at 304 n.27 (in case involving dismissal of RICO mail and wire fraud claims, leave to amend denied where "plaintiff has already had an opportunity to replead after specific warnings as to a complaint's deficiencies").

CONCLUSION

Based on the foregoing, the motion to dismiss is GRANTED and Flowers' amended complaint is DISMISSED as to Defendants Gen Re, Kellogg, Migel, Reindel and Seeger. Furthermore, leave to amend the complaint is DENIED.

**IT IS SO ORDERED** this 28th day of September, 2007.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE