IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

In re

RECIPROCAL OF AMERICA (ROA)
SALES PRACTICES LITIGATION

Master File No. MDL 1551

This Document Relates to:
Civil Action No. 04-2078

___

ORDER GRANTING MOTION OF DEFENDANTS MILLIMAN, INC. AND
SANDERS TO DISMISS AMENDED COMPLAINT
___

INTRODUCTION

Before the Court in this multi-district litigation is the motion of Defendants Milliman, Inc. and Robert L. Sanders (collectively, the "Milliman Defendants") to dismiss the complaint filed against them by Paula A. Flowers, Commissioner of Commerce and Insurance for the State of Tennessee (sometimes referred to herein as the "Commissioner"), in her capacity as Liquidator for Doctors Insurance Reciprocal, Risk Retention Group ("DIR"), American National Lawyers Insurance Reciprocal, Risk Retention Group ("ANLIR") and The Reciprocal Alliance, Risk Retention Group ("TRA") (collectively, the "RRGs"),[1] pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. On August 7, 2006, Flowers filed an amended complaint, of which the Milliman Defendants have likewise sought dismissal. Therefore, the original dispositive motion (Doc. No. 22) is hereby DISMISSED as moot with respect to Flowers' claims. See Harris v. City of N.Y., 186 F.3d 243, 249 (2d Cir. 1999) (recognizing that "it is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect"). At this

---

[1] Subsequent to the filing of the instant motion, Leslie A. Newman succeeded Paula A. Flowers as Commissioner of the Tennessee Department of Commerce and Insurance and liquidator for the RRGs. (See Order dated Mar. 1, 2007, Doc. No. 386) However, for purposes of this order and to avoid confusion, the Court will refer to the Plaintiff as "Flowers."

point, the Court will address the Milliman Defendants' motion to dismiss the amended pleading (Doc. No. 59).

## FACTUAL ALLEGATIONS

The facts in this litigation have been summarized as follows:

This case arises from the insolvency of a Virginia reciprocal insurer, ROA, and three Tennessee reciprocal risk retention groups that were largely reinsured by ROA, DIR, TRA and ANLIR. ROA was first organized in response to a perceived shortage in the Virginia market of medical liability (especially hospital liability) insurance options. For many years, the company seemed to grow and do well, returning to its hospital-owners substantial dividends. The benevolent period during which this growth occurred emboldened management, especially the enterprising attorney (Crews), who had first organized ROA and served as its general counsel. Together with his law firm, Crews & Hancock, and his associates in senior management and the board of directors (eventually including defendants Bland, Patterson, Kelley, Hudgins, McLean, and Davis, in his capacity as chairman of the board of DIR), Crews took ROA (initially known as [Virginia Professional Underwriters, Inc. ("VPUI") and The Virginia Insurance Reciprocal ("TVIR")]) from a small, single-state hospital insurer to a multi-state major player in the liability insurance market. During this time the company grew in size and complexity, diversifying its coverage by adding physician and lawyer malpractice, as well as workers' compensation and other types of insurance. In due course, the three Tennessee risk retention groups were created to avoid some of the burdens of Virginia insurance regulation and to specialize in some of the newer lines of business (physician malpractice for DIR, attorney malpractice for ANLIR, and health care liability for TRA), enabling segregation of risk as well. Crews participated actively in the management of the four insurance companies which, in many respects, were under common management. However, each was owned by a different group of policyholders/owners. Three of the four reciprocal insurance companies (i.e., DIR, TRA, and ANLIR) also qualified as lightly regulated Tennessee risk retention groups, a key reason for their formation. Those three companies were largely reinsured by ROA, the Virginia reciprocal, so that ultimately the latter became liable for most of their insurance risks.

During the 1970s and 1980s a number of well-publicized insurance insolvencies sensitized the insurance-buying public, especially commercial insureds, to the importance of financial soundness. Ratings accorded insurers by independent organizations, like A.M. Best, took on added value in the marketplace. Crews and his associates understood well the need to address that concern as a precursor to successful competition for lucrative new customers. For a young, and relatively small, insurer like ROA, the appearance of financial stability could be created

without actually amassing the necessary capital and surplus, a daunting and very lengthy process. Instead, they could arrange for a well-respected and well-heeled reinsurer to at least appear to stand behind its obligations through reinsurance. Of great value, this enabled the reinsured, ROA, to utilize Best's rating of the reinsurer. For this role, Crews and his associates selected one of the world's largest reinsurers, Gen Re. From the beginning, Crews had close business and personal ties with Gen Re and its management (including at various times, Reindel, Kellogg, and Seeger). Together these individuals, along with others, formed an informal "*de facto*" partnership to improve the appearance of ROA's balance sheet and stated surplus by ceding business from ROA to Gen Re. ROA was accorded superior ratings from Best's Insurance Reports in part because of ROA's reinsurance relationship with Gen Re, which A.M. Best rated A++ Superior. Best's Insurance Reports noted that "ROA's principal reinsurer is Gen Re." From a regulatory perspective, this permitted ROA to reduce the liability it had to recognize on its books by the amount for which the reinsurer would be liable (referred to in the industry as "reserve credit"). By providing ROA with this reinsurance, Gen Re earned lucrative ceding commissions from ROA. But the arrangement was structured so that, in reality, the risk assumed by Gen Re was minimal. Indeed, Gen Re entered into, and participated in, this arrangement with the full expectation that every year it would earn valuable reinsurance premiums with little danger of experiencing a net loss. At times, the illusion of reinsurance was additionally maintained through deceptive financial reinsurance, in which loans from Gen Re to ROA and [First Virginia Reinsurance, Ltd. ("FVR")] were guised as substantial insurance risk of net loss.

Crews and other members of management also sought to minimize regulatory oversight and taxation of ROA, ANLIR, DIR, and TRA and their owners. Toward this end, Crews formed the offshore Bermuda captive FVR to serve as reinsurer for ROA's physicians and attorney liability insurance business (and later, ROA's net retained share of risk on the DIR and ANLIR business), thereby enabling profits on that business to accumulate on a tax deferred basis. Atlantic Security and Witkowski served as FVR's agents in Bermuda. An offshore reinsurer's profits are not subject to United States taxation so long as the reinsurer does no business in the United States. Crews devised the use of FVR as a means to hold profits from ROA's retained business (for use as surplus to policyholders) while sheltering ROA's physician and lawyer subscribers from taxation on those profits until distribution. But, under Virginia law, reserve credit for reinsurance provided by offshore companies can only be taken to the extent of an acceptable security trust funded and maintained in the U.S. Moreover, this reliance by ROA upon FVR as reinsurer brought the latter within the scrutiny of Virginia insurance officials.

Starting in or about 1990, when regulators began asking too many questions about FVR, Crews' law firm and other defendants arranged for Gen Re to remove FVR from the regulators' scrutiny by providing "accommodation" reinsurance to ROA for all of the business that ROA formerly ceded directly to FVR. Pursuant to this

3

"accommodation reinsurance" arrangement, Gen Re would "accommodate" ROA by acting as a "pass-through" between ROA and FVR, with ROA ceding risk as reinsurance to Gen Re and Gen Re "retroceding" 100% of that risk to FVR. FVR remained the ultimate "retrocessionaire," but the "accommodation" enabled ROA to report only Gen Re (with its strong balance sheet), and not FVR, as a reinsurer of ROA, thereby removing FVR from the scrutiny of regulators. As Gen Re later explained, "Reinsurance assumed by FVR was always intended to be 'accommodation reinsurance.' If this was real reinsurance, rates would have been different.'"

As the insurance enterprise became less lucrative and economic challenges increased, FVR became chronically underfunded to meet its obligations to Gen Re on the risks ceded from ROA to Gen Re to FVR. If FVR had not been removed from scrutiny of ROA's regulators pursuant to the "accommodation" arrangement with Gen Re, ROA's reserve credit for the business ceded would have been at risk, because such a credit could only have been claimed to the extent of FVR's ability to secure its reinsurance obligations.

Unwilling to take on the increased reinsurance risk from ROA's mounting losses, Gen Re eventually demanded in October, 2000, that the "understanding" behind the "accommodation reinsurance" scheme be memorialized in writing--albeit in the 2000 Unreported Side Agreement kept hidden from the public. Subsequently, ROA's losses grew even worse. Gen Re feared the possibility that it would be found accountable for what the outside public thought was "real reinsurance," and thus in late 2000 devised a complicated plan which would "virtually eliminate" Gen Re's reinsurance risk of net loss as if "Gen Re were never there." Effective on or about December 31, 2001, Gen Re ceased providing "accommodation" reinsurance that required it to be at risk for FVR's financial condition. ROA resumed ceding certain risks directly to FVR, and the Wachovia-FVR Trust was established to secure FVR's reinsurance obligations to ROA. Wachovia served as trustee of the Wachovia-FVR Trust[,] which also became chronically underfunded.

Crews' law firm, Crews & Hancock, reaped substantial fees for legal work performed for ROA, which fees ultimately benefitted the partners at Crews & Hancock, including Crews and Bland. Besides Crews, other members of management came and went, but for the relevant years included McLean, Patterson, Hudgins, and Kelley, all of whom benefitted from the business in the way of substantial salaries and perquisites. A lesser, but significant participant was Davis, who served as Chairman of the Board for DIR, for which he, too, was paid a salary.

Independent auditors and certified actuaries for ROA, ANLIR, DIR, TRA, and FVR also came and went. However, for the relevant years, the independent auditor was [Pricewaterhouse Coopers, LLP ("PwC")] (whose engagement partner was Stephani) and the certified actuary was Milliman (whose work was performed by Sanders).

4

> Milliman (beginning in 1997) and PwC (beginning in 1999) reaped substantial fees for having, and maintaining as clients, ROA, ANLIR, DIR, TRA, and FVR.
>
> Eventually, ROA and DIR experienced extreme financial difficulty, due in large part to the nature of the "accommodation reinsurance" scheme, which enabled the companies to grow at an accelerated rate, and generate disproportionate profits, without ever providing the necessary capital and surplus that is essential to weather the inevitable cycles and developments. In order to maintain the false appearance of ROA's continued financial viability and therefore enable themselves to continue and maximize the benefits they were receiving from their association with ROA/TRG (or, in some instances to receive preferential payments), the Management Defendants (Crews, Patterson, Hudgins, and Kelley), McLean, the Gen Re Defendants (Gen Re, Seeger, Kellogg, and Reindel), Crews & Hancock, Bland, Davis, Witkowski, Atlantic Security, Milliman, Sanders, Stephani, PwC, and Wachovia conspired to participate, and did participate, in various fraudulent schemes . . .
>
> The fraudulent schemes included various types of "creative accounting," arbitrary reductions in DIR's and ROA's claim reserves, reinsurance agreements that did not transfer substantial insurance risk of net loss, nondisclosure of modifications to reinsurance agreements that rendered much of ROA's reinsurance receivables from Gen Re illusory, and disguised misappropriations of funds from ROA and the Wachovia-FVR Trust. The defendants appeared to have believed that if they could just conceal ROA's financial troubles long enough, ROA eventually could emerge from a hazardous financial condition without regulators ever being the wiser. Unfortunately, but predictably, things went from bad to worse, and the defendants' success in postponing regulatory intervention resulted in the deepening of ROA's insolvency.
>
> ROA's concealed insolvency finally came to light only after, in late December of 2002, Virginia regulators discovered the 2002 Unreported Side Agreement and its $135 million aggregate cap, and other financial irregularities. . . .

(Deputy Receiver's Resp. and Mem. In Opp'n to Mot. to Dismiss of Def. Ronald K. Davis, M.D. at pp. 1-7) (internal citations omitted). Flowers alleges violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., as well as various claims under Tennessee state law.

## STANDARD OF REVIEW

The Milliman Defendants have filed this motion pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. Rule 12(b)(6) permits dismissal of a lawsuit for failure to state a claim upon which relief could be granted. See Fed. R. Civ. P. 12(b)(6). The Rule requires the Court to "construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle relief." Grindstaff v. Green, 133 F.3d 416, 421 (6th Cir. 1998). "The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim." Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957). However, "[t]o avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all the material elements of the claim." Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003).

Rule 9(b) provides that "[i]n all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b). The Rule serves to put defendants on notice of the conduct complained of by the plaintiff to ensure that they are provided sufficient information to formulate a defense. Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 679 (6th Cir. 1988). The Sixth Circuit interprets the particularity requirement "liberally, . . . requiring a plaintiff, at a minimum, to allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." Coffey v. Foamex L.P., 2 F.3d 157, 162 (6th Cir. 1993) (internal quotations and citations omitted); Blount Fin. Serv., Inc. v. Walter E. Heller & Co., 819 F.2d 151, 152 (6th Cir. 1987) ("Fraud alleged in a RICO civil complaint for mail fraud must state with particularity the false statement of fact made by the defendant which the plaintiff relied on and the

6

facts showing the plaintiff's reliance on defendant's false statement of fact."); see also Evans v. Pearson Enter., Inc., 434 F.3d 839, 852-53 (6th Cir. 2006) (affirming dismissal of fraud action where plaintiff failed to plead reliance with particularity as required by Rule 9(b)).

In ruling on a motion pursuant to Rule 9(b), a court must read the particularity requirement in harmony with the "policy of simplicity in pleading" advanced by Federal Rule of Civil Procedure 8, which requires that a complaint provide only a "short and plain statement of the claim." Michaels Bldg. Co., 848 F.2d at 679 (quoting Fed. R. Civ. P. 8).  Accordingly, courts should not be "too exacting" or "demand clairvoyance from pleaders" in determining whether the requirements of Rule 9(b) have been met.  Id. at 681.  Rather, "if the defendant has fair notice of the charges against him, [Rule 9(b)] is satisfied."  Shapiro v. Merrill Lynch & Co., 634 F. Supp. 587, 593-94 (S.D. Ohio 1986); see also Michaels Bldg. Co., 848 F.2d at 680.  However, "a district court need not accept claims that consist of no more than mere assertions and unsupported or unsupportable conclusions." Sanderson v. HCA - The Health Care Co., 447 F.3d 873, 876 (6th Cir.), cert. denied, ___ U.S. ___, 127 S. Ct. 303, 166 L. Ed. 2d 155 (2006).

## ANALYSIS

### I. Violation of RICO, 18 U.S.C. § 1962(c)

Flowers has alleged in both her original and amended complaints that the Milliman Defendants, among others, violated Section 1962(c) of RICO, which provides that

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  In order to establish a RICO violation, the Plaintiff must show that these Defendants engaged in "(1) conduct, (2) of an enterprise (3) through a pattern (4) of racketeering

activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S. Ct. 3275, 3285, 87 L. Ed. 2d 346 (1985). "In addition, the plaintiff only has standing if, and can only recover to the extent that, [she] has been injured in [her] business or property by the [predicate acts] constituting the violation." Id. at 496, 105 S. Ct. at 3285; see also 18 U.S.C. § 1964(c). In the instant motion, the Milliman Defendants argue that the Commissioner has failed to state a claim for a violation of RICO and, on that basis, contend that the amended complaint must be dismissed.

A "pattern of racketeering activity" is demonstrated by "at least two acts of racketeering activity, one of which occurred after the effective date of [RICO] and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1962(c), § 1961(5). In addition, proof of a pattern of racketeering activity requires a showing that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." H.J., Inc., v. Nw. Bell Tel. Co., 492 U.S. 229, 109 S. Ct. 2893, 2900, 106 L. Ed. 2d 195 (1989). In the instant action, Flowers' RICO claims are premised on predicate acts of mail and wire fraud. Section 1961(1) enumerates specific acts which constitute racketeering activity, including acts of mail fraud indictable under the federal mail fraud statute, 18 U.S.C. § 1341,[2] and

---

[2] 18 U.S.C. § 1341, provides in relevant part that

> [w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341.

8

acts of wire fraud indictable under the federal wire fraud statute, 18 U.S.C. § 1343.[3]  18 U.S.C. § 1961(1)(B).  In order to be "indictable" and, thus, to sustain a claim under the RICO Act, each element of the predicate act must be proved.  Central Distrib. v. Conn, 5 F.3d 181, 183-84 (6th Cir. 1993).  Moreover, as noted above, to survive a motion to dismiss pursuant to Fed. R. Civ. P. 9(b), the complaint must plead the circumstances of the mail and wire fraud with particularity.  Fed. R. Civ. P. 9(b).

"The elements of mail and wire fraud are: (1) a scheme to defraud, and (2) use of the mails, or of an interstate electronic communication, respectively, in furtherance of the scheme."  Advocacy Org. for Patients & Providers v. Auto Club Ins. Assoc., 176 F.3d 315, 322 (6th Cir. 1999), cert. denied, 528 U.S. 871, 120 S. Ct. 172, 145 L. Ed. 2d 145 (1999); see also Carpenter v. United States, 484 U.S. 19, 25 n.6, 108 S. Ct. 316, 320 n.6, 98 L. Ed. 2d 275 (1987) (noting that the same analysis applies to offenses under both the mail and wire fraud statutes).  The Sixth Circuit has defined a

> scheme to defraud as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the designed end.  In other words, in order to present a cognizable claim for fraud, the plaintiff[] must show that [the defendants] made a material misrepresentation of fact that was calculated or intended to deceive persons of reasonable prudence and comprehension, and must also show that [the] plaintiff[] in fact relied upon that material misrepresentation.

VanDenBroeck v. CommonPoint Mortgage Co., 210 F.3d 696, 701 (6th Cir. 2000), reh'g denied (Feb. 13, 2001) (internal quotations and citations omitted); see also Advocacy Org., 176 F.3d at 322

---

[3] 18 U.S.C. 1343 provides that
[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both . . .

18.U.S.C. § 1343.

9

(quoting Kenty v. Bank One, Columbus, N.A., 92 F.3d 384, 389-90 (6th Cir. 1996)); Central Distrib., 5 F.3d at 184; Blount Fin. Serv., Inc., 819 F.2d at 152-53.

RICO's statutory standing provision, 18 U.S.C. § 1964(c), provides a private cause of action under RICO for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). In interpreting this provision, the United States Supreme Court has held that "[a] plaintiff's right to sue under § 1964(c). . . requires a showing that the defendants'] violation was the proximate cause of the plaintiff's injury." Holmes v. Sec. Investor Protection Corp., 503 U.S. 258, 112 S. Ct. 1311, 1312, 117 L. Ed. 2d 532 (1992) (concerning standing in a RICO action predicated on acts of securities fraud); see also Anza v. Ideal Steel Supply Corp., __ U.S. __, 126 S. Ct. 1991, 1994, 164 L. Ed. 2d 720 (2006). According to the Holmes court, in this context,"proximate cause" requires "some direct relation between the injury asserted and the injurious conduct alleged." Holmes, 503 U.S. at 268, 112 S. Ct. at 1318; see also Anza, 126 S. Ct. at 1998 ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."); Sedima, 473 U.S. at 497, 105 S. Ct. at 3285 (finding, in RICO action based on predicate acts of mail and wire fraud, that a plaintiff's damages must "flow from the commission of the predicate acts."); Trollinger v. Tyson Foods, Inc., 370 F.3d 602, 612 (6th Cir. 2004) (citing Holmes for the proposition that RICO statutory standing requires a showing of proximate cause).

The Sixth Circuit has interpreted § 1964(c)'s causation requirement to require a plaintiff to plead reliance in order to state a civil RICO claim predicated on acts of fraud.[4]  See Brown v.

---

[4]Several other circuits similarly impose reliance as a standing requirement for RICO actions involving fraud.  See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212 (4th Cir.), cert. denied, 543 U.S. 979, 125 S. Ct. 479, 160 L. Ed. 2d 356 (2004) ("To recover civil RICO damages, . . . an individual must allege that he was injured 'by reason of' the pattern of racketeering activity.  To meet this burden with respect to mail fraud and wire fraud, a plaintiff must '*plausibly* allege both that he detrimentally relied in some way on the fraudulent mailing or wire and that the mailing or wire was a

10

Cassens Transp. Co., 492 F.3d 640, 643 (6th Cir. 2007); Chaz Constr., LLC v. Codell, 137 F.App'x 735, 738-39 (6th Cir. 2005); Central Distrib., 5 F.3d at 184; Blount Fin. Serv., Inc., 819 F.2d at 152; Moon v. Harrison Piping Supply, 375 F. Supp. 2d 577, 597 (E.D. Mich. 2005), aff'd in part & rev'd in part on other grounds, 465 F.3d 719 (6th Cir. 2006) (citing Grantham & Mann, Inc. v. Am. Safety Prod., Inc., 831 F.2d 596, 605 (6th Cir. 1987)); Armbruster v. K-H Corp., 206 F. Supp. 2d 870, 898 (E.D. Mich. 2002) (holding that a civil RICO complaint based upon predicate acts of mail fraud must plead the plaintiff's reliance upon the defendant's misrepresentation); Paycom Billing Serv., Inc. v. Payment Res. Int'l, 212 F. Supp. 2d 732, 736 (W.D. Mich. 2002) (holding that a civil RICO complaint based upon predicate acts of mail fraud must plead the plaintiff's reliance upon the defendant's material misrepresentation). The reliance requirement has been further interpreted in this circuit to mean that "[a plaintiff] cannot maintain a civil RICO claim [predicated on mail or wire fraud] against . . . defendants absent evidence that the defendants made misrepresentations or omissions of material fact to [the plaintiff] and evidence that [the plaintiff] relied on those misrepresentations or omissions to its detriment." See Central Distrib., 5 F.3d at 184. In its most recent visit to the issue, this circuit reiterated that "the well-established precedent of this circuit requires that a civil RICO plaintiff alleging mail or wire fraud plead reliance, that is, that a defendant made fraudulent misrepresentations to the plaintiff on which the plaintiff relied." Brown, 492 F.3d at 643.

---

proximate cause of the alleged injury to his business or property.") (emphasis in original); Bank of China, N.Y. Branch v. NBM LLC, 359 F.3d 171, 176 (2d Cir. 2004), cert. dismissed, 546 U.S. 1026, 126 S. Ct. 675, 163 L. Ed. 2d 545 (2005) ("It is well established in this Circuit that where mail fraud is the predicate act for a civil RICO claim, the proximate cause element articulated in Holmes requires the plaintiff to show reasonable reliance."); Summit Props. Inc. v. Hoechst Celanese Corp., 214 F.3d 556, 562 (5th Cir. 2000) ("when civil RICO damages are sought for injuries resulting from fraud, a general requirement of reliance by the plaintiff is a commonsense liability limitation"); Appletree Square I, Ltd. P'ship v. W.R. Grace & Co., 29 F.3d 1283, 1286 (8th Cir. 1994) ("In order to establish injury to business or property 'by reason of' a predicate act of mail or wire fraud, a plaintiff must establish detrimental reliance on the alleged fraudulent acts.").

11

In a series of orders, this Court granted motions filed by various defendants to dismiss Flowers' amended complaint on the grounds that she failed to satisfy the standing requirement for the federal RICO claim.[5]  Thereafter, the Plaintiff sought and was granted permission to amend her complaint in order to cure deficiencies identified by the Court.  The gravamen of the instant motion is that the amended complaint also falls short of the pleading requirements for such a claim. According to the pleadings, Milliman, Inc., of which Sanders is a principal, provided actuarial analysis and audits, loss and expense reserve evaluations and consulting services for ROA, DIR and others.  Specifically, the Milliman Defendants assert that the Commissioner has failed to allege reliance on acts of mail or wire fraud committed by them.  In response, Flowers points to certain paragraphs of the 332-allegation amended complaint:

> ¶ 160   On information and belief, the Milliman Defendants were aware that DIR and ROA were under-reserved as early as December 1999.
>
> ¶ 162   The Defendants, Milliman and Sanders, were aware of the improper and arbitrary write-down of reserves as described herein and were under a duty to report the same to the Boards of Directors of the RRGs but failed to do so.
>
> ¶ 163   The Board of Directors of the RRGs, in reliance on the misrepresentations and suppressions by the Management Defendants [Kenneth R. Patterson, Carolyn B. Hudgins, John William "Bill" Crews, Gordon D. McLean and Judith A. Kelley], Director and Officer Defendants [Patterson, Crews, Hudgins, Kelley and Richard W.E. Bland] and the RICO Defendants [Patterson; Crews; Hudgins; Kelley; Bland; Tom N. Kellogg; Thomas M. Reindel; Victoria J. Seeger; Christopher J. Migel; Richard Witkowski; General Reinsurance Corporation; Crews & Hancock, P.L.C.; and Atlantic Security, Ltd.], Milliman and Sanders of the fraudulent and improper write-down of the reserves of DIR refrained from taking affirmative steps to

---

[5] Applying Sixth Circuit precedent, this Court held in its previous orders that "[w]ith respect to . . . injury as a result of alleged fraudulent conduct by [the moving Defendants], the Plaintiff has not demonstrated that *the RRGs* relied to *their* detriment on misrepresentation or omissions alleged herein that were directed to *them*."  (See e.g. Order Granting Mot. of Defs. John William Crews, Judith A. Kelley & Gordon D. McLean to Dismiss Fed. RICO Claims & Granting Pl.'s Req. to Am. Compl. at 20) (emphasis in original).

minimize or eliminate damage to the RRGs and its policyholders. Had it been apprised of the true facts, the Boards of Directors of the RRGs would have taken several steps. The failure of the RRGs Boards of Directors to take these steps in 1998, 1999, 2000 and 2001 resulted in damage to the Companies and its policyholders. The following actions would have been taken by the Board of Directors of DIR, ANLIR and TRA but for the deceit practiced upon it by the Management Defendants, Director and Officer Defendants, RICO Defendants, Milliman and Sanders.

   a. Each RRG would have conducted an investigation of the circumstances surrounding the fraudulent transaction, identified the culpable parties (identified in this Amended Complaint as the Management Defendants) and replaced them.

   b. Each RRG would have conducted an audit of the reserves and all monies held by FVR.

   c. Each RRG would have ensured that all monies of the other RRGs held by FVR would be unaffected by losses experienced by the other RRGs.

   d. Each RRG would have informed the Tennessee and Virginia regulators of the impropriety of the transaction.

   e. Each RRG would have ceased writing any new business.

   f. Each RRG would have sought to procure reinsurance for its direct book of business without respect to arrangements that may have existed for other RRGs.

¶ 164 The failure of the Boards of Directors of the RRGs to take these steps directly resulted in damage to the RRGs and its policyholders. Had the Boards of Directors of the RRGs taken these steps (or any one of them) the fraud practiced by the Management Defendants identified herein, and Milliman and Sanders would have been interrupted much earlier than it was and it is the contention of the Receiver that ANLIR could have been saved and many millions of dollars in losses prevented for both the Company and its policyholders.

¶ 190 On information and belief, on January 24, 2002, ROA's Senior Vice President Actuarial used wire communication to inform Milliman's Pete Wick and Robert L. Sanders that a "unique loss ratio cap of 130% or greater" would be put in place. This communication was copied to Hudgins and

13

Patterson.

¶ 191   On February 19, 2002, Sanders used wire communication to acknowledge to Patterson that Bland had briefed Sanders on the effects of the Loss Portfolio Transfer, and had informed Sanders of the 2000 Unreported Side Agreement and the proposed new side agreement (the "2002 Unreported Side Agreement"). Sanders' wire communication asked Patterson for copies of the side agreements, which Bland provided to Sanders by facsimile transmission dated February 20, 2002.

¶ 192   On February 27, 2002, Defendant Sanders issued his statement of Actuarial Opinion for ROA, for the year ended December 31, 2001. At page 3, paragraph 5, Sanders represented:

My opinion on the loss and loss adjustment expense reserves net of ceded reinsurance assumes that all ceded reinsurance is valid and collectible. The Company has represented to me that it knows of no uncollectible reinsurance cessions. I am not aware of any reinsurance that the Company treated as collectible but should have treated as uncollectible. This does not imply an opinion on the financial conditions of the Company's reinsurers. I have not anticipated any contingent liabilities that could arise if the reinsurers do not meet their obligations to the Company as reflected in the date and other information provided to me.

¶ 193   On page 4 of the opinion, Sanders discussed various risk factors, including: "If the Company's reinsurance protection does not respond to adverse reserve deviation, such deviation could materially affect the Company's surplus." He did not mention, however, the proposed 2002 Unreported Side Agreement or its $135 million aggregate cap, of which he had actual knowledge. Defendant Sanders did not, in evaluating net reserves, address the impact of the proposed 2002 Unreported Side Agreement or its $135 million aggregate cap on the ceded reinsurance.

¶ 194   Although the 2002 Unreported Side Agreement had not been finalized as of the date of the Statement of Actuarial Opinion signed by Sanders, he had knowledge of its impending implementation. More importantly, Sanders did not mention the 2000 Unreported Side Agreement and its $140 million cap and attendant impact on reserves as of December 31, 2001. This Agreement was in effect and was known to Sanders and Milliman. Since the 2000 Unreported Side Agreement made material changes to existing reinsurance contracts, Sanders and Milliman should have questioned the accounting treatment of the affected reinsurance contracts. Statement of Statutory Accounting Practices 62 ("SSAP 62," which is a statutory implementation of Financial Accounting Standards 113 ("FAS 113")) requires that reinsurance contracts that undergo material changes be treated as deposit accounting, nor

the more favorable reinsurance accounting. The implementation of a cap on a contract would be such a material change.

¶ 195   Despite knowledge of the 2002 Unreported Side Agreement and its $135 million aggregate cap, Defendants Milliman and Sanders never disclosed these as a material change in the assumptions previously employed by them in providing an opinion on the adequacy of reserves of ROA or the RRGs. Nor did Milliman or Sanders ever determine, or disclose, the additional amount of reserves that would be necessary as a consequence of the 2002 Unreported Side Agreement and its $135 million aggregate cap. The failure of Milliman and Sanders to disclose this information led to major problems for ROA and the RRGs.

¶ 227   The Boards of Directors of DIR, ANLIR and TRA relied to the detriment of their Company and their policyholders on the misrepresentations made by the RICO Defendants. The Management Defendants as described herein falsified financial reports presented to the RRG's Boards of Directors with the intent that the RRG's Boards would rely on the misrepresentations. Similarly, the Management Defendants, Director and Officer Defendants and RICO Defendants executed sham reinsurance contracts with the full knowledge and intent that the 2002 side agreement would be secreted from the Boards of Directors of the RRGs. The Management Defendants, Director and Officer Defendants, RICO Defendants, and Milliman Defendants upon information and belief, actively discussed among themselves the misleading nature of the 2002 Unreported Side Agreement to the reinsurance contract reported in the financials of ROA and each of the RRGs. The Management Defendants, Director and Officer Defendants, RICO Defendants and Milliman Defendants knew that the reinsurance contracts, with the 2002 Unreported Side Agreement, were executed for the purpose of deceiving (1) regulators, (2) the Boards of Directors of DIR, ANLIR and TRA, and (3) the public (policyholders, A.M. Best, etc.).

¶ 228   The 2002 Unreported Side Agreement should have been presented to the Boards of Directors of each RRG at each and every quarterly board meeting.

¶ 229   To the contrary, this information was withheld from the Board of Directors of the RRGs at the board meetings and in the financial reports of the RRGs and ROA. Indeed, the delivery of the written reinsurance agreement between ROA and Gen Re to the Boards of Directors of the RRGs amounted to a fraudulent misrepresentation by the Management Defendants, Director and Officer Defendants and RICO Defendants to the Boards of Directors of the RRGs. It was the intent and purpose of the Management Defendants, Director and Officer Defendants and RICO Defendants to induce and obtain the reliance of the Board of Directors of each RRG upon the written reinsurance agreement without disclosure of the 2002 Unreported Side Agreement.

Several of the referenced allegations allege wrongful acts by numerous Defendants. These allegations fail to aver that *Milliman, Inc. and/or Sanders* in particular made any material misrepresentation or omission *directly to the RRGs, their policyholders, or to the Plaintiff herself as a regulator.*[6] See Piccone v. Bd. of Dir. of Doctors Hosp. of Staten Island, Inc., 97 Civ. 8182(MBM), 2000 WL 1219391, at *6 (S.D.N.Y. Aug. 28, 2000) ("in cases with multiple defendants, Rule 9(b) requires that the complaint allege facts that specify each defendant's connection to the fraud. General allegations against a group of defendants are insufficient"); Adler v. Berg Harmon Assoc., 790 F. Supp. 1222, 1228 (S.D.N.Y. 1992) ("Plaintiffs cannot satisfy Rule 9(b) by masking the lack of factual allegations against each defendant through broad allegations which combine the acts of several defendants to create the impression that all engaged in every aspect of the alleged fraud"). Thus, Flowers has failed to adequately plead that the "[f]raud connected with [the] mail or wire fraud . . . involve[d] misrepresentations or omissions flowing from the defendant to the plaintiff." Paycom Billing Serv., Inc., 212 F. Supp. 2d at 736; see also Cent. Distrib., 5 F.3d at 184.

Moreover, the Plaintiff has failed to sufficiently plead detrimental reliance on alleged misrepresentations made by the Milliman Defendants. While she alleges that misrepresentations were made in an actuarial opinion prepared by the Milliman Defendants for ROA for the year ending December 31, 2001, Flowers fails to set forth with particularity facts showing specifically the who, what, when, where, and how of the fraud and of the reliance thereon by the injured party. See Sanderson, 447 F.3d at 877 (Rule 9(b) requires the plaintiff to specify the "who, what, when, where,

---

[6]Indeed, it appears Flowers lacks standing to sue based on alleged misrepresentations to anyone but herself, as the Sixth Circuit has rejected the notion that mail or wire fraud directed at a third party can form the basis of a RICO claim. See Brown, 492 F.3d at 645 n.2 ("Our court has explicitly rejected this approach, requiring that a plaintiff be the target of any alleged fraud").

16

and how of the alleged fraud"); Coffey, 2 F.3d at 162 (plaintiff must allege at a minimum time, place and content of misrepresentation); Blount Fin. Serv., Inc., 819 F.2d at 152 ("Fraud alleged in a RICO civil complaint for mail fraud must state with particularity the false statement of fact made by the defendant which the plaintiff relied on and the facts showing the plaintiff's reliance on defendant's false statement of fact."); see also Dowling v. Select Portfolio Serv., Inc., No. 2:05-CV-049, 2006 WL 571895, *7 (S.D. Ohio Mar. 7, 2006) ("the plaintiff must plead the element of reliance with particularity."); Evans, 434 F.3d at 852-53 (affirming dismissal of fraud action where plaintiff failed to plead reliance with particularity as required by Rule 9(b)); McGee v. City of Warrensville Heights, 16 F. Supp. 2d 837, 850 (N.D. Ohio 1998) (dismissing RICO action where complaint failed to allege misrepresentations or reliance with particularity); Gould, Inc. v. Mitsui Mining & Smelting Co., Ltd., 750 F. Supp. 838, 842-43 (N.D. Ohio 1990) (finding that both the false statement or omission and the reliance thereon by the plaintiff must be pled with particularity in civil RICO action based on mail or wire fraud). Because the amended complaint does not plead reliance with particularity, the § 1962(c) claim against these Defendants must be DISMISSED. See Brown, 492 F.3d at 646 (finding that failure of complaint to contain allegations of reliance by plaintiff on misrepresentations by defendants fatal to RICO claim).[7]

II. Violation of RICO, 18 U.S.C. § 1962(d)

Flowers also alleges that the Milliman Defendants violated 18 U.S.C. § 1962(d), which

---

[7]As she has done in response to previous motions to dismiss in this case, Flowers argues for adoption by this Court of the so-called "target theory" espoused by some circuits which permits a RICO plaintiff to base her claim on mail or wire fraud directed at a third party. See Procter & Gamble Co. v. Amway Corp., 242 F.3d 539, 565 (5th Cir. 2001). However, as the Sixth Circuit noted in Brown, "[o]ur court has explicitly rejected this approach, requiring that a plaintiff be the target of any alleged fraud." Brown, 492 F.3d at 645 n.2.

17

prohibits conspiracy to violate the section's other substantive provisions.[8] 18 U.S.C. § 1962(d). The standing requirement of 18 U.S.C. § 1964(c) applies to all claims brought pursuant to RICO, including conspiracy claims under § 1964(d). Beck v. Prupis, 529 U.S. 494, 500-01, 120 S. Ct. 1608, 1613-14, 146 L. Ed. 2d 561 (2000). Accordingly, to have standing to pursue a civil RICO conspiracy claim, the Commissioner must allege "'injur[y] by reason of' a 'conspiracy.'" See id. (quoting 18 U.S.C. §§ 1964(c), 1962(d)). In Beck, the United States Supreme Court held "that a person may not bring suit under § 1964(c) predicated on a violation of § 1962(d) for injuries caused by an overt act [in furtherance of the racketeering conspiracy] that is not an act of racketeering or otherwise unlawful under the statute." Beck, 529 U.S. at 507, 120 S. Ct. at 1617. Thus, to state a claim for civil RICO conspiracy under § 1964(c), the Plaintiff must allege that injury as a proximate result of an overt act in furtherance of the conspiracy that is *itself* an act of racketeering activity or otherwise unlawful under RICO.[9]

Although the amended complaint does not specifically identify the conspiratorial acts engaged in by the movants, the Court, for purposes of this motion, assumes that such acts encompass the racketeering acts of mail and wire fraud alleged elsewhere in the amended complaint. However, as discussed above, the amended complaint fails to allege injury as a proximate result of those racketeering acts because it does not plead with particularity facts demonstrating reliance. See

---

[8]Specifically, the statute provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

[9]Thus, under Beck and Holmes, § 1964(c) requires that racketeering acts proximately cause the injury complained of by a civil RICO plaintiff in actions pursuant to both §1962(c) and § 1962(d). Cf. Elkins v. Chapman, 36 F.App'x 543, 544 (6th Cir. 2002) ("In order to state a claim under § 1962(c), a complaint must allege that an act of racketeering activity was the cause of the injury."); see also Jones v. Enter. Rent A Car Co. of Tex., 187 F. Supp. 2d 670, 678 (S.D. Tex. 2002) (dismissing plaintiff's RICO claims pursuant to § 1962(a),(b), (c) and (d) where the complaint failed to allege that the defendants' commission of wire fraud, mail fraud, and institutional fraud proximately caused her injuries).

18

Central Distrib., 5 F.3d at 184; Chaz Constr., L.L.C., 137 F.App'x at 735.  Because the amended complaint insufficiently pleads with respect to the substantive RICO violation under prevailing Sixth Circuit precedent, Flowers lacks standing pursuant to § 1964(c).  Accordingly, her § 1962(d) claims against these Defendants must be DISMISSED.  See Chaz Constr., LLC, 137 F.App'x at 739 (holding, without identifying the particular RICO claim at issue, that a "plaintiff[] must plead reliance in order to establish standing in a civil RICO case").

### III.   Remaining State Law Claims.

The exercise by a district court of supplemental, or pendent, jurisdiction over state law claims is governed by 28 U.S.C. § 1367, which expressly permits the Court to decline the exercise of jurisdiction when it has dismissed all claims over which it has original jurisdiction.  28 U.S.C. § 1367(c)(3).  Absent any remaining federal claims against the Milliman Defendants, the Court, in its sound discretion, hereby dismisses without prejudice the Plaintiff's claims against them under state law.  See Weeks v. Portage County Executive Offices, 235 F.3d 275, 279-80 (6th Cir. 2000) (district court's decision to decline to exercise supplemental jurisdiction lies within its sound discretion).

### IV.   Further Amendment of Complaint.

Finally, Plaintiff's response contains a footnote which states that she "reserves the right to file a Third Amended Complaint should the Court find that plaintiff's RICO allegations are insufficient."  (Pl. Paula A. Flowers' Resp. to the Defs. Milliman, Inc. and Robert L. Sanders' Mot. to Dismiss Deputy Receiver Flowers' Am. Compl. at 19 n.12)  However, the right to file a third amended complaint is not Flowers' to reserve.  Motions to amend a complaint are governed by Rule 15 of the Federal Rules of Civil Procedure, which permits amendment *"once* as a matter of course. . . . Otherwise, a party may amend the party's pleading only by leave of court or by written consent

19

of the adverse party." Fed. R. Civ. P. 15(a) (emphasis added).  Since the Milliman Defendants oppose in their reply the granting of permission to again amend the complaint, Flowers may only amend her complaint with leave of the Court.

While it is true leave to amend "shall be freely given when justice so requires," see Fed. R. Civ. P. 15(a), denial of such a request may be warranted where there exists "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment." Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962); Morse v. McWhorter, 290 F.3d 795, 800 (6th Cir. 2002).  Here, despite 332 allegations, the Plaintiff is still unable to adequately plead her RICO claim and the Court frankly remains unconvinced that another bite at the apple would yield a different result.  Leave to amend is, therefore, DENIED. See Odyssey Re (London) Ltd., 85 F. Supp. 2d at 304 n.27 (in case involving dismissal of RICO mail and wire fraud claims, leave to amend denied where "plaintiff has already had an opportunity to replead after specific warnings as to a complaint's deficiencies").

## CONCLUSION

Based on the foregoing, the motion of Defendants Milliman, Inc. and Sanders to dismiss the amended complaint is hereby GRANTED and leave to amend the complaint is DENIED.

**IT IS SO ORDERED** this 28th day of September, 2007.

                                           s/ J. DANIEL BREEN
                                           UNITED STATES DISTRICT JUDGE